# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
### Case No. 1:15-CV-732

| | |
|---|---|
| Burke Bowers, Robert Sims, Erik Gavidia, Stephanie Gavidia, Stacy Holstein, Jeffrey Stauffer, and Kerri Greaner, individually and as representatives of classes of similarly situated persons, and on behalf of the BB&T Corporation 401(k) Savings Plan,<br><br>                Plaintiffs,<br><br>v.<br><br>BB&T Corporation, the BB&T Corporation Employee Benefits Plan Committee, the BB&T Corporation Board of Directors, the Compensation Committee of the Board of Directors of BB&T Corporation, John P. Howe, Anna R. Cablik, Edwin H. Welch, Eric C. Kendrick, Louis B. Lynn, Tollie W. Rich, Steve Reeder, Cindy Powell, Sterling Capital Management LLC, and John Does 1–40,<br><br>                Defendants. | **COMPLAINT – CLASS ACTION** |

## INTRODUCTION

1.     Plaintiffs Burke Bowers, Robert Sims, Erik Gavidia, Stephanie Gavidia, Stacy Holstein, Jeffrey Stauffer, and Kerri Greaner ("Plaintiffs"), individually and as representatives of the classes described herein, and on behalf of the BB & T Corporation 401(k) Savings Plan (the "Plan"), bring this class action against the Plan's fiduciaries, Defendants BB&T Corporation ("BB&T"), the BB&T Corporation Employee Benefits Plan Committee and its members and delegates, the BB&T Board of Directors, the

1

Compensation Committee of the Board of Directors of BB&T Corporation and its members and delegates, John P. Howe, Anna R. Cablik, Edwin H. Welch, Eric C. Kendrick, Louis B. Lynn, Tollie W. Rich, Steve Reeder, Cindy Powell, Sterling Capital Management LLC ("Sterling Capital"), and John Does 1–40 (who are members of the Defendant committees or otherwise believed to be fiduciaries to the Plan). Based upon Defendants' breaches of their fiduciary duties and their engagement in prohibited transactions in violation of the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001, *et seq.* ("ERISA"), Plaintiffs seek to recover the financial losses suffered by the Plan and to obtain injunctive and other equitable relief from Defendants.

2. This case is about an employer's self-dealing and imprudent decision-making in the management of its retirement plan.

3. ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other fiduciaries of the Plan. 29 U.S.C. § 1104(a)(1). These fiduciary duties are "the highest known to the law." *Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 356 (4th Cir. 2014) (citation and quotation marks omitted). Fiduciaries must act "solely in the interest of the participants and beneficiaries." 29 U.S.C. § 1104(a)(1).

4. BB&T does not act in the best interest of its employees and Plan participants. Instead, BB&T treats its 401(k) Plan as an opportunity to maximize company profits at the expense of Plan participants, by (among other things) charging Plan participants excessive fees and then recouping those fees as profits.

2

5. BB&T is the Plan's sponsor, recordkeeper, custodian, and primary investment manager. Defendants have loaded the plan with high-cost mutual funds run by BB&T's wholly-owned subsidiary, Sterling Capital, which is also a participating employer in the Plan. Sterling Capital then pays a large portion of the investment management fees it receives back to BB&T, ostensibly for the recordkeeping and custodial services that BB&T provides to the Plan, but in actuality the payments are two to three times greater than the costs BB&T actually incurs to provide those services. The rest is profit. Defendants' prioritization of BB&T's profits over prudent management of the Plan has cost Plan participants tens of millions of dollars in excess expenses, and constitutes a breach of Defendants' fiduciary duties of prudence and loyalty that they owed to Plan participants. Defendants' various forms of self-dealing also constitute prohibited transactions with a party-in-interest and a fiduciary in violation of 29 U.S.C. § 1106(a) and (b) and illegal inurement of Plan assets for the benefit of an employer under 29 U.S.C. § 1103(c)(1).

6. Defendants' mismanagement of the Plan extends beyond their failure to adequately control Plan costs. Defendants have also failed to remove poor performing investments from the Plan, in breach of their fiduciary duties. For example, the BB&T Large Cap Fund has been a poor performing mutual fund for decades. By 2009, it had underperformed its benchmark index by over two percent per year over the past decade, and had fallen short of its benchmark index in six of the past seven calendar years. Despite its terrible performance, Defendants kept the fund in the Plan because of the

3

revenue the fund generated for BB&T, and the results have been predictably poor for Plan participants, costing them at least $24 to $32 million over the past six years.

7.     Defendants also have mismanaged the Plan's fixed investments, keeping funds in a money market fund that has produced virtually no earnings for the past six years, despite the availability of stable value funds that would have earned Plan participants millions more in earnings each year without an increase in risk. Defendants also retained the Plan's investment in a BB&T deposit account, despite its low yields and the availability of superior investment alternatives.

8.     Based on this conduct, Plaintiffs, individually and on behalf of the proposed classes, assert claims against Defendants for breach of the fiduciary duties of loyalty and prudence (Count One), engaging in prohibited transactions with a party in interest (Count Two) and a plan fiduciary (Count Three), and unlawful inurement of plan assets to the benefit of an employer (Count Four).

## JURISDICTION AND VENUE

9.     Plaintiffs bring this action pursuant to 29 U.S.C. § 1132(a)(2) and (3), which provide that participants in an employee retirement plan may pursue a civil action on behalf of the plan to remedy breaches of fiduciary duties and other prohibited conduct, and to obtain monetary and appropriate equitable relief as set forth in 29 U.S.C. § 1109.

10.     This case presents a federal question and therefore this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1)(F).

4

11.     Venue is proper pursuant to 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because this is the district where the plan is administered, where the breaches of fiduciary duties giving rise to this action occurred, and where Defendants may be found.

## THE PARTIES

### Plaintiffs

12.     Plaintiff Burke Bowers is a former participant in the Plan within the meaning of 29 U.S.C. §§ 1002(7) and 1132(a)(2)–(3), and is a resident of Abingdon, Maryland.

13.     Plaintiff Robert Sims is a former participant in the Plan within the meaning of 29 U.S.C. §§ 1002(7) and 1132(a)(2)–(3), and is a resident of Hampton, Georgia.

14.     Plaintiff Erik Gavidia is a current participant in the Plan within the meaning of 29 U.S.C. §§ 1002(7) and 1132(a)(2)–(3), and is a resident of Wake Forest, North Carolina.

15.     Plaintiff Stephanie Gavidia is a former participant in the Plan within the meaning of 29 U.S.C. §§ 1002(7) and 1132(a)(2)–(3), and is a resident of Wake Forest, North Carolina.

16.     Stacy Holstein is a former participant in the Plan within the meaning of 29 U.S.C. §§ 1002(7) and 1132(a)(2)–(3), and is a resident of Atlanta, Georgia.

17.     Jeffrey Stauffer is a former participant in the Plan within the meaning of 29 U.S.C. §§ 1002(7) and 1132(a)(2)–(3), and is a resident of Sykesville, Maryland.

18.     Kerri Greaner is a current participant in the Plan within the meaning of 29

5

U.S.C. §§ 1002(7) and 1132(a)(2)–(3), and is a resident of Pembroke Pines, Florida.

## The Plan

19.     BB&T is the "plan sponsor" of the BB&T Corporation 401(k) Savings Plan within the meaning of 29 U.S.C. § 1002(16)(B).

20.     The Plan is an "employee pension benefit plan" within the meaning of 29 U.S.C. § 1002(2)(A) and a "defined contribution plan" within the meaning of 29 U.S.C. § 1002(34).

21.     The Plan is a qualified plan under 26 U.S.C. § 401 and is commonly referred to as a "401(k) plan."

22.     The Plan was established on July 1, 1982, amended and restated as of January 1, 2007, and amended and restated again as of January 1, 2013.

23.     The Plan covers eligible employees and former employees of BB&T.

24.     BB&T acted as the Plan's trustee and recordkeeper throughout the applicable statutory period.

## Defendants

25.     BB&T is one of the largest financial services holding companies in the United States, offering a full range of consumer and commercial banking, securities brokerage, investment banking, insurance, trust, lending, and investment management services.  Based in Winston-Salem, North Carolina, BB&T and its subsidiaries have locations throughout the United States.

26.     Defendant BB&T Corporation Employee Benefits Plan Committee

6

(hereinafter, with its members and delegates, the "EBPC") is responsible under Section 8.1 of the Plan Document "for the general administration and interpretation of the plan" and has administered the Plan at all relevant times during the statutory period. The Chairman of the EBPC is designated as the plan administrator in Section 8.1 of the Plan Document. The EBPC, and specifically the Chairman of the EBPC, are named fiduciaries under Section 10.1.2–.3 of the Plan Document and the Summary Plan Description, tasked with administration of the Plan. Members of the EBPC are appointed by the Board of Directors of BB&T Corporation.

27.      The EBPC and the Chairman of the EBPC are designated in Section 8.1 of the Plan Document as the "administrator" of the Plan under 29 U.S.C. § 1002(16)(A) and are fiduciaries of the Plan under 29 U.S.C. § 1102(a).

28.      The members of the EBPC, including the Chairman, are also fiduciaries of the Plan under 29 U.S.C. § 1002(21)(A) because they exercised discretionary authority and/or discretionary control respecting the management of the Plan, and had discretionary authority and/or discretionary responsibility for the administration of the Plan. The Chairman and other members of the EBPC are currently unknown to Plaintiffs, and those individuals are therefore collectively named as John Does 1–10. Plaintiffs will substitute the names of the John Does when they become known.

29.      Any individual or entity to whom the EBPC delegated any of its fiduciary functions or responsibilities are also fiduciaries of the Plan under 29 U.S.C. § 1002(21)(A). Because the individuals and/or entities that have been delegated fiduciary

7

responsibilities by the EBPC are not currently known to Plaintiffs, they are collectively named as John Does 11–20.

30. Defendant Steve Reeder is or was at all relevant times the Benefits Director at BB&T. Reeder is a delegate of the EBPC, and in that capacity, signed the Plan's Form 5500, filed with the Department of Labor, for 2009, 2010, 2011, 2012, and 2013.

31. Defendant Cindy Powell is the Corporate Controller for BB&T. Powell acted as a delegate of BB&T in management and administration of the Plan, and in that capacity, has signed the Plan's Form 5500's, filed with the Department of Labor, for 2009, 2010, 2011, 2012, and 2013.

32. Defendant Compensation Committee of the BB&T Corporation Board of Directors (hereinafter, with its members and delegates, the "Compensation Committee") is a named fiduciary of the Plan in Section 10.1.5 of the Plan Document and the Summary Plan Description, and is tasked with the duty of selecting, monitoring, and removing investment options within the Plan and with adopting an investment policy statement, and at all relevant times herein served in this capacity. BB&T's Bylaws provide that the Compensation Committee shall be composed of not less than three members of the BB&T Board of Directors ("Board"), each of whom shall be elected by a majority of the Board. Committee members are appointed annually by the Board and may also be replaced by the Board. Current members of the Compensation Committee are individual Defendants John P. Howe, Anna R. Cablik, Edwin H. Welch, Eric C. Kendrick, Louis B. Lynn, and Tollie W. Rich. Former members of the Compensation

8

Committee are not currently known to Plaintiffs and are collectively named as John Does 21–30.

33.     The Compensation Committee is a fiduciary of the Plan pursuant to 29 U.S.C. § 1002(21) because it exercised discretionary authority or discretionary control respecting management of the Plan, and exercised authority or control respecting management or disposition of the Plan's assets.

34.     Any individual or entity to whom the Compensation Committee delegated any of its fiduciary functions or responsibilities is also a fiduciary of the Plan under 29 U.S.C. §§ 1002(21)(A) & 1105(c).  Because the individuals and/or entities that have been delegated fiduciary responsibilities by the Compensation Committee are not currently known to Plaintiffs, they are collectively named as John Does 31–40.

35.     The BB&T Corporation Board of Directors is a named fiduciary of the Plan in Section 10.1.1 of the Plan Document and is responsible for appointing and removing members of the EBPC and the Compensation Committee.  The Board is also given authority to appoint and remove trustees of the Plan.

36.     Defendant Sterling Capital Management, LLC ("Sterling Capital") is a wholly-owned subsidiary of BB&T and is a participating employer in the Plan.  Sterling Capital is a "party in interest" pursuant to 29 U.S.C. § 1002(14)(C) & (G), given that it is an employer of employees covered by the Plan and is more than 50 percent owned by BB&T, also an employer with employees in the Plan.  Sterling Capital is a fiduciary of the Plan pursuant to 29 U.S.C. § 1002(21)(A) because it exercises authority or control

respecting management or disposition of Plan assets when it negotiates the payment of revenue sharing and/or indirect compensation payments to BB&T from Plan assets.

37.     Pursuant to 29 U.S.C. § 1002(16)(B), BB&T is the Plan sponsor.

38.     BB&T also serves as the Plan's recordkeeper, trustee, and primary service provider, and thus is a "party in interest" under 29 U.S.C. § 1002(14).  BB&T, acting through its Board of Directors, is a fiduciary to the Plan because it is responsible for appointing and removing members of the EBPC and the Compensation Committee that administer the Plan and select the Plan's investment options.

39.     BB&T and the Board are also subject to co-fiduciary liability under 29 U.S.C. § 1105(a)(1)–(3) because they enabled other fiduciaries to commit breaches of fiduciary duties through their appointment powers and failed to remedy breaches of fiduciary duties of which they had knowledge.  Finally, BB&T retains control over the activities of its employees, Board, internal departments, and agents that performed fiduciary functions with respect to the Plan through its power to appoint, terminate, and determine levels of compensation at will.  BB&T is therefore liable for the fiduciary breaches alleged herein of its employees, Board, internal departments, and agents.

## ERISA FIDUCIARY DUTIES AND PROHIBITED TRANSACTIONS

40.     ERISA imposes strict fiduciary duties of loyalty and prudence upon Defendants as fiduciaries of the Plan.  29 U.S.C. § 1104(a)(1) states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—
>
> > (A)     For the exclusive purpose of

        (i)       Providing benefits to participants and their beneficiaries; and

        (ii)      Defraying reasonable expenses of administering the plan;

    (B)    With the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

41.     These fiduciary duties owed by "those responsible for the administration of employee benefit plans and the investment and disposal of plan assets . . . to the participants and beneficiaries of an ERISA plan are the highest known to the law." *Tatum*, 761 F.3d at 355–56.

42.     The duty of loyalty requires fiduciaries to act with an "eye single" to the interests of plan participants. *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000). "Perhaps the most fundamental duty of a [fiduciary] is that he must display . . . complete loyalty to the interests of the beneficiary and must exclude all selfish interest and all consideration of the interests of third persons." *Id.* at 224 (quotation marks and citations omitted). Thus, "in deciding whether and to what extent to invest in a particular investment, a fiduciary must ordinarily consider *only* factors relating to the interests of plan participants and beneficiaries . . . . A decision to make an investment may not be influenced by [other] factors unless the investment, when judged *solely* on the basis of its economic value to the plan, would be equal or superior to alternative investments available to the plan." Dep't of Labor ERISA Adv. Op. 88-16A (Dec. 19, 1988) (emphasis added).

43.     ERISA also "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v.*

*Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted).  In addition to a duty to

select prudent investments, under ERISA a fiduciary "has a continuing duty to monitor

[plan] investments and remove imprudent ones" that exists "separate and apart from the

[fiduciary's] duty to exercise prudence in selecting investments." *Tibble v. Edison Int'l*,

135 S. Ct. 1823, 1828 (2015).  If an investment is imprudent, the plan fiduciary "must

dispose of it within a reasonable time." *Id.* (quotation omitted).  Therefore, "a fiduciary

cannot free himself from his duty to act as a prudent man simply arguing that other

funds" available within the plan could have "theoretically . . . create[d] a prudent

portfolio." *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 423 (4th Cir. 2007).

44.     Failing to closely monitor and subsequently minimize administrative

expenses wherever possible by surveying the competitive landscape and leveraging the

plan's size to reduce fees, constitutes a breach of fiduciary duty.  *Tussey v. ABB, Inc.*, 746

F.3d 327, 336 (8th Cir. 2014).  Similarly, selecting higher-cost investments because they

benefit a party in interest constitutes a breach of fiduciary duties when similar or identical

lower-cost investments were available.  *Braden v. Wal-Mart Stores*, 588 F.3d 585, 596

(8th Cir. 2009).

45.     The Supreme Court has noted that the legal construction of an ERISA

fiduciary's duties is "derived from the common law of trusts." *Tibble*, 135 S. Ct. at 1828.

Therefore "[i]n determining the contours of an ERISA fiduciary's duty, courts often must

look to the law of trusts." *Id.*  In fact, the duty of prudence imposed under 29 U.S.C. §

12

1104(a)(1)(B) is a codification of the common law prudent investor rule found in trust

law. *Buccino v. Continental Assur. Co.*, 578 F. Supp. 1518, 1521 (S.D.N.Y. 1983).

46. Pursuant to the prudent investor rule, fiduciaries are required to "incur only

costs that are reasonable in amount and appropriate to the investment responsibilities of

the trusteeship." Restatement (Third) of Trusts § 90(c)(3) (2007); *see also* Restatement §

90 cmt. b ("[C]ost-conscious management is fundamental to prudence in the investment

function."). The Introductory Note to the Restatement's chapter on trust investment

further clarifies:

> [T]he duty to avoid unwarranted costs is given increased emphasis in the
> prudent investor rule. This is done to reflect the importance of market-
> efficiency concepts and differences in the degrees of efficiency and
> inefficiency in various markets. . . . The duty to be cost conscious requires
> attention to such matters as the cumulation of fiduciary commissions with
> agent fees or the purchase and management charges associated with mutual
> funds and other pooled investment vehicles. In addition, active
> management strategies involve investigation expenses and other transaction
> costs . . . that must be considered, realistically, in relation to the likelihood
> of increased return from such strategies.

Restatement (Third) of Trusts ch. 17, intro. note (2007). Where markets are efficient,

fiduciaries are encouraged to use low-cost index funds. *Id.* § 90 cmt. h(1). While a

fiduciary may consider higher-cost, actively-managed mutual funds as an alternative to

index funds, "[a]ctive strategies . . . entail investigation and analysis expenses and tend to

increase general transaction costs . . . . [T]hese added costs . . . must be justified by

realistically evaluated return expectations." *Id.* § 90 cmt. h(2).

47. In considering whether a fiduciary has breached the duties of prudence and

loyalty, the Court considers both the "merits of a transaction" as well as "the

13

thoroughness of the investigation into the merits of that transaction." *DiFelice*, 497 F.3d at 418 (quotation and citation marks omitted). Mere good faith in executing these duties is not a defense: "a pure heart and an empty head are not enough." *Id.*

48.     The general duties of loyalty and prudence imposed by 29 U.S.C. § 1104 are supplemented by 29 U.S.C. § 1106, which provides a detailed list of transactions that are expressly prohibited and thus constitute *per se* violations of ERISA. 29 U.S.C. § 1106(a)(1) relates to transactions between the plan and parties in interest, providing, in pertinent part, that:

> A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect—
>
> (A)     sale or exchange, or leasing, of any property between the plan and a party in interest;
>
> . . .
>
> (C)     furnishing of goods, services, or facilities between the plan and a party in interst;
>
> (D)     transfer to, or use by or for the benefit of a party in interest, of any assets of the plan . . . .

49.     29 U.S.C. § 1106(b) relates to transactions between the plan and a fiduciary of the plan, providing that:

> A fiduciary with respect to a plan shall not—
>
> (1)     deal with the assets of the plan in his own interest or for his own account;
>
> (2)     in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are

14

adverse to the interests of the plan or the interests of its participants or beneficiaries; or

(3)    receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

50.    ERISA also imposes explicit co-fiduciary duties on plan fiduciaries.  29

U.S.C. § 1105(a) states, in pertinent part, that:

In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:

(1) If he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or

(2) if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(3) If he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

## PRUDENT MANAGEMENT OF AN EMPLOYEE RETIREMENT PLAN

51.    The Plan is a defined-contribution or 401(k) plan, a type of employee

retirement plan in which employees invest a percentage of their earnings on a pre-tax

basis.  The company often matches those contributions up to a certain percentage of the

compensation contributed by the employee each pay period.  For example, within the

Plan, BB&T employees may defer anywhere from 1% to 50% of their compensation on a

pre-tax basis, and BB&T matches those contributions at a rate of 100% for the first 6% of

compensation that an employee contributes.  2015 BB&T Summary Plan Description at

15

4, 6.  Participants direct the investment of these contributions, choosing from among a lineup of options offered by the Plan.  Investment Company Institute, *A Close Look at 401(k) Plans*, at 9, available at https://www.ici.org/pdf/ppr_14_dcplan_profile_401k.pdf (hereinafter "ICI Study").

52.     Fiduciaries are obligated to assemble a diversified menu of investment options.  29 U.S.C. § 1104(a)(1)(C); 29 C.F.R. § 2550.404c-1(b)(1)(ii).  Each investment option is generally a pooled investment product—which includes mutual funds, collective investment trusts, and separate accounts—offering exposure to a particular asset class or sub-asset class.  ICI Study at 7; Ian Ayres & Quinn Curtis, *Beyond Diversification: The Pervasive Problem of Excessive Fees and "Dominated Funds" in 401(k) Plans*, 124 Yale L.J. 1476, 1485 (2015) (hereinafter "*Beyond Diversification*").  The broad asset classes generally include fixed investments, bonds, stocks, and occasionally real estate.  Money market funds, guaranteed investment contracts, and stable value funds are examples of fixed investments.  Bonds are debt securities, which are generally categorized by the issuer/borrower (U.S. Government, foreign governments, municipalities, corporations), the duration of the debt (repayable anywhere between 1 month and 30 years), and the credit risk associated with the particular borrower.  Equity, or stock, investments, are generally defined by three characteristics: (1) where they invest geographically (i.e., whether they invest in domestic or international companies, or both); (2) the size of company they invest in (generally categorized as small cap, mid cap, or large cap); and (3) their investment style, i.e. growth, value, or blend (growth funds invest in fast-

16

growing companies, value funds look for more conservative or established stocks that are more likely to be undervalued, and blend funds invest in a mix of both types of stocks). Balanced funds are a type of fund that invests in a mix of stocks and bonds. Target-date funds assemble a broad portfolio of investments from different asset classes at a risk level that declines over time as the targeted retirement date approaches.

53. Investment funds can be either passively or actively managed. Passive funds, popularly known as "index funds," seek to replicate the performance of a market index, such as the S&P 500, by purchasing a portfolio of securities matching the composition of the index itself. James Kwak, *Improving Retirement Savings Options for Employees*, 15 U. Pa. J. Bus. L. 483, 493 (2013). By following this strategy, index funds produce returns that are very close to the market segment tracked by the index. *Id.* Index funds therefore offer predictability, diversified exposure to a particular asset or sub-asset class, and low expenses. *Id.* Actively managed funds, on the other hand, pick individual stocks and bonds within a particular asset or sub-asset class and try to beat the market through superior investment selection. *Id.* at 485–86. Actively managed funds are typically much more expensive than index funds, but offer the potential to outperform the market (although this potential is typically not realized). U.S. Dep't of Labor, *Understanding Retirement Plan Fees and Expenses*, at 9 (Dec. 2011), available at http://www.dol.gov/ebsa/pdf/undrstndgrtrmnt.pdf.

54. At retirement, employees' benefits "are limited to the value of their own investment accounts, which is determined by the market performance of employee and

employer contributions, less expenses." *Tibble*, 135 S. Ct. at 1826. Maximizing employees' retirement benefits is therefore heavily influenced by two critical, interrelated functions of plan fiduciaries: designing the menu of investment options and minimizing plan expenses.

55.     There are two major categories of expenses within a defined contribution plan: administrative expenses and investment management expenses. Investment Company Institute & Deloitte Consulting LLP, *Inside the Structure of Defined Contribution/401(k) Plan Fees, 2013*, at 17 (Aug. 2014), available at https://www.ici.org/pdf/rpt_14_dc_401k_fee_study.pdf (hereinafter "ICI/Deloitte Study"). Recordkeeping expenses are typically the largest administrative expense, followed by custodial/trustee services related to the actual purchase and holding of monies and securities. Investment management expenses are the fees that are charged by the investment manager, and participants "typically pay these asset-based fees as an expense of the investment options in which they invest." *Id.* On average, 82% of overall fees within a plan are investment expenses, while administrative fees on average make up only 18% of total fees. *Id.* at 17.

56.     Recordkeeping and custodial services are essentially commodities. Eric Droblyen, *Evaluating 401k Providers: Separating Commodity from Value-Added Services*, The Frugal Fiduciary Blog (Feb. 10, 2015), http://blog.employeefiduciary.com/blog/evaluating-401k-providers-separating-commodity-value-added-services (last accessed Aug. 21, 2015). Fiduciaries should

18

therefore select recordkeeping and custodial service providers based upon which provider can provide these services at the lowest cost to the Plan. *Id.*

57. Plan fiduciaries have many tools available to them to monitor and control the plan's administrative costs. First, they can hire consultants to conduct a benchmarking study of the plan's fees and costs compared to other similar plans. *See* Philip Chao, *Fiduciary Considerations in Controlling and Accounting for Plan Administration Fees*, at 16 (January 25, 2014), https://www.chaoco.com/Data/Files/Whack-A-Mole%20-%20Fiduciary%20Considerations%20in%20Plan%20Fees%202014%2001%2025%20Chao%20Co%20S.pdf (hereinafter "*Fiduciary Considerations*") (recommending commission of a benchmarking study every two years); Kathleen McBride, *The $14 Trillion Question: Why Aren't There More Bidding Wars for Service Providers to 401(k) Plans?*, Fiduciary Path Blog (Sept. 5, 2013), http://fiduciarypath.com/2013/09/06/the-14-trillion-question-why-arent-there-more-bidding-wars-for-vendor-services-to-401k-plans/ (last accessed Aug. 18, 2015). Second, a plan may submit a Request for Information (RFI) from both its incumbent service providers and competitors to assess the capabilities and costs of competing providers. The Vanguard Group, *Determining Reasonableness of Retirement Plan Fees*, at 5 (September 2011), http://www.vanguard.com/pdf/planfees.pdf?cbdForceDomain=true (last accessed Aug. 18, 2015). Finally, a Plan can periodically engage in a competitive bidding process by submitting a Request for Proposal (RFP) to multiple service providers. *Id.* at 6; *see also*

19

*George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 799 (7th Cir. 2011) (finding triable issue of fact regarding prudence of defendant's plan management given its failure to engage in a competitive bidding process for plan services). According to the Department of Labor ("DOL"), regular use of each of these tools is the best means of controlling plan costs. Dep't of Labor Employee Benefits Security Administration, *Understanding Retirement Plan Fees and Expenses*, at 11 (December 2011), http://www.dol.gov/ebsa/pdf/undrstndgrtrmnt.pdf; Chao, *Fiduciary Considerations*, at 16.

58. Administrative expenses can be paid directly by employers, directly by the plan, or indirectly as a built-in component of the fees charged for the investment products offered in the plan in a practice known as "revenue sharing." Ayres & Curtis, *Beyond Diversification* at 1486; ICI/Deloitte Study at 16. Fees paid directly to service providers out of the plan assets are referred to as "Direct Compensation"; monies received by service providers pursuant to a revenue-sharing scheme are referred to as "Indirect Compensation." 29 C.F.R. § 2550.408b-2(c)(viii)(B); IRS Form 5500, Schedule C. Most, but not all, forms of direct and indirect compensation are disclosed on Form 5500—the form that must be filed for employee benefit plans under sections 104 and 4065 of ERISA—or in the audited financial statements of ERISA-compliant 401(k) plans. ICI Study at 39.

59. Fiduciaries exercising control over administration of the plan and the selection of core investment options can minimize plan expenses by hiring low-cost

service providers and by selecting a menu of low-cost investment options. This task is made significantly easier the larger a plan gets. Economies of scale generally lower administrative expenses on a per-participant or percentage-of-assets basis. ICI/Deloitte Study at 7, 21. Larger plans also can lower investment management fees by selecting mutual funds only available to institutional investors or by negotiating directly with the investment manager to obtain a lower fee than is offered to mutual fund investors. *See* Consumer Reports, *How to Grow Your Savings: Stop 401(k) Fees from Cheating You Out of Retirement Money* (Aug. 2013), available at http://www.consumerreports.org/cro/magazine/2013/09/how-to-grow-your-savings/index.htm (instructing employees of large corporations that "[y]our employer should be able to use its size to negotiate significant discounts with mutual-fund companies"); U.S. Dep't of Labor, *Study of 401(k) Plan Fees and Expenses*, at 17 (April 13, 1998), https://www.dol.gov/ebsa/pdf/401kRept.pdf (reporting that by using separate accounts and similar instruments, "[t]otal investment management expenses can commonly be reduced to one-fourth of the expenses incurred through retail mutual funds"). Empirical evidence bears this out. In 2012, total plan fees in the average defined contribution plan were 0.91%, but this varied between an average of 1.27% in plans with $1 million to $10 million in assets, and an average of only 0.33% for plans with over $1 billion in assets. ICI Study at 41.

60.     Given the significant variation in total plan costs attributable to plan size, the reasonableness of administrative expenses and investment expenses should be

21

determined by comparisons to other similarly-sized plans. *Cf. Tibble v. Edison Int'l*, 2010 WL 2757153, at *9, 15, 28 (C.D. Cal. July 8, 2010) (evaluating the propriety of particular fees and investment decisions in light of the size of the plan), *rev'd on other grounds*, 135 S. Ct. 1823 (2015); *Tussey v. ABB, Inc.*, 2007 WL 4289694, at *6, *6 n.5 (W.D. Mo. Dec. 3, 2007) (determining that administrative and investment expenses were unreasonable through comparisons to similar plans because "[a]t most, reasonable compensation should mean compensation commensurate with that paid by similar plans for similar services to unaffiliated third parties") (quoting Nell Hennessy, *Follow the Money: ERISA Plan Investments in Mutual Funds and Insurance*, 38 J. Marshall L. Rev. 867, 877 (2005)).

61. With respect to designing the menu of investment options (*see supra* at ¶ 53), a substantial body of academic and financial industry literature provides two critical insights for fiduciaries to consider when selecting investments to be offered within a plan. The first critical insight provided by academic and financial literature is that fiduciaries must carefully tend to their duty of investment menu construction—selecting prudent investments, regularly reviewing plan options to ensure that investment choices remain prudent, and weeding out costly or poorly-performing investments. Plan participants often engage in "naïve diversification," whereby they attempt to diversify their holdings simply by spreading their money evenly among the available funds. Jill E. Fisch & Tess Wilkinson-Ryan, *Why Do Retail Investors Make Costly Mistakes?*, 162 U. Pa. L. Rev. 605, 636–38 (2014) (hereinafter "*Costly Mistakes*"); Shlomo Benartzi & Richard H.

Thaler, *Naïve Diversification Strategies in Defined Constribution Plans*, 91 Am. Econ. Rev. 79, 96 (2001). Additionally, once an initial investment allocation has been chosen, 401(k) participants are prone to inertia, failing to reassess their investment decisions even when presented with evidence suggesting that they should. John Ameriks & Stephen P. Zeldes, *How Do Household Portfolio Shares Vary with Age?*, at 31, 48, Columbia University Working Paper (Sept. 2004) (finding that among group of 16,000 randomly selected TIAA-CREF participants, in a ten-year period, 48 percent of participants made no changes at all to their account and 73 percent of participants made no change to the allocation of existing assets); Julie Agnew *et al.*, *Portfolio Choice and Trading in a Large 401(k) Plan*, 93 Amer. Econ. Rev. 193, 194 (Mar. 2003) (sampling of seven thousand 401(k) accounts showed that 87 percent of 401(k) account holders made no trades in the average year and that the average 401(k) investor makes one trade every 3.85 years). Prudent fiduciaries therefore will limit their menus to only those funds that represent sound long-term investments, and remove imprudent investments rather than trusting participants to move their money out of an imprudent investment.

62. The second critical insight provided by academic and financial industry literature is that in selecting prudent investments, the most important consideration is low fees. Numerous scholars have demonstrated that high expenses are not correlated with superior investment management. Indeed, funds with high fees on average perform worse than less expensive funds even on a *pre-fee basis*. Javier Gil-Bazo & Pablo Ruiz-Verdu, *When Cheaper is Better: Fee Determination in the Market for Equity Mutual*

23

*Funds*, 67 J. Econ. Behav. & Org. 871, 873 (2009); *see also* Fisch & Wilkinson-Ryan,

*Costly Mistakes*, at 1993 (summarizing numerous studies showing that "the most

consistent predictor of a fund's return to investors is the fund's expense ratio").

> [T]he empirical evidence implies that superior management is not priced
> through higher expense ratios. On the contrary, it appears that the effect of
> expenses on after-expense performance (even after controlling for funds'
> observable characteristics) is more than one-to-one, which would imply that
> low-quality funds charge higher fees. Price and quality thus seem to be
> inversely related in the market for actively managed funds.

Gil-Bazo & Ruiz-Verdu, *When Cheaper is Better*, at 883.

63.     While high-cost mutual funds may exhibit positive, market-beating

performance over shorter periods of time, studies demonstrate that this is arbitrary:

outperformance during a particular period is not predictive of whether a mutual fund will

perform well in the future. Laurent Barras et al., *False Discoveries in Mutual Fund*

*Performance: Measuring Luck in Estimated Alphas*, 65 J. Fin. 179, 181 (2010); Mark M.

Carhart, *On Persistence in Mutual Fund Performance*, 52 J. Fin. 57, 57, 59 (1997)

(measuring thirty-one years of mutual fund returns and concluding that "persistent

differences in mutual fund expenses and transaction costs explain almost all of the

predictability in mutual fund returns"). Any sustainable ability to beat the market that

managers do demonstrate is nearly always dwarfed by mutual fund expenses. Eugene F.

Fama & Kenneth R. French, *Luck Versus Skill in the Cross-Section of Mutual Fund*

*Returns*, 65 F. Fin. 1915, 1931–34 (2010); Russ Wermers, *Mutual Fund Performance: An*

*Empirical Decomposition into Stock-Picking Talent, Style, Transaction Costs, and*

*Expenses*, 55 J. Fin. 1655, 1690 (2000). The one exception to the general arbitrariness

and unpredictability of mutual fund returns is that the worst-performing mutual funds show a strong, persistent tendency to continue their poor performance. Carhart, *On Persistence in Mutual Fund Performance*, at 57. Therefore, regardless of where one comes down on the issue of active versus passive investing, a prudent investor should choose only index funds and low-cost actively managed funds whose long-term performance history permits a fiduciary to realistically conclude that the fund is likely to outperform its benchmark index in the future, after accounting for investment expenses. *See* Restatement (Third) of Trusts § 90 cmt. h(2).

## DEFENDANTS' VIOLATIONS OF ERISA IN MANAGING THE BB&T 401(k) PLAN

### I.   DEFENDANTS FAILED TO ADEQUATELY CONTROL PLAN COSTS

64.    As of the end of 2009, the Plan had approximately $1,637,870,000 in assets and 27,435 participants with a balance in their account.

65.    The only investment options originally offered under the Plan were BB&T company stock and mutual funds managed by BB&T. BB&T did not begin offering investment options managed by non-BB&T entities until 2009. *See* Account Statement of Burke Bowers, Page 4, dated December 31, 2008 (listing balance of investments in each Plan investment as of December 31, 2008) (attached to Complaint as **Exhibit A**).

66.    As of the end of 2009, the Plan offered participants the choice of 25 "core" investment options. The core investment options included a company stock fund that invests exclusively in BB&T stock, a fixed account managed by BB&T, a money market mutual fund, one bond mutual fund managed by BB&T, twelve target date funds

25

managed by T. Rowe Price, and nine equity mutual funds, seven of which were managed by BB&T. The Plan also gave participants the option of choosing from a wider array of investments in a Self-Directed Brokerage Account ("SDBA").

67.     As of the end of 2013, the Plan had approximately $2,729,550,000 in assets and 32,008 participants with a balance in their account.

68.     As of the end of 2013, the Plan offered 27 core investment options consisting of a BB&T company stock fund, two fixed accounts, one of which was managed by BB&T, a money market fund, twelve target date funds, a bond fund managed by Sterling Capital, BB&T's wholly owned subsidiary,[1] and ten equity mutual funds, five of which were managed by Sterling Capital. Because of the Plan's history of holding only investment funds owned by BB&T and the general inertia exhibited by 401(k) investors discussed above, over $1 billion in plan assets were invested in Sterling Capital mutual funds. An additional $650 million was held in company stock, and $174 million was held in a fixed account managed by BB&T.

69.     Taking into account all administrative and investment expenses within the Plan, and using 2013 year-end balances—as reported in the most recent Form 5500 filed by the Plan—and publicly available information regarding each investment's expenses (while making certain low-end assumptions regarding the cost of operating the company

---

[1] In 2010, BB&T's mutual funds were re-branded as Sterling Capital Funds, a wholly-owned subsidiary of BB&T, and all management responsibilities were transferred to Sterling Capital Management, LLC, a separate entity that is also wholly-owned by BB&T. All money that participants had previously held in BB&T mutual funds was transferred into the re-branded Sterling Capital Funds.

stock fund and managing separate accounts in the Plan that BB&T does not disclose), Plaintiffs estimate that total plan costs for 2013 were approximately $14.1 million, equal to 0.52% of the $2.73 billion in Plan assets. The total plan cost of 0.52% is at the 90th percentile for plans over $1 billion in assets, and is approximately 57% higher than the average total plan cost of 0.33% for plans over $1 billion in assets. ICI Study at 40–42. Had the Plan merely conformed its total plan cost to the average of 0.33%, total plan costs only would have been approximately $8.9 million, a savings of approximately $5.2 million per year for Plan participants. As will be described below, these excessive costs can be attributed almost entirely to Defendants' self-serving selection of high-cost, proprietary mutual funds to support their own bottom line.

## II. BB&T RECEIVED GROSSLY EXCESSIVE COMPENSATION FOR ADMINISTERING THE PLAN

70. BB&T acts as the sole trustee and recordkeeper for the Plan, aside from the SDBA, which is managed by TD Ameritrade.

71. For each year in which data is available, BB&T has received indirect compensation for these services, as disclosed on Schedule C of Form 5500. (Excerpts of BB&T's 2009 Form 5500 are attached to the Complaint as **Exhibit B**). These fees were paid as a percentage of assets of several of the investments within the plan. In 2009, BB&T received indirect compensation from nine of the equity mutual funds and all twelve of the target date funds within the Plan in the following percentages:

| Fund | Indirect Comp Rec'd by BB&T | Fund Expense Ratio | % of Fund Expenses Paid to BB&T |
|---|---|---|---|

27

| | | | |
|---|---|---|---|
| BB&T Mid Value | 0.70% avg daily balance (adb) | 0.95% | 74% |
| BB&T Total Return Bond | 0.45% adb | 0.72% | 63% |
| BB&T Int'l Equity | 0.85% adb | 1.53% | 56% |
| BB&T Large Cap | 0.60% adb | 0.83% | 72% |
| BB&T Equity Income | 0.70% adb | 0.97% | 72% |
| BB&T Special Opportunities | 0.80% adb | 1.07% | 75% |
| BB&T Mid Cap Growth | 0.70% adb | 0.98% | 71% |
| BB&T Small Cap | 0.80% adb | 1.16% | 69% |
| Brandywine Blue | 0.15% adb | 1.16% | 13% |
| All T. Rowe Price Funds | 0.15% adb | various | various |

(Ex. B at 4–7.)

72.     Based upon 2009 year-end balances, BB&T received approximately $4.07 million in indirect compensation in 2009, supposedly to reimburse BB&T for the provision of recordkeeping and custodial services.  The indirect compensation formulas remained unchanged in 2010, although the BB&T Mid Cap Growth Fund and BB&T Small Cap Fund were closed (their balances were transferred to other funds), the Brandywine Blue Fund was removed from the Plan, and the BB&T funds were re-branded as Sterling Capital funds (a wholly-owned subsidiary of BB&T).  (*See* BB&T 2010 Form 5500, excerpts attached as **Exhibit C** to the Complaint.)  Based upon 2010 year-end balances, BB&T received approximately $5.08 million in indirect compensation

in 2010. In 2011, BB&T *increased* the amount it received from two of its own funds, increasing the charge to the Sterling Capital Small Cap Value Fund from 0.80% to 1.20% and the Sterling Capital Total Return Bond Fund from 0.45% to 0.48%, but otherwise BB&T charged the same percentages as in 2010. (*See* BB&T 2011 Form 5500, excerpts attached to Complaint as **Exhibit D**.) The indirect compensation formulas for 2011 are shown below:

| Fund | Indirect Comp Rec'd by BB&T | Fund Expense Ratio | % of Fund Expenses Paid to BB&T |
|---|---|---|---|
| Sterling Capital Mid Value | 0.70% avg daily balance (adb) | 0.95% | 74% |
| Sterling Capital Total Return Bond | 0.48% adb | 0.72% | 67% |
| Sterling Capital International | 0.85% | 1.62% | 53% |
| Sterling Capital Select Equity (formerly BB&T Large Cap) | 0.60% adb | 0.83% | 72% |
| Sterling Capital Equity Income | 0.70% adb | 0.97% | 72% |
| Sterling Capital Special Opportunities | 0.80% adb | 1.07% | 75% |
| Sterling Capital Small Cap Value | 1.20% adb | 1.20% | 100% |
| All T. Rowe Price Funds | 0.15% adb | various | various |

(Ex. D at 4–6.)

73.    Based on 2011 year-end account balances, BB&T received approximately $5.14 million in indirect compensation in 2011.    In 2012, the Sterling Capital International Fund was removed from the Plan when it ceased operations, and BB&T stopped receiving indirect compensation from fund families other than Sterling Capital, but despite these changes BB&T still received approximately $5.3 million in indirect compensation solely from the Sterling Capital Funds, using 2012 year-end values for each fund as reported on its Form 5500 disclosures.    (*See* BB&T 2012 Form 5500, excerpts attached to Complaint as **Exhibit E**.)    In 2013, according to its Form 5500, BB&T reduced the indirect compensation it received from its own funds to 0.15%. Based on 2013 year-end values, BB&T was only compensated approximately $1.5 million in indirect compensation as reimbursement for custodial and recordkeeping services.

74.    The indirect compensation received between 2009 and 2012 grossly exceeded the actual administrative expenses incurred by BB&T to operate the Plan. According to the ERISA Section 408(b)(2) Fee Disclosure provided to the Plan by BB&T Retirement and Institutional Services on May 31, 2012, attached to the Complaint as **Exhibit F**, the total cost of all administrative services provided to participants and the Plan by BB&T was $58.60 per participant, which BB&T estimated would amount to $1,744,287 in costs in 2012 based on 29,766 participants in the Plan.  (*See* Exhibit F at 8, 10, 15.)  According to BB&T's Form 5500, the number of Plan participants with active balances at the end of each year (the figure that BB&T appears to use to calculate Plan

expenses) was: 27,435 in 2009; 28,138 in 2010; 28,550 in 2011; and 31,512 in 2012. (Ex. B at 2; Ex. C at 2; Ex. D at 2; Ex. E at 2.) Based upon its own disclosures (reflecting costs of $58.60 per plan participant), BB&T would have incurred the following costs for providing administrative services to the Plan and Plan participants from 2009 to 2012: $1,607,691.00 in 2009; $1,648,886.80 in 2010; $1,673,030.00 in 2011; and $1,846,603.20 in administrative costs in 2012. The indirect compensation received by BB&T from 2009 to 2012 was therefore ***two to three times greater*** than the administrative expenses incurred by BB&T during those four years, as shown in the following chart:

| Year | Indirect Compensation Received (Est.) | Administrative Costs Incurred by BB&T (Est.) | Net Profit to BB&T (Est.) |
|---|---|---|---|
| 2009 | $4.07M | $1.61M | $2.46M |
| 2010 | $5.08M | $1.65M | $3.43M |
| 2011 | $5.14M | $1.67M | $3.47M |

| 2012 | $5.29M[2] | $1.85M | $3.44M |
|---|---|---|---|

75.     Had Defendants prudently managed the Plan and performed benchmarking studies, submitted RFIs and RFPs to recordkeeping and custodial service providers that were not affiliated with BB&T, and procured the services of the lowest bidders, Defendants would have saved Plan participants several million dollars per year from 2009 to 2012.  Instead, Defendants failed to prudently monitor and contain Plan costs, permitting BB&T to act as the sole provider of administrative services to the Plan out of loyalty to the Plan sponsor, rather than Plan participants, in breach of Defendants' fiduciary duties.

76.     Although BB&T has reduced its receipt of revenue sharing payments from the Sterling Capital Funds from 2013 to the present, Plaintiffs believe BB&T continues to profit in a similar manner through the excess fees charged by the Sterling Capital Funds and the retained profits of BB&T's subsidiary, Sterling Capital.

---

[2] There is a significant discrepancy between Plaintiffs' estimates of BB&T's indirect compensation and the amount of compensation BB&T disclosed in its 408(b)(2) Fee Disclosure to the Plan.  (Ex. F.)  In the Fee Disclosure, BB&T estimated annual receipt of only $1.62 million in revenue sharing payments.  (*Id.* at 10, 14.)  The source of this conflict is a difference in the percentage of each fund's balance BB&T purported it was receiving.  In the Fee Disclosure, it alleged it was only receiving 0.15% of the balance of most Sterling Capital funds, with the exception of 0.55% it claimed it was receiving from the Sterling Capital Small Cap Value Fund.  (*Id.* at 14.)  But on the 2012 Form 5500, BB&T reported it was receiving between 0.48% and 1.20% of the average daily balance of the Sterling Capital funds.  (Ex. E at 4–6.)  Because Form 5500 was reported to the federal government (and required to be reported under federal law), the higher percentages disclosed on Form 5500 are presumably more reliable.

32

### III. DEFENDANTS SELECTED AND RETAINED HIGH COST PROPRIETARY FUNDS IN THE PLAN IN THEIR OWN SELF-INTEREST AND AT THE EXPENSE OF PLAN PARTICIPANTS

77.     The market for pooled investment funds within the retirement plan market is highly competitive, with hundreds of asset management firms and thousands of pooled investment funds available to choose from.  Retirement plans with assets over $1 billion have access to virtually any money manager that they choose at extraordinarily competitive rates.

78.      In 2009, in retirement plans with over $1 billion in assets, the average domestic equity mutual fund had an expense ratio of 0.56%, the average international equity mutual fund had an expense ratio of 0.77%, and the average domestic bond mutual fund had an expense ratio of 0.38%.  ICI Study at 46.

79.     In 2009, the six BB&T domestic equity funds in the Plan (BB&T Mid Cap Growth, BB&T Mid Value, BB&T Large Cap, BB&T Small Cap, BB&T Equity Income, BB&T Special Opportunities) had expense ratios between 0.83% and 1.16%, which were 48 to 107 percent higher than the average domestic equity mutual fund for plans of BB&T's size.

80.     In 2009, the BB&T International Equity Fund had an expense ratio of 1.53%.  The BB&T Total Return Bond Fund had an expense ratio of 0.72%.  In each case, the BB&T mutual fund was nearly twice as expensive as the average mutual fund held by plans over $1 billion in assets.

33

81.    There were superior options available to the Plan in 2009 other than the BB&T mutual funds that would have offered comparable or superior investment services at a lower cost.  Alternatively, given the recognized efficiency of domestic equity and bond markets, Defendants could have replaced the BB&T funds with index funds at 5% or less of the cost of the BB&T funds.  Had Defendants prudently monitored the Plan investments in a process that was not tainted with self-interest, they would have removed the BB&T mutual funds and invested in lower-cost investment options, saving plan participants millions of dollars per year.

82.    BB&T Mid Cap Growth and BB&T Small Cap ceased operations in February 2010, and the assets invested in those funds were transferred into other proprietary funds.  Around the same time, the BB&T mutual funds were re-branded as Sterling Capital funds; Sterling Capital is a wholly owned subsidiary of BB&T.  By the end of 2010, five proprietary domestic equity funds remained in the Plan: Sterling Capital Mid Value, Sterling Capital Small Cap Value (replacing BB&T Small Cap), Sterling Capital Select Equity (renamed from BB&T Large Cap), Sterling Capital Equity Income, and Sterling Capital Special Opportunities.  These five funds had expense ratios between 0.84% and 1.20%.  The only international offering in the Plan was Sterling Capital International, which had an expense ratio of 1.53%.  The only bond fund in the Plan was the Sterling Capital Total Return Bond Fund, which had an expense ratio of 0.71%.  Each fund's expenses greatly exceeded the average expense ratio of comparable mutual funds within retirement plans with over $1 billion in assets.  *See* ICI Study at 46.  Had

34

Defendants prudently monitored Plan investments in a process not tainted by self-interest, they would have removed the Sterling Capital funds from the Plan and chosen lower-cost alternatives with comparable or superior performance, saving Plan participants millions of dollars per year.

83. The Sterling International Fund was removed from the Plan in January 2012 when it ceased operations, leaving the five Sterling Capital domestic equity funds and the Sterling Capital bond fund as the remaining proprietary mutual funds in the Plan.

84. Defendants have kept each of these six proprietary investments in the Plan to the present date. Their expense ratios have declined slightly—as of the end of 2014 the equity funds had expense ratios between 0.81% and 0.99% while the bond fund had an expense ratio of 0.56%—but these expense ratios remain as disproportionately excessive as they were in 2009. As of the end of 2012, the most recent data available to Plaintiffs, in retirement plans with over $1 billion in assets, the average domestic equity mutual fund had an expense ratio of 0.48%, and the average domestic bond fund had an expense ratio of 0.35%. ICI Study at 45. The Sterling Capital Funds are therefore between 69 and 106 percent more expensive than the average fund held by plans of BB&T's size. By keeping the Plan invested in these high-cost mutual funds, Defendants have breached their ongoing duty to monitor Plan investments and to remove investments that are no longer prudent. Had they honored their fiduciary duties of prudence and loyalty to Plan participants, they would have removed these funds and selected lower cost alternatives, saving Plan members millions of dollars per year.

85.    Defendants' imprudence is underscored by the fact that Sterling Capital offers many of the same investment products in the broader marketplace for far lower fees.  Sterling Capital advertises itself to the public as an institutional money manager that manages separate accounts for institutions and investors that meet certain account minimums.  *See* Sterling Capital ADV at 10–12 (attached to Complaint as **Exhibit G**).  Sterling Capital advertises this institutional money management at rates much lower than those paid by Plan participants in the Sterling Capital mutual funds.  (*Id.*)  For example, at the end of 2014 the Plan had $222 million invested in the Sterling Capital Special Opportunities Fund, as shown in the Plan's 11-K report for 2014, excerpts of which are attached to the complaint as **Exhibit H**.  For Plan participants, the expense ratio for the Sterling Capital Special Opportunities Fund in 2014 was 0.96%, meaning Plan participants invested in this fund paid approximately $2.14 million in expenses in 2014.  Sterling Capital advertises institutional management of "Special Opportunities Portfolios" (that presumably mirror the portfolio of the Special Opportunities mutual fund) at the following rates: 0.70% on the first $25 million; 0.60% on the next $25 million; 0.50% on the next $25 million; and 0.40% on all incremental assets above $75 million.  (Ex. G at 12.)  Had the Plan negotiated with Sterling Capital at arms' length to manage the money invested in the Special Opportunities Fund ($222 million) at these rates within a collective investment trust or a separate account, Plan participants would have paid approximately $1.04 million in investment management expenses in 2014, *less*

36

*than half* of the $2.14 million that Plan participants paid within the Special Opportunities mutual fund.

86.     Comparable levels of savings were available for every Sterling Capital fund within the Plan.  Plaintiffs estimate that had the assets in the Plan invested in Sterling Capital mutual funds been managed at the institutional investor rates advertised by Sterling Capital for separate accounts, Plan participants would have paid at least $4.06 million less in investment management expenses in 2014 alone.

87.     Even these metrics likely understate the Plan's true losses.  Given the large amount of assets the Plan had in each fund, the Plan should have negotiated a much lower management fee than that advertised by Sterling Capital.  Had Defendants honored their fiduciary duties to Plan participants, rather than furthering BB&T's bottom line, and engaged in an arms-length negotiation over the price of investment services, rather than simply investing in the Sterling Capital mutual funds, Defendants would have negotiated investment management expenses two to three times lower than Plan participants actually paid, saving Plan participants tens of millions of dollars.

## IV.    DEFENDANTS FAILED TO ADEQUATELY MONITOR PLAN INVESTMENTS AND REMOVE POORLY PERFORMING INVESTMENTS

### A.    Defendants Failed to Remove the BB&T Large Cap Fund Despite Persistently Poor Performance Dating Back to Its Inception

88.     In 2009, the Plan had approximately $150 million invested in what at the time was called the BB&T Large Cap Fund, ticker BBISX (hereinafter the "Large Cap Value Fund").  Ex. B at 7.  Viewed from the perspective of the beginning of the statutory

period in 2009, the Large Cap Value Fund had a track record of poor performance that warranted its removal. Attached as **Exhibit I** of the Complaint is portfolio and performance data regarding the Large Cap Value Fund, provided by Morningstar, as of June 30, 2009, which offers the perspective from which Defendants were viewing the Large Cap Value Fund six years ago. The Large Cap Value Fund was, and still is, classified as a large company value fund, and therefore its performance is properly compared to that of the Russell 1000 Value Index, an index of large company value stocks. The report shows that as of June 30, 2009, over the prior 3-year, 5-year, and 10-year periods, the Large Cap Value Fund had underperformed its benchmark index by roughly **2% per year**. *See* Exhibit I. The Large Cap Value Fund had underperformed its benchmark index six of the past seven calendar years between 2002 and 2008, and was on pace to underperform its benchmark index again in 2009. *Id.* This placed the Large Cap Value Fund among the bottom 17 percent of large company value funds over the prior 3-year, 5-year, and 10-year periods. *Id.* Given the fund's consistently poor performance, a prudent investor acting exclusively in the interests of Plan participants would have removed the Large Cap Value Fund from the Plan in late 2009. Defendants did not take this action. By the end of 2010, the Plan had approximately $154 million in assets in the Large Cap Value Fund. (Ex. C at 8.)

89.    In February 2010, the Large Cap Value Fund was renamed the Sterling Capital Select Equity Fund. The name change did nothing to halt the fund's terrible performance. Attached as **Exhibit J** of the Complaint is portfolio and performance data

regarding the Large Cap Value Fund, provided by Morningstar, as of June 30, 2012, which offers roughly the perspective from which Defendants would have been viewing the fund three years ago. The Large Cap Value Fund underperformed its benchmark index by approximately seven percent in 2009, three percent in 2010, and six percent in 2011, and was on pace to underperform its benchmark index again in 2012. Given this poor performance, viewed in light of the fund's terrible performance historically, had Defendants been prudently monitoring the investments within the Plan in a manner not tainted with self-interest, they would have removed the Large Cap Value Fund from the Plan by 2012. Instead, Defendants retained the Large Cap Value Fund in the Plan, and by the end of 2012, the Plan had approximately $167 million invested in the Large Cap Value Fund. (Ex. E at 7.)

90. In September 2013, the Large Cap Value Fund's name was changed once again, this time to the Sterling Capital Behavioral Large Cap Value Equity Fund. As David Snowball, publisher of the Mutual Fund Observer website, wrote at the time:

> Sterling Capital Select Equity has been a **determinedly bad fund for years**. **It's had three managers since 1993 and it has badly trailed its benchmark under each of them.** The strategy is determinedly nondescript. They've managed to return 3.2% annually over the past 15 years. That's better – by about 50 bps – than Vanguard's money market fund, but not by much. Effective September 3, 2013, they're hitting "reformat."

David Snowball, *September 1, 2013*, Mutual Fund Observer Blog, http://www.mutualfundobserver.com/2013/09/september-1-2013/ (last accessed Aug. 17,

2015) (emphasis added).  As of the end of 2014, the Plan had $228 million invested in the Large Cap Value Fund.

91.    Plan participants have suffered greatly as a result of Defendants' failure to remove the Large Cap Value Fund from the Plan.   Attached as **Exhibit K** to the Complaint is a hypothetical illustration prepared using data and software from Morningstar.   The illustration shows the investment results of retaining the fund, compared with two likely investment alternatives.   This illustration covers the period from the end of 2009 through the end of August 2015, and looks at three possible scenarios for investment of the $153,818,747 held in the Large Cap Value Fund (shown in the illustration as the Sterling Capital Behavioral Large Cap Value Equity Fund) at the end of 2009.  The first scenario assumes the Plan retained the Large Cap Value Fund in 2009.   The second scenario assumes investment in a large cap value index fund, the Vanguard Value Index Fund.  The third scenario assumes the Plan invested in the Dodge & Cox Stock Fund, which as of October 2010 was the most commonly held large company value equity fund in 401(k) plans in the United States, and therefore would appear to be a likely alternative to the Large Cap Value Fund.  InvestmentNews, *The Top 10 Funds in the 401(k) Marketplace by Total Distribution* (Oct. 4, 2010), http://www.investmentnews.com/article/20101004/CHART/101009980   (last   accessed Aug. 17, 2015).   All three scenarios assume that $613,000 is withdrawn on a monthly basis, to approximate the net withdrawals from the Large Cap Value Fund that have occurred over the past six years.

40

92.     **Exhibit K** shows that under the first scenario, where the fund is retained, the balance in the Large Cap Value Fund as of August 2015 was approximately $210.9 million.  (Ex. K at 1, 2.)  Under the second scenario, where the fund is removed at the end of 2009 and replaced with the Vanguard Value Index Fund, the balance at the end of July 2015 would have been $235.7 million.  (Ex. K at 1, 3.)  Under the third scenario, where the fund is removed at the end of 2009 and replaced with the Dodge & Cox Stock Fund, the balance at the end of July 2015 would have been $242.5 million.  (Ex. K at 1, 4.)  According to the hypothetical illustration, Defendants' breach of their fiduciary duties in retaining the Large Cap Value Fund has caused at least $24.8 to $31.6 million in damages to Plan participants.

> **B.     Defendants Failed to Remove the Imprudent Money Market Fund Despite Expenses Twenty Times Higher than the Fund's Negligible Yield**

93.     In 2009, the Plan had approximately $138 million invested in the Federated Treasury Obligations Fund, fund ticker TOIXX, a money market fund (hereinafter the "Money Market Fund").  (Ex. B at 8.)  Money market funds invest in ultra-short-duration fixed-income investments to provide high levels of liquidity.  Michael Chamberlain, CFP, *Your 401(k): Money Market vs. Stable Value*, Forbes (Oct. 11, 2011), http://www.forbes.com/sites/feeonlyplanner/2011/10/11/whats-in-your-401k/ (last accessed Aug. 18, 2015).

94.     Though money market funds may have historically provided yields of one to three percent, money market yields plummeted following the recent financial crisis.

As a result, the Money Market Fund yielded only 0.10% in 2009, 0.02% in 2010, and 0.01% in 2011 and every year thereafter. The only one profiting from the Money Market Fund appears to be its managers. In 2014, the Money Market Fund charged management fees of 0.20% of total assets, which is twenty times higher than the Money Market Fund's actual yield.

95. Unlike equity investments, where future results may be difficult to predict, a money market fund's likely returns can be accurately gauged based upon the fund's current yield. Defendants have therefore been aware since as early as 2009 of the likelihood that the Money Market Fund would produce these incredibly low returns going forward.

96. The money invested in the Money Market Fund should have instead been invested in a stable value fund. Stable-value funds are only available in defined contribution plans and some college savings plans. Stable Value Investment Association, *Stable Value Investment Assocation FAQ*, http://stablevalue.org/knowledge/faqs/question/why-cant-i-find-a-stable-value-investment-option-for-my-ira (last accessed Aug. 19, 2015). Stable value funds invest in a diversified portfolio of fixed income securities that are "protected from interest-rate volatility through contracts with banks or insurance companies in which the financial institution agrees to protect the fund's principal and guarantees a rate of return over a given time period even if the underlying portfolio of investments loses money." Adam Zoll, *For Safety-First Savers, Stable-Value Funds are Tough to Beat*, Morningtar Short

Answer            Blog            (April            16,            2013),
http://ibd.morningstar.com/article/article.asp?id=592164&CN=brf295,http://ibd.mornings
tar.com/archive/archive.asp?inputs=days=14;frmtId=12,%20brf295 (last accessed Aug.
19, 2015).

97.    Because they are able to hold a broader array of debt securities than a
money market fund, stable value funds produce superior returns to money market funds.
In 2011, when money market yields had dropped to an average of 0.03%, stable value
funds were earning 2.5% to 3%.   Chamberlain, *supra*, *Money Market v. Stable Value*.  A
2011 study from Wharton Business School analyzed money market and stable-value fund
returns from the previous two decades and concluded that "any investor who preferred
more wealth to less wealth should have avoided investing in money market funds when
[stable value] funds were available, irrespective of risk preferences."  David F. Babbel &
Miguel A. Herce, *Stable Value Funds: Performance to Date*, at 16 (Jan. 1, 2011),
available at http://fic.wharton.upenn.edu/fic/papers/11/11-01.pdf (last accessed Aug. 19,
2015).  Given the superior yields offered by stable value funds at comparable levels of
risk, large 401(k) plans overwhelmingly choose stable value funds over money market
funds.  Chris Tobe, CFA, *Do Money-Market Funds Belong in 401(k)s?*, MarketWatch
(Aug. 30, 2013), available at http://www.marketwatch.com/story/do-money-market-
funds-belong-in-401ks-2013-08-30 (last accessed Aug. 19, 2015).  "With yields hovering
around 0%, money-market funds aren't a prudent choice for a 401(k)."  *Id.*  Therefore,
had Defendants honored their fiduciary duties by conducting a prudent review of the

43

Plan's investments and subsequently removing imprudent investments from the Plan, Defendants would have removed the Money Market Fund from the Plan.

98.     Plan participants have suffered greatly as a result of Defendants' failure to remove the Money Market Fund from the Plan.  Attached as **Exhibit L** to the Complaint is a hypothetical illustration prepared using data and software from Morningstar.  The illustration shows the investment results of retaining the Money Market Fund, compared with three likely investment alternatives.  This illustration covers the period from the end of 2009 through the end of June 2015,[3] and looks at four possible scenarios for investment of the approximately $138.6 million held in the Money Market Fund at the end of 2009.  The first scenario assumes the Plan retained the fund.  The second scenario assumes investment in the T. Rowe Price Stable Value Fund.  The third scenario assumes investment in the Wells Fargo Stable Value Fund.  The fourth scenario assumes investment in the Morley Stable Value Fund.  The Wells Fargo Stable Value Fund was offered by the Plan in 2012, but had been eliminated by the end of 2013.  (*Compare* Ex. E at 8 (showing assets invested in Wells Fargo Stable Value Fund) *with* Ex. H at 4–5 (showing that Wells Fargo Stable Value Fund was no longer held by the Plan).)  The Morley Stable Value Fund has been offered as an investment option in the Plan since 2012.  (*See* Ex. E at 8; Ex. H at 5.)  Their prior inclusion in the Plan makes the stable value funds from Morley and Wells Fargo plausible alternatives to the Money Market

---

[3] Performance data for certain of the stable-value funds analyzed in this hypothetical is only updated quarterly.

Fund. The T. Rowe Price Stable Value Fund appears plausible both because the Plan already offered a number of investment options from T. Rowe Price, and because the T. Rowe Price Stable Value Fund is the fifth most commonly held stable value fund within 401(k) plans in the United States. Yahoo! Finance, *Top 20 Stable Value Funds Held in America's 401k Plans* (Nov. 14, 2011), http://finance.yahoo.com/news/brightscope-reveals-top-20-stable-140000654.html (last accessed Aug. 19, 2015). The illustration assumes that $705,029 is withdrawn from each of the four investments on a monthly basis, from January 2010 through June 2015, to approximate the net withdrawals from the Money Market Fund that occurred during this period. (*See* Ex. L at 2–6; *compare* Ex. B at 8 (showing that approximately $138.6 million was invested in the Money Market Fund as of December 31, 2009) *with* Ex. H at 4 (showing a balance of $96 million in the Money Market Fund as of December 31, 2014).)

99. **Exhibit L** shows that under the first scenario, in which the Plan continued to hold the Money Market Fund, the balance as of the end of June 2015 was approximately $92.1 million. (Ex. L at 1, 2.) The illustration shows that under the second scenario, had the Plan removed the Money Market Fund at the end of 2009 and transferred those assets into the T. Rowe Price Stable Value Fund, the balance at the end of June 2015 would have been $113.4 million. (*Id.* at 1, 3.) Under the third scenario, had the Plan transferred out of the Money Market Fund and into the Wells Fargo Stable Value Fund, the balance at the end of June 2015 would have been $105.3 million. (*Id.* at 1, 4.) Finally, turning to the fourth scenario, had the Plan removed the Money Market Fund and

transferred the balance to the Morley Stable Value Fund, the balance at the end of June 2015 would have been $102.6 million. (*Id.* at 1, 5.) According to the hypothetical illustration, Defendants' breach of their fiduciary duties in retaining the Money Market Fund has caused at least $10.5 to $21.3 million in damages to Plan participants.

## C. Defendants Failed to Remove the Imprudent BB&T Deposit Account from the Plan

100. At the end of 2009, the Plan held approximately $120 million in the BB&T 1-Year Bank Investment Contract (a/k/a BB&T Associate Insured Deposit) (hereinafter the "Deposit Account"). This investment earns Plan participants a fixed interest rate that resets each month. The interest rate credited is set based upon market yields of United States Treasury Notes having a one-year maturity. (Ex. E at 7–8.) BB&T profits from the Deposit Account because the company earns fees for administration of the account and may retain investment earnings when the average yield of the contract's underlying investments exceed the credited interest rate earned by Plan participants.

101. Given the availability of stable value funds to the Plan, it was imprudent for the Plan to retain its investment in the Deposit Account. In 2009 and 2010, the Deposit Account earned 1.4% interest. The interest rate in the Deposit Account was 0.77% in 2011, 0.67% in 2012, 0.64% in 2013, and 0.61% in 2014. These earnings were one-third to one-half of what Plan participants would have earned in a stable value fund. *See* Ex. L at 7–9 (showing annual returns generally two to three times higher in the T. Rowe Price, Wells Fargo, and Morley stable value funds). Had Defendants monitored Plan investments and removed imprudent investments in accordance with their fiduciary duties

46

in a process that was not tainted by self-interest, Defendants would have removed the Deposit Account from the Plan as early as 2009. Plan participants have suffered millions of dollars in damages as a result of Defendants' breach of their fiduciary duties.

## V. PLAINTIFFS HAVE SUFFERED DAMAGES AS A RESULT OF EACH FORM OF MISCONDUCT IDENTIFIED IN THE COMPLAINT

102. Plaintiffs have suffered from the breaches of fiduciary duties and other unlawful conduct identified in Sections I through IV above through their investment in various investment options within the Plan.

103. Plaintiff Burke Bowers ("Bowers") was a participant in the Plan from on or before 2009 through mid-2013. During that time, he at various times had funds invested in the BB&T/Sterling Capital Total Return Bond Fund, the BB&T/Sterling Capital Mid Value Fund, the BB&T Small Cap Fund, the Sterling Capital Small Cap Value Fund, the BB&T/Sterling Capital Special Opportunities Fund, and the Sterling Capital Equity Income Fund. Because the value of his account when he cashed out of the Plan was less than it would have been had Defendants honored their fiduciary duties, Bowers has statutory and Article III standing to bring the present action. *In re Mutual Funds Inv. Litig.*, 529 F.3d 207, 215–19 (4th Cir. 2008).

104. Plaintiff Robert Sims ("Sims") was a participant in the Plan from on or before 2009 until mid-2013. During that time, he was at various times invested in the BB&T Mid Cap Growth Fund, the BB&T/Sterling Capital International Equity Fund, the BB&T/Sterling Capital Mid Value Fund, and the T. Rowe Price Retirement 2010 Fund. Because the value of his account when he cashed out of the Plan was less than it would

47

have been had Defendants honored their fiduciary duties, Sims has statutory and Article III standing to bring the present action. *In re Mutual Funds Inv. Litig.*, 529 F.3d at 215–19.

105.    Plaintiff Erik Gavidia has been a participant in the Plan from on or before 2009 to the present.  During that time, he has at various times had funds invested in the BB&T/Sterling Capital Total Return Bond Fund, the BB&T Mid Cap Growth Fund, the BB&T Large Cap Fund (a/k/a Sterling Capital Select Equity or Sterling Capital Behavioral Large Cap Value Equity Fund), the BB&T/Sterling Capital International Equity Fund, the BB&T/Sterling Capital Mid Value Fund, the T. Rowe Price Retirement Income Fund, and the Federated Treasury Obligations Fund (the Money Market Fund). As a result, Plaintiff Erik Gavidia has statutory and Article III standing to bring the present action.

106.    Plaintiff Stephanie Gavidia was a participant in the Plan from on or before 2009 until 2014.  During that time, she has at various times had funds invested in the BB&T 1-Year Bank Investment Contract (a/k/a BB&T Associate Insured Deposit), the Federated Treasury Obligations Fund (the Money Market Fund), the BB&T/Sterling Capital Total Return Bond Fund, the T. Rowe Price Retirement Income Fund, the BB&T Large Cap Fund (a/k/a Sterling Capital Select Equity or Sterling Capital Behavioral Large Cap Value Equity Fund), the BB&T/Sterling Capital Special Opportunities Fund, the BB&T/Sterling Capital Mid Value Fund, and the BB&T/Sterling Capital International Equity Fund.  Because the value of her account when she cashed out of the Plan was less

48

than it would have been had Defendants honored their fiduciary duties, Plaintiff Stephanie Gavidia has statutory and Article III standing to bring the present action. *In re Mutual Funds Inv. Litig.*, 529 F.3d at 215–19.

107.    Plaintiff Stacy Holstein ("Holstein") was a participant in the Plan from on or before 2009 until October 2013.  During that time, she has at various times been invested in the BB&T 1-year Bank Investment Contract account (a/k/a BB&T Associate Insured Deposit), the BB&T/Sterling Capital Total Return Bond Fund, the T. Rowe Price Retirement Income Fund, the T. Rowe Price Retirement 2040 Fund, the BB&T/Sterling Capital Special Opportunities Fund, the BB&T/Sterling Capital Equity Income Fund, the T. Rowe Price Mid Cap Growth Fund, and the BB&T/Sterling Capital Small Cap Value Fund.  Because the value of her account when she cashed out of the Plan was less than it would have been had Defendants honored their fiduciary duties, Holstein has statutory and Article III standing to bring the present action. *In re Mutual Funds Inv. Litig.*, 529 F.3d at 215–19.

108.    Plaintiff Jeffrey Stauffer ("Stauffer") was a participant in the Plan from on or before 2009 until late 2013.  During that time, he has at various times been invested in the BB&T 1-Year Bank Investment Contract (a/k/a BB&T Associate Insured Deposit), the BB&T/Sterling Capital Total Return Bond Fund, the T. Rowe Price Retirement 2040 Fund, the BB&T/Sterling Capital Equity Income Fund, and the BB&T/Sterling Capital Special Opportunities Fund.  Because the value of his account when he cashed out of the Plan was less than it would have been had Defendants honored their fiduciary duties,

49

Stauffer has statutory and Article III standing to bring the present action. *In re Mutual Funds Inv. Litig.*, 529 F.3d at 215–19.

109.    Plaintiff Kerri Greaner ("Greaner") was a participant in the Plan from on or before 2009 to the present. During that time, she has at various times had funds invested in the Federated Treasury Obligations Fund (the Money Market Fund), the BB&T 1-year Bank Investment Contract account (a/k/a BB&T Associate Insured Deposit), and the T. Rowe Price Mid Cap Growth Fund. As a result, Plaintiff Kerri Greaner has statutory and Article III standing to bring the present action.

110.    Plaintiffs did not have actual knowledge of any of the foregoing breaches of fiduciary duty or other unlawful conduct in violation of ERISA until Defendants' misconduct was uncovered shortly before this action was filed. Defendants have concealed their illegal conduct by, among other actions, making false and misleading statements on Plan participants' quarterly statements that BB&T was paying all administrative expenses associated with operation of the Plan and that no administrative expenses were being deducted from participants' accounts.

## CLASS ACTION ALLEGATIONS

111.    Plaintiffs bring this action pursuant to Rule 23 on behalf of the classes of persons described herein,[4] and on behalf of the Plan.

_____

[4] Plaintiffs reserve the right to revise their class definitions, and to propose other or additional classes in subsequent pleadings or their motion for class certification, after discovery in this action.

112.    Plaintiffs Burke Bowers, Robert Sims, Erik Gavidia, Stephanie Gavidia, Stacy Holstein, Jeffrey Stauffer, and Kerri Greaner assert Counts I–IV against Defendants on behalf of an "Indirect Compensation Class" defined as follows:

> **Indirect Compensation Class:**  All participants and beneficiaries of the Plan whose accounts were invested in mutual funds from which revenue sharing payments and/or indirect compensation were paid to BB&T at any time on or after September 4, 2009.  Excluded from this class are Defendants, other employees with responsibility for the Plan's investment or administrative functions, and members of the BB&T Board of Directors.

113.    Plaintiffs Burke Bowers, Robert Sims, Erik Gavidia, Stephanie Gavidia, Stacy Holstein, and Jeffrey Stauffer assert Counts I–IV against Defendants on behalf of a "BB&T/Sterling Capital Funds Class" defined as follows:

> **BB&T/Sterling Capital Funds Class:**  All participants and beneficiaries of the Plan whose accounts were invested in shares of mutual funds within the BB&T or Sterling Capital fund families on or after September 4, 2009.  Excluded from this class are Defendants, other employees with responsibility for the Plan's investment or administrative functions, and members of the BB&T Board of Directors.

114.    Plaintiffs Erik Gavidia and Stephanie Gavidia assert Counts I–IV against Defendants on behalf of a "Large Cap Value Class" defined as follows:

> **Large Cap Value Class:**  All participants and beneficiaries of the Plan whose accounts were invested in shares of the BB&T Large Cap Fund (a/k/a Sterling Capital Select Equity Fund and Sterling Capital Behavioral Large Cap Value Equity Fund) on or after September 4, 2009.  Excluded from this class are Defendants, other employees with responsibility for the Plan's investment or administrative functions, and members of the BB&T Board of Directors.

115.    Plaintiffs Erik Gavidia, Stephanie Gavidia, and Kerri Greaner assert Count I against Defendants on behalf of a "Money Market Class" defined as follows:

> **Money Market Class:**  All participants and beneficiaries of the Plan whose accounts were invested in shares of the Federated Treasury Obligations Fund on or after September 4, 2009.  Excluded from this class are Defendants, other employees with responsibility for the Plan's investment or administrative functions, and members of the BB&T Board of Directors.

116.    Plaintiffs Stephanie Gavidia, Stacy Holstein, Jeffrey Stauffer, and Kerri Greaner assert Counts I–IV against Defendants on behalf of a "Deposit Account Class" defined as follows:

> **Deposit Account Class:**  All participants and beneficiaries of the Plan whose accounts were invested in shares of the BB&T 1-Year Bank Investment Contract (a/k/a BB&T Associate Insured Deposit) on or after September 4, 2009.  Excluded from this class are Defendants, other employees with responsibility for the Plan's investment or administrative functions, and members of the BB&T Board of Directors.

117.    <u>Numerosity</u>: The Classes are so numerous that joinder of all Class members is impracticable.  The Plan has had between approximately 27,000 and 32,000 participants during the applicable statutory period.  Based upon the investment balances in each investment within the Plan, each Class contains at least several thousand Plan participants.

118.    <u>Typicality</u>:   Plaintiffs' claims are typical of the Class members' claims. Like other Class members, Plaintiffs are current or former participants in the Plan, who have suffered injuries as a result of Defendants' mismanagement of the Plan.  Defendants treated Plaintiffs consistently with other class members with regard to the Plan.

Defendants managed the Plan as a single entity, and therefore Defendants' imprudent decisions affected all Plan participants similarly.

119. <u>Adequacy</u>: Plaintiffs will fairly and adequately protect the interests of the Classes, as their interests are aligned with the Classes that they seek to represent and they have retained counsel experienced in complex class action litigation. Plaintiffs do not have any conflicts of interest with any Class members that would impair or impede their ability to represent such Class members.

120. <u>Commonality</u>: Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members, including but not limited to:

    a.  Whether Defendants breached their duties of prudence and loyalty by failing to adequately monitor and control the Plan's administrative costs;

    b.  Whether the indirect compensation and/or revenue sharing payments received by BB&T exceeded reasonable compensation for the services provided, thus constituting a prohibited transaction with a fiduciary and party-in-interest under 29 U.S.C. § 1106;

    c.  Whether the collection of indirect compensation/revenue sharing payments by BB&T in excess of the cost of the services provided to the Plan constitutes an illegal inurement of benefit to the Plan sponsor in violation of 29 U.S.C. § 1103 and/or constitutes a prohibited transaction under 29 U.S.C. § 1106;

    d.  Whether Defendants breached their duties of prudence and loyalty by failing to monitor and remove the Plan's investments in BB&T/Sterling Capital Funds;

    e.  Whether the expenses paid by participants invested in the BB&T/Sterling Capital Funds exceeded that which was reasonable

53

and constituted a prohibited transaction with a fiduciary and a party-in-interest under 29 U.S.C. § 1106;

f.  Whether Defendants failed to exercise appropriate skill, care, loyalty, and diligence by failing to investigate and attempt to negotiate lower-cost alternatives to the BB&T/Sterling Capital Funds;

g.  Whether Defendants breached their duty to monitor plan investments and remove imprudent investments by failing to remove the Large Cap Value Fund;

h.  Whether Defendants breached their duty to monitor plan investments and remove imprudent investments by failing to remove the Money Market Fund;

i.  Whether Defendants breached their duty to monitor plan investments and remove imprudent investments by failing to remove the Deposit Account;

j.  The proper measure of monetary relief; and

k.  The proper form of equitable and injunctive relief.

121. Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) because prosecuting separate actions against Defendants would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class. Separate lawsuits would establish incompatible standards to govern Defendants' conduct as fiduciaries.

122. Class certification is also appropriate under Fed. R. Civ. P. 23(b)(1)(B) because adjudications with respect to individual class members, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their

interests.  Any award of equitable relief by the Court such as removal of particular Plan investments or removal of a plan fiduciary would be dispositive of non-party participants' interests.  The accounting and restoration of the property of the Plan that would be required under 29 U.S.C. §§ 1109 and 1132 would be similarly dispositive of the interests of other Plan participants.

123.  Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Classes predominate over any questions affecting only individual Class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation.  Defendants' conduct described in this Complaint applied uniformly to all members of the Classes. Class members do not have an interest in pursuing separate actions against Defendants, as the amount of each Class member's individual claims is relatively small compared to the expense and burden of individual prosecution, and Plaintiffs are unaware of any similar claims brought against Defendants by any Class members on an individual basis.  Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendants' practices.  Moreover, management of this action as a class action will not present any likely difficulties.  In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single forum.

## COUNT I
### Breach of Duties of Loyalty and Prudence
### 29 U.S.C. § 1104(a)(1)(A)–(B)
### *Asserted on Behalf of All Classes*

124.    29 U.S.C. § 1104 imposes the fiduciary duties of prudence and loyalty upon Defendants in their administration of the Plan and in their selection and monitoring of Plan investments.

125.    As described throughout the Complaint, Defendants BB&T, the Board, EBPC, Reeder, Powell, and John Does 1–20 breached their fiduciary duties of prudence and loyalty related to non-investment administration of the Plan by failing to take reasonable steps to manage administrative costs of the Plan.  These Defendants hired BB&T as the provider of all major services to further the profit of BB&T without engaging in an objective, competitive process to hire the lowest cost providers.  These Defendants also failed to take prudent steps to monitor and control administrative costs on an ongoing basis, such as hiring a consultant to conduct a benchmarking study, submitting an RFI and RFP to other service providers to solicit information and competitive bids, and hiring those service providers with the most competitive pricing and services.

126.    As described throughout the Complaint, Defendants BB&T, the Board, the Compensation Committee, Howe, Cablik, Welch, Kendrick, Lynn, Rich, and John Does 21–40 breached their fiduciary duties of prudence and loyalty with respect to selection and management of the Plan's investment options by, *inter alia*:

   a.    Selecting and retaining investments in the Plan because they were

affiliated with BB&T, and therefore would generate more revenue for BB&T;

b.  Selecting and maintaining mutual funds in the Plan based upon their willingness to pay revenue sharing and/or indirect compensation to BB&T, rather than selecting lower-cost investments that may not have been willing to pay revenue sharing;

c.  Negotiating large revenue sharing payments from Sterling Capital Funds in lieu of attempting to negotiate lower investment management expenses or refunding larger portions of investment management expenses to Plan participants;

d.  Failing to monitor Plan investments and explore whether the investment management services provided by Sterling Capital could be provided at lower cost, despite the fact that Sterling Capital advertised those services to institutional investors at rates much lower than Plan participants were paying through the Sterling Capital Funds;

e.  Failing to conduct a prudent and objective review of the Plan's investments and failing to remove the imprudent Large Cap Value Fund from the Plan;

f.  Failing to conduct a prudent and objective review of the Plan's fixed investments, specifically the Money Market Fund and Deposit Account, and failing to remove these imprudent investments from the Plan;

127.   BB&T is liable as a co-fiduciary under 29 U.S.C. § 1105 given the Board's authority to appoint and remove members of the EBPC and the Compensation Committee, its knowledge of each Defendant's breach of fiduciary duties, and its failure to exercise its authority to take reasonable steps to prevent these breaches.

128.   Each Defendant performing non-investment-related duties also knowingly participated in the breaches of the other Defendants performing such duties, knowing that other Defendants were breaching their fiduciary duties, and enabling commission of these

breaches by failing to lawfully discharge their own fiduciary duties or make any reasonable effort under the circumstances to remedy other Defendants' breaches.

129.    Each Defendant performing investment-related duties also knowingly participated in the breaches of the other Defendants performing such duties, knowing that other Defendants were breaching their fiduciary duties, and enabling commission of these breaches by failing to lawfully discharge their own fiduciary duties or make any reasonable effort under the circumstances to remedy other Defendants' breaches.

130.    Each Defendant is personally liable, and Defendants are jointly and severally liable, under 29 U.S.C. §§ 1109(a), 1132(a)(2), and (a)(3), to make good to the Plan the losses resulting from the aforementioned breaches, to restore to the Plan any profits Defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count.

131.    On behalf of the Plan, Plaintiffs also seek appropriate equitable relief pursuant to 29 U.S.C. § 1132(a)(3) (as described in the Prayer for Relief), recovery of pre-judgment interest, *see Quesinberry v. Life Ins. Co. of N. Am.*, 987 F.2d 1017, 1030–31 (4th Cir. 1993); *Meyer v. Berkshire Life Ins. Co.*, 250 F. Supp. 2d 544, 574 (D. Md. 2003), and attorney fees and costs pursuant to 29 U.S.C. § 1132(g).

**COUNT II**
**Prohibited Transactions with Party in Interest**
**29 U.S.C. §§ 1106(a)(1)**
*Asserted on Behalf of the Indirect Compensation Class, the BB&T/Sterling*
*Capital Funds Class, the Large Cap Value Class, and the Deposit Account Class*

132.   BB&T and Sterling Capital are parties in interest under 29 U.S.C. §§ 1106(a)(1).

133.   As described throughout the Complaint, Defendants BB&T, the Board, the Compensation Committee, Howe, Cablik, Welch, Kendrick, Lynn, Rich, and John Does 21–40 caused the Plan to use Sterling Capital Funds and the Deposit Account as investment options when those transactions constituted a direct or indirect furnishing of services between the Plan and a party in interest for more than reasonable compensation and a transfer of assets of the Plan to a party in interest.

134.   As described throughout the Complaint, Defendants BB&T, the Board, the Compensation Committee, Howe, Cablik, Welch, Kendrick, Lynn, Rich, and John Does 21–40 caused the Plan to negotiate revenue sharing and/or indirect compensation arrangements with investment managers hired to manage Plan assets knowing that the payments greatly exceeded the value of services provided by BB&T to the Plan and therefore constituted a prohibited transaction under 29 U.S.C. § 1106(a)(1).

135.   As described throughout the Complaint, Defendants BB&T, EBPC, Reeder, Powell, and John Does 1–20 caused the Plan to hire BB&T as trustee and recordkeeper when they knew or should have known BB&T would receive compensation for these services directly or indirectly from Plan assets, and knew or should have known it

59

constituted a direct or indirect furnishing of services between the Plan and a party in interest for more than reasonable compensation and a transfer of assets of the Plan to a party in interest.

136. As a direct and proximate result of these prohibited transactions, the Plan directly or indirectly paid millions of dollars per year in investment management and other fees to parties in interest in transactions that were prohibited under ERISA, thereby suffering millions of dollars in losses.

137. Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), Defendants are liable to restore all losses suffered by the Plan as a result of the prohibited transactions and disgorge all revenues received and/or earned by BB&T and Sterling Capital from the fees paid by the Plan to BB&T and Sterling Capital. Plaintiffs also seek appropriate equitable relief on behalf of the Plan pursuant to 29 U.S.C. § 1132(a)(3).

## COUNT III
### Prohibited Transactions with a Fiduciary
### 29 U.S.C. § 1106(b)
*Asserted on Behalf of the Indirect Compensation Class, the BB&T/Sterling Capital Funds Class, the Large Cap Value Class, and the Deposit Account Class*

138. BB&T and its wholly owned subsidiary Sterling Capital are fiduciaries of the Plan as the term is used in 29 U.S.C. §§ 1106(b)(1).

139. BB&T and Sterling Capital dealt with the assets of the Plan in their own interest and for their own account when they caused the Plan to use BB&T/Sterling Capital Funds as investment options and failed to remove those investments from the Plan.

60

140.    BB&T and Sterling Capital received consideration for their own personal account from parties dealing with the Plan in connection with transactions involving the assets of the Plan.  This includes BB&T's receipt of revenue sharing payments and/or indirect compensation from various investment managers in the Plan; the profits received by BB&T and Sterling Capital from the Plan's assets held in BB&T/Sterling Capital mutual funds; and the profits or fees BB&T earned managing the Deposit Account.

141.    As a direct and proximate result of these prohibited transactions, the Plan directly or indirectly paid millions of dollars per year in investment management and other fees to fiduciaries in transactions that were prohibited under ERISA, thereby suffering millions of dollars in losses.

142.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), BB&T and Sterling Capital are liable to restore all losses suffered by the Plan as a result of the prohibited transactions and disgorge all revenues received and/or earned by BB&T and Sterling Capital resulting directly or indirectly from the above-mentioned prohibited transactions. Plaintiffs also seek appropriate equitable relief on behalf of the Plan pursuant to 29 U.S.C. § 1132(a)(3).

<u>**COUNT IV**</u>
**Anti-Inurement Provision**
**29 U.S.C. § 1103**
*Asserted on Behalf of the Indirect Compensation Class, the BB&T/Sterling Capital Funds Class, the Large Cap Value Class, and the Deposit Account Class*

143.    BB&T and Sterling Capital are both employers of participants of the Plan as defined by 29 U.S.C. § 1002(5).

61

144. 29 U.S.C. § 1103(c)(1) provides that the assets of an employee benefit plan "shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries."

145. The purpose of this provision "is to apply the law of trusts to discourage abuses such as self-dealing, imprudent investment, and misappropriation of plan assets, by employers and others." *Raymond B. Yates, M.D., P.C. Profit Sharing Plan v. Hendon*, 541 U.S. 1, 23 (2004).

146. As a result of BB&T and Sterling Capital's self-dealing and imprudent investments, Plan assets inured to the benefit of BB&T and Sterling Capital as a result of (1) BB&T receiving revenue sharing and/or indirect compensation payments grossly exceeding its cost of providing services to the Plan; (2) the Plan's investments in the BB&T/Sterling Capital Funds and the subsequent assessment of investment management expenses against the accounts of Plan participants; and (3) the receipt of administrative fees resulting from the Plan's investment in the Deposit Account.

147. Pursuant to 29 U.S.C. § 1132(a)(3), BB&T and Sterling Capital should be required to disgorge all Plan assets that have inured to them as a result of their self-dealing. These assets should be restored to the Plan under principles of equitable restitution. Plaintiffs seek any other equitable relief the Court deems appropriate including appointment of an independent fiduciary or fiduciaries to run the Plan; removal of the Sterling Capital Funds and the Deposit Account from the Plan's core investment options; transfer of Plan assets in the Sterling Capital Funds and the Deposit Account to

prudent alternative investments; a requirement that the Plan engage in a competitive bidding process for the provision of recordkeeping and trustee services; removal of Plan fiduciaries deemed to have breached their fiduciary duties and/or engaged in prohibited transactions, and imposition of a constructive trust as necessary for administration of some or all of the aforementioned remedies.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Bowers, Sims, Erik Gavidia, Stephanie Gavidia, Holstein, Stauffer, and Greaner individually and as representatives of the classes defined herein, and on behalf of the BB&T Corporation 401(k) Savings Plan, pray for relief as follows:

A.     A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(3) of the Federal Rules of Civil Procedure;

B.     Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.     A declaration that Defendants have breached their fiduciary duties in the manner described in the Complaint;

D.     A declaration that Defendants violated 29 U.S.C. § 1106 by allowing the Plan to engage in prohibited transactions;

E.     A declaration that Plan assets inured to the benefit of BB&T and Sterling Capital in violation of 29 U.S.C. § 1103;

F.     An order compelling Defendants to personally make good to the Plan all losses that the Plan incurred as a result of the breaches of fiduciary duties described above and to restore the Plan to the position it would have been in but for these breaches;

G.      An order requiring Defendants to disgorge all revenues received from, or in respect of, the Plan;

H.      An order granting equitable restitution and other appropriate equitable monetary relief against Defendants;

I.      An order enjoining Defendants collectively from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

J.      Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan; removal of the Sterling Capital Funds, the Money Market Fund, and the Deposit Account within the Plan's core investment options; transfer of Plan assets in the Sterling Capital Funds, the Deposit Account, and the Money Market Fund to prudent alternative investments; a requirement that the Plan engage in a competitive bidding process for the provision of recordkeeping and trustee services; and removal of Plan fiduciaries deemed to have breached their fiduciary duties and/or engaged in prohibited transactions;

K.      An award of pre-judgment interest;

L.      An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and/or the common fund doctrine;

M.      An award of such other and further relief as the Court deems equitable and just.


September 4, 2015                    Respectfully Submitted,

                                     /s/ F. Hill Allen
                                     F. Hill Allen
                                     North Carolina State Bar No. 18884
                                     **THARRINGTON SMITH, L.L.P.**
                                     P.O. Box 1151
                                     Raleigh, NC 27602-1151
                                     Telephone: 919-821-4711
                                     Facsimile: 919-829-1583
                                     E-mail: hallen@tharringtonsmith.com

*And*

**NICHOLS KASTER, PLLP**
Kai H. Richter, MN Bar No. 0296545*
Carl F. Engstrom, MN Bar No. 0396298*
Joe Hashmall, MN Bar No. 0392610*
Adam W. Hansen, MN Bar No. 0391704*
　　　*appearing by *special appearance*
4600 IDS Center
80 S 8th Street
Minneapolis, MN 55402
Telephone: 612-256-3200
Facsimile: 612-338-4878
krichter@nka.com
cengstrom@nka.com
jhashmall@nka.com
ahansen@nka.com

ATTORNEYS FOR PLAINTIFFS