# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

Brewster Smith, Jr., Erik Gavidia, Stephanie
Gavidia, Doris Kirouac, Paula Bridges, Nancy
Johnson, Kerri Greaner, Burke Bowers, Robert
Sims, Stacy Holstein, Jeffrey Stauffer, and
Patricia Wells, individually and as
representatives of a class of similarly situated
persons, and on behalf of the BB&T
Corporation 401(k) Savings Plan,

                Plaintiffs,

v.

BB&T Corporation, BB&T Corporation
Employee Benefits Plan Committee, BB&T
Corporation Board of Directors, Compensation
Committee of the Board of Directors of BB&T
Corporation, John A. Allison, IV, Jennifer S.
Banner, K. David Boyer, Jr., Anna R. Cablik,
Nelle R. Chilton, Ronald E. Deal, Tom D.
Efird, James A. Faulkner, Barry J. Fitzpatrick,
J. Littleton Glover, Jr., L. Vincent Hackley,
Jane P. Helm, I. Patricia Henry, John P. Howe,
III, Eric C. Kendrick, Kelly S. King, Valeria
Lynch Lee, Louis B. Lynn, James H. Maynard,
Albert O. McCauley, Edward C. Milligan, J.
Holmes Morrison, Charles A. Patton, Nido R.
Qubein, William J. Reuter, Tollie W. Rich, Jr.,
E. Rhone Sasser, Christine Sears, Thomas E.
Skains, Thomas N. Thompson, Edwin H.
Welch, Stephen T. Williams, Steven L. Reeder,
Branch Banking and Trust Company, Sterling
Capital Management LLC, Paul Barnes, Ken
Fitchett, Sharon Jeffries-Jones, Keith Kiser,
John Sapp, Becky Sink, Henry Skinner, Derek
Surette, and Cardinal Investment Advisors,
LLC.

                Defendants.

CONSOLIDATED
COMPLAINT—CLASS ACTION


No. 1:15-cv-732-CCE-JEP
     1:15-cv-841-LCB-JEP

## CONSOLIDATED SECOND AMENDED COMPLAINT

1. This case arises from breaches of fiduciary duties by BB&T Corporation, its Board of Directors, officers, employees, committees, and affiliates, and Cardinal Investment Advisors, LLC in the management of the BB&T Corporation 401(k) Savings Plan ("the Plan")). In the competitive marketplace for retirement plan services, multi-billion dollar 401(k) plans such as the Plan wield tremendous bargaining leverage, and can obtain high-quality investment management and administrative services at low cost. As fiduciaries to the Plan, Defendants are obligated to act for the exclusive benefit of participants and without self-interest, while ensuring that the Plan's fees are reasonable. Defendants failed to honor these obligations in their imprudent and disloyal management and operation of the Plan. For instance, instead of using the Plan's bargaining power to benefit employees, BB&T Defendants, who were advised by Defendant Cardinal Investment Advisors ("Cardinal"), acted to benefit themselves or others by using high-cost proprietary investment funds managed by BB&T and its subsidiary and hiring BB&T itself or another BB&T subsidiary to be the Plan's trustee and recordkeeper, and selecting other high-cost investment options. This allowed BB&T and its subsidiaries[1] to maximize company profits at the expense of Plan participants by paying themselves millions of dollars in fees, in an amount that greatly exceeded the value of the services to

---

[1] Unless specified otherwise, as used herein "BB&T Defendants" means BB&T Corporation, the Board of Directors of BB&T Corporation, BB&T Corporation Employee Benefits Plan Committee, BB&T Corporation Board of Directors, Compensation Committee of the Board of Directors of BB&T Corporation.

the Plan. By acting for their own or others benefit rather than solely in the interest of Plan participants, and failing to adequately consider the use of non-proprietary products and services and other low-cost options available to the Plan, Defendants breached their fiduciary duties of loyalty and prudence, and engaged in transactions expressly prohibited by ERISA.[2] In addition, BB&T Defendants covered up their long campaign of self-interested and imprudent conduct through a series of false and misleading communications to Plan participants.

2.      To remedy these fiduciary breaches, Plaintiffs, individually and as representatives of a class of similarly situated persons, bring this action on behalf of the Plan under 29 U.S.C. §§1132(a)(2) and (3) to enforce Defendants' personal liability under 29 U.S.C. §1109(a) to make good to the Plan all losses resulting from each breach of fiduciary duty and to restore to the Plan any profits made through Defendants' use of the Plan's assets. In addition, Plaintiffs seek such other equitable or remedial relief for the Plan as the Court may deem appropriate.

## JURISDICTION AND VENUE

3.      This court has federal question subject matter jurisdiction under 28 U.S.C. §1331 because this is an action under 29 U.S.C. §1132(a)(2) and (3), for which federal district courts have exclusive jurisdiction under 29 U.S.C. §1132(e)(1).

4.      This district is the proper venue for this action under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b) because it is the district in which the Plan is administered, where

---

[2] The Employee Retirement Income Security Act, 29 U.S.C. §§1001–1461.

at least one of the alleged breaches took place, and where at least one defendant resides

or may be found, including BB&T Corporation, which has its headquarters in Winston-

Salem, North Carolina, within this district. All Defendants are subject to nationwide

service of process under 29 U.S.C. §1132(e)(2).

## PARTIES

### BB&T Corporation 401(k) Savings Plan

5.     BB&T Corporation established and maintains the Plan for its eligible

employees and is the Plan sponsor under 29 U.S.C. §1002(16)(B).

6.     As required by 29 U.S.C. §1102(a)(1), the Plan is established and

maintained pursuant to a written plan document, titled "BB&T Corporation 401(k)

Savings Plan."

7.     With the exception of certain employees covered by collective bargaining

agreements, all employees of BB&T Corporation and certain of its affiliates are eligible

to participate in the Plan.

8.     The Plan is an "employee pension benefit plan" under 29 U.S.C.

§1002(2)(A), and an "individual account plan" or "defined contribution plan" under 29

U.S.C. §1002(34).

9.     The Plan was established on July 1, 1982 by a predecessor of BB&T

Corporation, and was subsequently amended and restated effective January 1, 2000,

January 1, 2007, and January 1, 2013.

4

10.     As of year-end 2014, the Plan had approximately $3 billion in assets and 32,000 participants with account balances.

**Plaintiffs**

11.     Brewster Smith, Jr. resides in Timberlake, North Carolina, within this district. He is a "participant" in the Plan under 29 U.S.C. §1002(7) because he and his beneficiaries are eligible to receive benefits under the Plan.

12.     Erik Gavidia resides in Wake Forest, North Carolina and is a participant in the Plan because he and his beneficiaries are eligible to receive benefits under the Plan.

13.     Stephanie Gavidia resides in Wake Forest, North Carolina and was a participant in the Plan until 2014, when her account balance was distributed from the Plan. Stephanie Gavidia nonetheless is entitled to receive benefits from the Plan in the amount of the difference between the value of her account as of the time her account was distributed and what her account would have been worth at that time had Defendants not breached their duties as alleged herein.

14.     Doris Kirouac resides in Duluth, Georgia and is a participant in the Plan because she and her beneficiaries are eligible to receive benefits under the Plan.

15.     Paula Bridges resides in Greenville, West Virginia and is a participant in the Plan because she and her beneficiaries are eligible to receive benefits under the Plan.

16.     Nancy Johnson resides in Charleston, West Virginia and is a participant in the Plan because she and her beneficiaries are eligible to receive benefits under the Plan.

17.    Kerri Greaner resides in Pembroke Pines, Florida and is a participant in the Plan because she and her beneficiaries are eligible to receive benefits under the Plan.

18.    Patricia Wells resides in Kingston, Tennessee and was a participant in the Plan until the second quarter of 2012, when her account balance was distributed from the Plan. Wells nonetheless is entitled to receive benefits from the Plan in the amount of the difference between the value of her account as of the time her account was distributed and what her account would have been worth at that time had Defendants not breached their duties as alleged herein or had Defendants performed their duties in accordance with 29 U.S.C. §1104(a) before that date.

19.    Burke Bowers resides in Abingdon, Maryland and was a participant in the Plan until mid-2013, when his account balance was distributed from the Plan. Bowers nonetheless is entitled to receive benefits from the Plan in the amount of the difference between the value of his account as of the time his account was distributed and what his account would have been worth at that time had Defendants not breached their duties as alleged herein or had Defendants performed their duties in accordance with 29 U.S.C. §1104(a) before that date.

20.    Robert Sims resides in Hampton, Georgia and was a participant in the Plan until mid-2013, when his account balance was distributed from the Plan. Sims nonetheless is entitled to receive benefits from the Plan in the amount of the difference between the value of his account as of the time his account was distributed and what his account would have been worth at that time had Defendants not breached their duties as

alleged herein or had Defendants performed their duties in accordance with 29 U.S.C. §1104(a) before that date.

21.     Stacy Holstein resides in Atlanta, Georgia and was a participant in the Plan until October 2013, when her account balance was distributed from the Plan. Holstein nonetheless is entitled to receive benefits from the Plan in the amount of the difference between the value of her account as of the time her account was distributed and what her account would have been worth at that time had Defendants not breached their duties as alleged herein or had Defendants performed their duties in accordance with 29 U.S.C. §1104(a) before that date.

22.     Jeffrey Stauffer resides in Sykesville, Maryland and was a participant in the Plan until late 2013, when his account balance was distributed from the Plan. Stauffer nonetheless is entitled to receive benefits from the Plan in the amount of the difference between the value of his account as of the time his account was distributed and what his account would have been worth at that time had Defendants not breached their duties as alleged herein or had Defendants performed their duties in accordance with 29 U.S.C. §1104(a) before that date.

**Defendants**

23.     Defendants identified below include both "named fiduciaries" under 29 U.S.C. §1102(a)(1), who have authority under the written plan document to control and manage the administration of the plan, and functional fiduciaries under 29 U.S.C. §1002(21)(A), who possess or exercise certain types of authority, responsibility, or

7

control over the Plan. Each Defendant identified therein is also a "party in interest" under 29 U.S.C. §1002(14).

24.     Section 10.1 of the Plan provides for five named fiduciaries under 29 U.S.C. §1102(a)(1) with joint or several authority to control and manage the operation and administration of the Plan:

a.     Section 10.1.1 names the Board of Directors of BB&T Corporation as the fiduciary responsible for appointing and removing members of the Employee Benefits Plan Committee. The Board of Directors is responsible for oversight of the Plan, including the appropriateness of the Plan's investment offerings, and monitoring of investment performance.

b.     Section 10.1.2 names the Employee Benefits Plan Committee as the fiduciary responsible for interpreting the provisions of the Plan, determining the rights of participants under the Plan, administering the Plan in accordance with its terms (except to the extent the Plan delegates such powers to another fiduciary), accounting for the interests of participants in the Plan, and directing the Trustee in the distribution of trust assets. Section 8.1 provides that the Employee Benefits Plan Committee is responsible "for the general administration and interpretation of the plan[.]" The Employee Benefits Plan Committee consists of at least three individuals, all of whom are appointed by the Board of Directors.

8

c.   Section 8.1 of the Plan provides that the Chairman of the Employee

Benefits Plan Committee is the Plan Administrator under 29 U.S.C.

§1002(16)(A). Under §10.1.3 of the Plan, the Plan Administrator is the

fiduciary responsible for filing required reports with the United States

Department of Labor, Internal Revenue Service, and other government

agencies; complying with legal requirements for disclosing plan provisions

and other plan-related information to participants and other interested

parties; and administering claims for benefits. Since 2003, Defendant

Steven L. Reeder, Senior Vice President & Benefits Manager of BB&T

Corporation, has signed as "plan administrator" the Plan's annual

returns/reports filed with the United States Departments of Labor and

Treasury and Securities and Exchange Commission.

d.   Section 10.1.4 of the Plan provides that the Plan trustee is the fiduciary

responsible for investing trust assets, making distributions to participants,

rendering annual accountings to BB&T Corporation, and otherwise

holding, administering, and controlling the assets of the trust as provided in

the plan and trust agreement. The Plan's Trustee is and has been either

BB&T Corporation or its wholly-owned subsidiary, Defendant Branch

Banking and Trust Company.

e.   The Compensation Committee of the Board of Directors of BB&T

Corporation is named by §10.1.5 as the fiduciary responsible for

9

determining the investment funds to be made available to participants and adopting an investment policy statement for the Plan. The members of the Compensation Committee of the Board of Directors of BB&T Corporation are provided with regular communication and contact with BB&T management along with personal meetings with the BB&T Chairman and Chief Executive Officer related to Compensation Committee issues.

f.      The Charter of the Compensation Committee of the Board of Directors of BB&T Corporation gives to the Compensation Committee the authority to obtain advice and assistance from advisors, including outside investment consultants. From at least 2009 to the present, beginning with a search conducted by BB&T along with representatives from BB&T Human Systems and BB&T Asset Management, the Compensation Committee engaged the services of Defendant Cardinal Investment Advisors, LLC ("Cardinal") to serve as an outside investment consultant to the Compensation Committee.

g.      In its role as an investment advisors and consultant and the services it provide to the Compensation Committee, Cardinal acknowledged its role under ERISA as a fiduciary to the Plan. The Compensation Committee expressly acknowledged and required Cardinal's role as fiduciary to the Plan.

10

h.      Although not fully disclosed to Plaintiffs at this time, the services provided

by Cardinal to the Compensation Committee included, but was not limited

to: (i) providing advice and recommendations to the Compensation

Committee regarding investments offered in the Plan; (ii) amending and

revising the Statement of Investment Policy for the Plan; (iii) monitoring

the investment options and the managers of the investment options in the

Plan for annual reviews, compliance with the Statement of Investment

Policy, and adherence to stated style and performance; (iv) the analysis of

custodian, manager and investment account search, selection, and

transition; (v) preparing reporting of the investment options including the

performance of the investments, net of fees; and (vi) conducting Plan

administrative fee reviews, cost assessments, and fee benchmarking studies.

Further, Cardinal provided overall support to the Compensation Committee

as requested by the Compensation Committee.

i.      In addition to providing fiduciary services to the Plan, Cardinal provided

similar services to other BB&T retirement plans including BB&T's defined

benefit plan and other defined contribution plans, including supplemental

plans, non-qualified plans, and defined contribution plans for highly

compensated employees at BB&T.

25.      Acting through its Board of Directors and other BB&T Corporation

officers, directors, employees, agents, affiliates, subsidiaries, and committees, BB&T

Corporation exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, or had discretionary authority or discretionary responsibility in the administration of the Plan by hiring and retaining itself or its subsidiary to be the Plan's recordkeeper, causing or allowing excessive compensation to be paid to the recordkeeper, selecting and retaining imprudent and unreasonably expensive plan investment options, using and retaining very short-term investments for the Plan's fixed-income options while failing to adequately investigate replacing those investments with a longer duration stable value fund with higher returns, as many 401(k) plans have, and structuring the BB&T Common Stock Fund as a unitized account with excessive fees, direct conflicts of interest, and mismanagement of the fund, all as described in more detail below.

26.     The Plan's financial statements filed with the United States Departments of Labor and Treasury and the Securities and Exchange Commission state that BB&T Corporation's "Trust Division" provides trustee and recordkeeping services to the Plan. Materials provided to Plan participants state that a BB&T subsidiary, Branch Banking and Trust Company, is the trustee and recordkeeper. To the extent BB&T Corporation rather than its subsidiary is the Trustee, it is a named fiduciary under 29 U.S.C. §1102(a)(1) and Plan §10.1.4. In its capacity as trustee and recordkeeper, BB&T Corporation is a fiduciary to the Plan under 29 U.S.C. §1002(21)(A) because it exercised control over its own compensation from Plan assets through the actions of the Board of

Directors and the named fiduciary committees in retaining BB&T Corporation as recordkeeper, selecting and retaining plan investment options that paid excessive recordkeeping fees and other compensation, and causing or allowing BB&T Corporation to receive excessive compensation, all as described in more detail below.

27. Moreover, regardless of whether it is a fiduciary, BB&T Corporation is also subject to appropriate equitable relief under 29 U.S.C. §1132(a)(3) based on its knowing participation in prohibited transactions, its knowing receipt of payments made in breach of the fiduciary Defendants' fiduciary duties, and the unlawful inurement of Plan assets to its benefit as a Plan employer, all as described in more detail below.

28. The following individuals are current or former members of the Board of Directors of BB&T Corporation: John A. Allison, IV, Jennifer S. Banner, K. David Boyer, Jr., Anna R. Cablik, Nelle R. Chilton, Ronald E. Deal, Tom D. Efird, James A. Faulkner, Barry J. Fitzpatrick, J. Littleton Glover, Jr., L. Vincent Hackley, Jane P. Helm, I. Patricia Henry, John P. Howe, Eric C. Kendrick, Kelly S. King, Valeria Lynch Lee, Louis B. Lynn, James H. Maynard, Albert O. McCauley, Edward C. Milligan, J. Holmes Morrison, Charles A. Patton, Nido R. Qubein, William J. Reuter, Tollie W. Rich, Jr., E. Rhone Sasser, Christine Sears, Thomas E. Skains, Thomas N. Thompson, Edwin H. Welch, and Stephen T. Williams. By virtue of their membership on the Board of Directors, each of these individuals possessed discretionary authority and responsibility in the administration of the Plan, exercised discretionary authority or control respecting management of the Plan by appointing and monitoring the members of the Employee

13

Benefits Plan Committee, exercised authority or control respecting management or disposition of Plan assets through their actions or omissions with respect to the appropriateness of the Plan's investment offerings and monitoring of investment performance, and directly facilitated and participated in Defendant Board of Directors' breaches of fiduciary duties, all as described in more detail below. Thus, each of these individuals is a fiduciary with respect to the Plan under 29 U.S.C. §1002(21)(A).

29.     The following individuals are current or former members of Compensation Committee of the Board of Directors of BB&T Corporation: Nelle R. Chilton, Ronald E. Deal, Albert O. McCauley, Tom D. Efird, Jane P. Helm, Thomas N. Thompson, Jennifer S. Banner, J. Littleton Glover,  Jr., Thomas E. Skains, Anna R. Cablik, Valeria Lynch Lee, John P. Howe, III, Edward C. Milligan, Charles A. Patton, Edwin H. Welch, Tollie W. Rich, Jr., Eric C. Kendrick, and Louis B. Lynn. By virtue of their membership on the Compensation Committee, each of these individuals possessed discretionary authority and responsibility in the administration of the Plan. Through their actions and omissions with respect to determining the investment funds to be made available to participants, each of these individuals exercised discretionary authority or control respecting management of the Plan and exercised authority or control respecting management or disposition of the Plan's assets, and directly participated in and facilitated the Defendant Compensation Committee's breaches of fiduciary duties, all as described in more detail below. Thus, each of these individuals is a fiduciary with respect to the Plan under 29 U.S.C. §1002(21)(A).

30.     The following individuals are current or former members of EBPC: Paul Barnes, Ken Fitchett, Sharon Jeffries-Jones, Keith Kiser, John Sapp, Becky Sink, Henry Skinner and Derek Surette. By virtue of their membership on the Employee Benefits Plan Committee, each of these individuals possessed discretionary authority and responsibility in the general administration and interpretation of the Plan. Through their actions and omissions with respect to interpreting the provisions of the Plan, determining the rights of participants under the Plan, administering the Plan in accordance with its terms (except to the extent the Plan delegates such powers to another fiduciary), accounting for the interests of participants in the Plan, and directing the Trustee in the distribution of trust assets, each of these individuals is a Plan fiduciary under 29 U.S.C. §1002(21)(A).

31.     Reeder, acting as referenced above and as Secretary to the Employee Benefits Plan Committee, as well as the current or former members of the Employee Benefits Plan Committee including Paul Barnes, Ken Fitchett, Sharon Jeffries-Jones, Keith Kiser, John Sapp, Becky Sink, Henry Skinner and Derek Surette are fiduciaries of the Plan under 29 U.S.C. §1002(21)(A) because they exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, or had discretionary authority or discretionary responsibility in the administration of the Plan, as described in more detail below. Because Plaintiffs are currently unaware of the identities of the all individual members of the Employee Benefits Plan Committee. To the extent the Employee Benefits Plan Committee delegated any of its fiduciary functions to another

15

person or entity, the nature and extent of which has not been disclosed to Plaintiffs, the person or entity to which the function was delegated is also a fiduciary under 29 U.S.C. §1002(21)(A) for the same reasons.

32.     Branch Banking and Trust Company is a wholly-owned subsidiary of BB&T Corporation, and is the Plan's trustee and recordkeeper. Under Plan §1.33, it is a "Participating Employer" whose employees participate in the Plan. Thus, it is a "party in interest" under 29 U.S.C. §1002(14)—which is defined to encompass those entities that a fiduciary might be inclined to favor at the expense of the plan's participants—because it provides services to the Plan and its employees are covered by the Plan. As Trustee, it is a named fiduciary under 29 U.S.C. §1102(a)(1) and Plan §10.1.4. Under 29 U.S.C. §1002(21)(A), it is a fiduciary to the Plan because it exercised control over the amount of revenue sharing payments it received from the Plan, as described in more detail below. Moreover, regardless of whether it is a fiduciary, it is subject to appropriate equitable relief under 29 U.S.C. §1132(a)(3) based on its knowing participation in prohibited transactions, knowing receipt of payments made in breach of the fiduciary Defendants' fiduciary duties, and the unlawful inurement of Plan assets to its benefit as a Plan employer. Sterling Capital Management, LLC is a wholly-owned subsidiary of BB&T Corporation and serves as the investment adviser of several of the Plan's mutual funds. Under Plan §1.33, it is a "Participating Employer" whose employees participate in the Plan. Thus, it is a "party in interest" under 29 U.S.C. §1002(14) because it provides services to the Plan and its employees are covered by the Plan. Under 29 U.S.C.

16

§1002(21)(A), it is a fiduciary to the Plan because it exercised control over the amount that the recordkeeper and trustee was paid from Plan assets, all as described in more detail below. Moreover, regardless of whether it is a fiduciary, it is subject to appropriate equitable relief under 29 U.S.C. §1132(a)(3) based on its knowing participation in prohibited transactions, knowing receipt of payments made in breach of the fiduciary Defendants' fiduciary duties, and the unlawful inurement of Plan assets to its benefit as a Plan employer.

33.     In addition to its stringent fiduciary duties owed to the Plan, Defendants, in their roles as fiduciaries, are responsible for all investment and administrative functions related to other BB&T retirement plans including BB&T's defined benefit plan and other defined contribution plans, including supplemental plans, non-qualified plans, and defined contribution plans for highly compensated employees at BB&T. Defendants performed their fiduciary functions on behalf of the Plan in conjunction with their duties owed to other BB&T-sponsored retirement plans, such as during the same fiduciary committee meetings.

## FACTS APPLICABLE TO ALL COUNTS

### Proprietary Investment Funds

34.     In a defined-contribution plan, participants' retirement benefits are limited to the value of their own individual accounts, which is determined solely by employee and employer contributions plus the amount gained through investment in the options made available in the plan, less expenses. See 29 U.S.C. §1002(34). Accordingly, poor

17

investment performance and excessive fees can significantly impair the value of a participant's account. Over time, even seemingly small differences in fees and performance can result in vast differences in the amount of savings available at retirement. *See, e.g.*, U.S. Dep't of Labor, *A Look at 401(k) Plan Fees* 1–2 (Aug. 2013) (illustrating impact of expenses with example in which 1% difference in fees and expenses over 35 years reduces participant's account balance at retirement by 28%).

35. Here, BB&T Defendants, as advised by Cardinal, controlled the available investments in which the participants could place their retirement assets. Despite the many high-quality and low-cost investment options available in the market, the Plan's investment options have contained many of BB&T's own proprietary mutual funds. These Defendants chose, and/or recommended, the BB&T funds not based on their merits as investments, or because doing so was in the interest of Plan participants, but because these products provided significant revenues and profits to BB&T Corporation and its subsidiaries.

36. Prior to October 1, 2010, the proprietary options in the Plan were managed by BB&T Asset Management, Inc., a wholly-owned subsidiary of BB&T Corporation, and were branded as "BB&T" funds. On October 1, 2010, BB&T Asset Management merged into Sterling Capital Management, LLC, another wholly-owned subsidiary of BB&T Corporation. Effective February 1, 2011, the BB&T funds were renamed "Sterling Capital" funds, but remained BB&T proprietary funds.

18

37.     As of January 1, 2007, the date of the previous restatement of the Plan and the proposed starting date for Plaintiffs' class, the Plan's designated investment options were exclusively proprietary options, including 16 BB&T mutual funds, the BB&T Common Stock Fund, and the BB&T One-Year Bank Investment Contract.[3]

38.     The Plan did not include any non-proprietary funds among the designated options until 2009. At that time, the Plan continued to include eight BB&T mutual funds, along with the proprietary BB&T Common Stock Fund and One-Year Bank Investment Contract. The total annual operating expense or "expense ratio" of the eight BB&T mutual funds ranged between 72 basis points to 153 basis points (100 basis points = 1%), far beyond the fees in funds that are readily available to 401(k) plans of the same size or even those that are much smaller than the Plan:

    A.     BB&T International Equity Fund: 153 basis points;

    B.     BB&T Small Cap Value Fund: 116 basis points;

    C.     BB&T Special Opportunities Fund: 107 basis points;

    D.     BB&T Mid Cap Growth Fund: 98 basis points;

    E.     BB&T Equity Income Fund: 97 basis points;

---

[3] The Plan also offered a self-directed brokerage option, through which participants could invest in various mutual funds and stocks that have not been screened by a fiduciary and have not been designated for inclusion on the core investment menu. BB&T represents that it "does not monitor these investments … and it is up to you to determine if these options are suitable for your retirement." As of 2007, only about 1.5% of the Plan's assets were invested in the self-directed brokerage option. The investments available through the brokerage option are mostly retail mutual funds, and any participant using this option must sign a brokerage account contract and agree to pay a number of additional fees, including brokerage commissions, transaction fees of up to $25 for each trade, account maintenance fees of $50 per year, and various miscellaneous charges.

F.      BB&T Mid Cap Value Fund: 95 basis points;

G.      BB&T Large Cap Fund (later known as Select Equity Fund): 83 basis points;

H.      BB&T Total Return Bond Fund: 72 basis points.

39.      Two of those funds are no longer in the Plan because they went out of business: the BB&T Mid Cap Growth Fund was merged into the BB&T Mid Cap Value Fund on February 1, 2010, and the BB&T International Equity Fund was liquidated on January 31, 2012.

40.      Currently, the Plan's designated investment options continue to include six proprietary Sterling Capital mutual funds, with expense ratios ranging from 85 to 103 basis points for equity funds, and 59 basis points for the bond fund, far beyond the fees readily available to 401(k) plans of the same size and even much smaller than the Plan:

A.      Sterling Capital Small Cap Value Fund: 103 basis points;

B.      Sterling Capital Special Opportunities Fund: 99 basis points;

C.      Sterling Capital Equity Income Fund: 97 basis points;

D.      Sterling Capital Mid Cap Value Fund: 93 basis points;

E.      Sterling Capital Large Cap Value Fund (formerly known as Select Equity Fund): 85 basis points;

F.      Sterling Capital Total Return Bond Fund: 59 basis points.

41.     As of December 31, 2014, the Plan had over $1 billion invested in these proprietary mutual funds. In prior years, the plan had similar totals: 2013—$974 million; 2012—$790 million; 2011—$716 million; 2010—$726 million; 2009—$591 million.[4]

42.     In addition to the proprietary mutual funds, Defendants continue to provide as Plan investments two other proprietary non-mutual fund options: the BB&T Common Stock Fund, the largest Plan option, with over $614 million as of December 31, 2014, and the BB&T Associate Insured Deposit Account (which replaced the BB&T One-Year Bank Investment Contract in 2012), which held $172 million at year-end 2014.

43.     Accordingly, as of December 31, 2014, $1.84 billion of the Plan's $2.93 billion in assets—*63%*—was invested in proprietary BB&T options.

44.     Until 2009, Defendants provided participants only proprietary options. To the extent non-proprietary options have been added, they have generally covered different investment styles than the remaining proprietary options, so participants seeking to invest in styles for which the Plan offered only proprietary funds had no means to avoid the proprietary option. Moreover, while the number of available proprietary options has been reduced over time, the proprietary equity funds that were removed had relatively small asset levels compared to the proprietary funds retained in the plan, so the amount of assets invested in the proprietary options has remained high—currently almost two-thirds of the entire Plan. As of year-end 2006, the Plan had about $1.75 billion invested in

---

[4] The figures for 2011 and 2010 include assets in the BB&T International Fund, which was removed from the Plan in 2012; 2009 includes both the International Fund and the BB&T Mid Cap Growth Fund, which merged into the Mid Cap Value Fund in 2010.

proprietary investments, similar to the current amount. Accordingly, the asset base from which BB&T and its subsidiaries derive revenues from employees' investments in proprietary funds continues to represent most of the Plan's assets, despite the reduction in the number of proprietary funds.

## Proprietary Recordkeeping

45.     Recordkeeping is a service necessary for every defined contribution plan. The market for recordkeeping is highly competitive. There are numerous vendors in the marketplace who are equally capable of providing a high level of service to large 401(k) plans like the Plan and will readily respond to a request for proposals. These vendors primarily differentiate themselves based on price, and vigorously compete for business by offering the best price.

46.     Rather than using an arm's length bidding process to hire a recordkeeper, since 2000, BB&T Defendants have used BB&T Corporation's Trust Division or BB&T Corporation's subsidiary, Branch Banking and Trust Company, as the Plan's trustee and recordkeeper.

47.     BB&T Defendants used BB&T or its subsidiary to provide these services without any competitive bidding process and without any negotiation over the compensation to be paid for these services, even though other entities could have provided the same services at a far lower cost to the Plan. This allowed BB&T or its subsidiary to receive significant revenues and profits, which came at the direct expense of Plan participants.

22

48.     As described below, by favoring proprietary options and services and engaging in other imprudent and disloyal conduct in managing the Plan, Defendants generated profits for BB&T Corporation and its subsidiaries while the Plan suffered losses due to excessive administrative and investment management fees and poor performance.

## Excessive Administrative Fees

49.     To ensure that plan administrative expenses are reasonable, prudent fiduciaries of large 401(k) plans such as the Plan put plan recordkeeping and administrative services out for competitive bidding at regular intervals of around 3 years.

50.     The cost of providing recordkeeping services depends on the number of participants, not on the amount of money in participants' accounts. The cost of providing recordkeeping services to a participant with $100,000 in her retirement account is the same as for a participant with $1,000 in her retirement account. Plans with large numbers of participants can take advantage of economies of scale: a plan with 30,000 participants can negotiate a much lower per participant fee for recordkeeping services than a plan with 1,000 participants.

51.     Because recordkeeping costs are not affected by account size, prudent fiduciaries negotiate recordkeeping fees on the basis of a fixed dollar amount for each participant in the plan, instead of a percentage of plan assets. Otherwise, as plan assets increase (such as through participant contributions and investment gains), recordkeeping compensation increases without any change in recordkeeping services.

23

52.     Some mutual funds engage in a practice known as "revenue sharing." In a revenue sharing arrangement, a mutual fund takes a portion of the expense ratio it charges investors and pays it to the plan's recordkeeper. Here, rather than payments to an independent recordkeeper, the revenue sharing payments were made from one BB&T entity to another.

53.     While revenue sharing payments are ostensibly provided as compensation to the recordkeeper for providing administrative services, the payments can effectively be "kickbacks" for including the fund in a plan's investment lineup. Certain vendors of recordkeeping services also sell investment products and recommend that plan fiduciaries use such affiliated funds or other funds offering revenue sharing arrangements that are favorable to the recordkeeper. Other vendors do recordkeeping only and do not sell investment products. These vendors are more likely to offer pricing on a pure per-participant basis, without any revenue sharing component.

54.     In order to make an informed assessment as to whether a recordkeeper is receiving no more than a reasonable fee for the services provided to a plan, the responsible fiduciary must identify *all* fees, including recordkeeping fees and other sources of compensation, paid to the service provider. To the extent that a plan's investment options pay asset-based revenue sharing to the recordkeeper, prudent fiduciaries monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable levels, and require that any revenue sharing payments that exceed a reasonable level be returned to the plan.

55. Here, since the BB&T Defendants and Cardinal must monitor the BB&T recordkeeping entity's fees, there is a direct conflict of interest, and the Plan's fees became excessive in part because Defendants failed to assess, monitor and control the amount of the revenue sharing payments to BB&T or its subsidiary.

56. Further, BB&T Defendants explicitly told participants that BB&T Corporation "pays the administration fees for the Plan." This statement was false. In fact, the Plan participants pay the vast majority of these fees through revenue sharing paid from their investments in the Plan's mutual funds, which are kicked back to the BB&T recordkeeping entity. According to the Plan's annual reports filed with the United States Departments of Labor and Treasury, BB&T or its subsidiary received indirect compensation from all of the Plan's mutual funds, including the non-proprietary funds. These payments directly reduced the retirement assets in Plan participants' accounts.

57. For purposes of a plan's annual report, revenue sharing payments are classified as "indirect compensation," as distinguished from "direct" payments from the Plan. Instead of being flat fees per participant, the revenue sharing payments are asset-based, meaning they are assessed as a percentage of the assets Plan participants have invested in each investment option each year. In the Plan's annual reports, BB&T Corporation reported that it or its subsidiary received indirect compensation from the Plan's mutual funds at the following rates, applied to the amount of the Plan's investment in each fund:

## A. Proprietary Funds

| Fund name | Rate of indirect compensation |
|---|---|
| Sterling Capital International Fund | 85 basis points |
| Sterling Capital Small Cap Fund | 80 basis points |
| Sterling Capital Special Opportunities Fund | 80 basis points |
| Sterling Capital Mid Value Fund | 70 basis points |
| BB&T Mid Cap Growth Fund | 70 basis points |
| Sterling Capital Equity Income Fund | 70 basis points |
| Sterling Capital Select Equity Fund / Lg Cap Value | 60 basis points |
| Sterling Capital Total Return Bond Fund | 45 basis points |

## B. Non-proprietary Funds[5]

| Fund name | Rate of indirect compensation |
|---|---|
| Fidelity Contrafund | 25 basis points |
| Brandywine Blue Fund | 15 basis points |
| T. Rowe Price Mid Cap Growth Fund | 15 basis points |

---

[5] BB&T Corporation failed to disclose any indirect compensation from Fidelity Contrafund and Harbor International Fund in the Plan's annual reports, but other sources confirm these figures.

| Fund name | Rate of indirect compensation |
|---|---|
| T. Rowe Price target date funds (Retirement Income Fund and 11 funds dated 2005 through 2055) | 15 basis points |
| Harbor International Fund | 10 basis points |

58.     As this chart shows, the level of revenue sharing that BB&T Corporation or its subsidiary received from the proprietary BB&T and Sterling Capital mutual funds was not only asset-based instead of a flat fee per participant, but also several orders of magnitude higher than the revenue sharing from the non-proprietary options. BB&T Defendants, and Cardinal, selected and retained the proprietary BB&T and Sterling Capital mutual funds in part because of this revenue sharing system, driving revenue to their in-house recordkeeper, and exceeding by orders of magnitude a reasonable level of fees.

59.     Based on these revenue sharing rates shown on the annual reports, and the amount of reported direct compensation from the Plan, BB&T or its subsidiary received the following approximate amounts of combined direct and indirect compensation for recordkeeping from 2009 through 2013: 2009—$4.1 million; 2010—$5.4 million; 2011—$5.3 million; 2012—$5.9 million; 2013—$2.8 million.

60.     Moreover, the Plan's annual reports failed to disclose several additional sources of revenue received by BB&T or its subsidiary, including: float revenue, finders' fees, non-monetary gifts or sponsorships, and revenue paid to BB&T or its subsidiary by

ProNvest, an investment advice service in the Plan which paid BB&T or its subsidiary a portion of its fees (60 to 100 basis points). The amounts of these undisclosed payments are currently not capable of precise determination from documents BB&T Defendants have filed with the Department of Labor or issued to participants, but only increase the already excessive amounts disclosed on the annual reports.

61.     Based on information currently available to Plaintiffs regarding the Plan's features, the nature of the administrative services provided by BB&T or its subsidiary, and the Plan's participant level (roughly 30,000), and the recordkeeping market, the outside limit of a reasonable recordkeeping fee for the Plan would have been $30 per participant. Based on the direct and indirect compensation levels shown on the Plan's annual reports, the Plan paid approximately *$90 to $190* per participant per year from 2009 through 2013, up to *633% higher* than a reasonable fee for these services.

62.     From the beginning of 2009 to year-end 2014, the Plan's assets more than doubled, from $1.4 billion to over $2.9 billion. By year-end 2012, the Plan's assets had increased 57% percent compared to the beginning of 2009, to $2.2 billion. Because the revenue sharing payments are asset-based, the already excessive compensation paid to BB&T or its subsidiary each year from 2010 through 2012 *skyrocketed by over 50%* compared to 2009—about $2 million more per year—even though the administrative services that BB&T or its subsidiary provided to the Plan remained essentially the same. BB&T Defendants and Cardinal could have capped the amount of revenue sharing to ensure that any excessive amounts were returned to the Plan.

28

63.     Based on these facts, BB&T Defendants and Cardinal failed to prudently monitor and control BB&T's recordkeeping compensation, particularly the amount of asset-based, uncapped revenue sharing received by BB&T or its subsidiary. By allowing BB&T or its subsidiary to receive an uncapped amount of revenue sharing, Defendants allowed BB&T or its subsidiary to receive excessive compensation for the same level of service.

64.     Moreover, had BB&T Defendants, and Cardinal, conducted a competitive bidding process for the Plan's recordkeeping services, the market would have determined a reasonable recordkeeping fee for the Plan. Had BB&T Defendants and Cardinal done so, they would have seen that the amount the Plan was paying to BB&T or its subsidiary was greatly excessive. That would have allowed BB&T Defendants and Cardinal to negotiate a reduction in recordkeeping fees, either from the BB&T recordkeeping entity, or by retaining a new recordkeeper. At that point, even if the Plan continued to use revenue sharing to pay for recordkeeping, the amount of revenue sharing could have been capped at a reasonable level, with any excess returned to the Plan.

65.     BB&T Defendants and Cardinal's failure to obtain competitive bids, while allowing BB&T to receive an uncapped amount of revenue sharing, resulted in the Plan paying millions of dollars in excessive fees for recordkeeping.

### Excessive Investment Management Fees and Performance Losses

66.     Academic and financial industry literature shows the importance of low fees in selecting investments. Numerous scholars have demonstrated that high expenses

are not correlated with superior investment management. Indeed, funds with high fees on average perform worse than less expensive funds even on a *pre-fee basis*. Javier Gil-Bazo & Pablo Ruiz-Verdu, *When Cheaper is Better: Fee Determination in the Market for Equity Mutual Funds*, 67 J. Econ. Behav. & Org. 871, 873 (2009); see also Jill E. Fisch, *Rethinking the Regulation of Securities Intermediaries*, 158 U. Pa. L. Rev. 1961, 1993 (2010)(summarizing numerous studies showing that "the most consistent predictor of a fund's return to investors is the fund's expense ratio").

> [T]he empirical evidence implies that superior management is not priced through higher expense ratios. On the contrary, it appears that the effect of expenses on after-expense performance (even after controlling for funds' observable characteristics) is more than one-to-one, which would imply that low-quality funds charge higher fees. Price and quality thus seem to be inversely related in the market for actively managed funds.

Gil-Bazo & Ruiz-Verdu, *When Cheaper is Better*, at 883.

67.     While high-cost mutual funds may exhibit positive, market-beating performance over shorter periods of time, studies demonstrate that this is arbitrary: outperformance during a particular period is not predictive of whether a mutual fund will perform well in the future. Laurent Barras et al., *False Discoveries in Mutual Fund Performance: Measuring Luck in Estimated Alphas*, 65 J. Fin. 179, 181 (2010); Mark M. Carhart, *On Persistence in Mutual Fund Performance*, 52 J. Fin. 57, 57, 59 (1997) (measuring thirty-one years of mutual fund returns and concluding that "persistent differences in mutual fund expenses and transaction costs explain almost all of the predictability in mutual fund returns"). However, the *worst-performing* mutual funds

show a strong, persistent tendency to continue their poor performance. Carhart, *On Persistence in Mutual Fund Performance*, at 57.

68.     To the extent managers show any sustainable ability to beat the market, the outperformance is nearly always dwarfed by mutual fund expenses. Eugene F. Fama & Kenneth R. French, *Luck Versus Skill in the Cross-Section of Mutual Fund Returns*, 65 F. Fin. 1915, 1931–34 (2010); Russ Wermers, *Mutual Fund Performance: An Empirical Decomposition into Stock-Picking Talent, Style, Transaction Costs, and Expenses*, 55 J. Fin. 1655, 1690 (2000). Accordingly, investment costs are of paramount importance to prudent investment selection, and a prudent investor will not select higher cost actively managed funds without a documented process to realistically conclude that the fund is likely to be that rare exception that will outperform its benchmark index in the future, net of investment expenses.

69.     At all relevant times, the Plan's investment options charged unreasonable fees for the services provided to the Plan. Those high fees were not justified by superior investment performance.

### A. Excessive fees compared to other mutual funds

70.     As of 2009, the proprietary BB&T equity mutual funds charged 83 to 153 basis points, and the BB&T bond fund charged 72 basis points. See ¶38, *supra*. The fees currently disclosed to participants show that the proprietary Sterling Capital equity mutual funds charge 85 to 103 basis points, while the Sterling Capital bond fund charges 59 basis points. See ¶40, *supra*. These are far higher than reasonable investment

31

management fees for such funds. The fees in many of the non-proprietary options also have been excessive. The fees in the Plan's mutual funds were and are significantly higher than comparable institutional investments available to 401(k) plans. The fees, moreover, are and were significantly higher than the fees available from alternative mutual funds, including Vanguard institutional funds with similar investment styles that were readily available as Plan investment options. The fees for the Plan's investment options were up to *14 times more expensive* than available Vanguard alternatives in the same investment style:

| Fund in Plan | Exp. ratio | Vanguard alternative | Exp. ratio | Investment style | % fee excess |
|---|---|---|---|---|---|
| Brandywine Blue Fund (BLUEX) | 119 bps | Vanguard Growth Index Instl (VIGIX) | 8 bps | Large Growth | 1488% |
| Sterling Capital Small Cap (SPSCX) | 103 bps | Vanguard Small-Cap Value Index Instl (VSIIX) | 8 bps | Small Value | 1288% |
| Sterling Capital Special Opportunities (BOPIX) | 99 bps | Vanguard Growth Index Instl (VIGIX) | 8 bps | Large Growth | 1238% |
| Sterling Capital Total Return Bond (BIBTX) | 59 bps | Vanguard Intermediate-Term Bond Index Instl Plus (VBIUX) | 5 bps | Intermediate Term Bond | 1180% |
| Sterling Capital International (BBTIX) | 116 bps | Vanguard Total Int'l Stock Index Instl Plus (VTPSX) | 10 bps | Foreign Large Blend | 1160% |

| Fund in Plan | Exp. ratio | Vanguard alternative | Exp. ratio | Investment style | % fee excess |
|---|---|---|---|---|---|
| Sterling Capital Equity Income (BEGIX) | 97 bps | Vanguard Value Index Admiral (VVIAX) | 9 bps | Large Value | 1078% |
| Sterling Capital Mid Value (OVEIX) | 93 bps | Vanguard Mid-Cap Value Index Admiral (VMVAX)(since 9/2011); Vanguard Selected Value Fund Investor (VASVX) | 9 bps; 44 bps | Mid Value | 1033%; 211% |
| Sterling Capital Select Equity/Lg. Cap (BBISX) | 85 bps | Vanguard Value Index Admiral (VVIAX) | 9 bps | Large Value | 944% |
| T. Rowe Price Mid Cap Growth (RPMGX) | 78 bps | Vanguard Mid-Cap Growth Index Admiral (VMGMX) (since 9/2011); Investor (VMGIX) | 9 bps; 23 bps | Mid Growth | 867%; 339% |
| Fidelity Contrafund (FCNTX) | 67 bps | Vanguard Growth Index Instl (VIGIX) | 8 bps | Large Growth | 838% |
| Harbor International (HAINX) | 74 bps | Vanguard European Stock Index Admiral (VEUSX) | 12 bps | Foreign Large Blend | 617% |
| BB&T Mid Cap Growth (OCAAX) | 99 bps | Vanguard Mid-Cap Growth Index Admiral (VMGIX) | 23 bps | Mid Growth | 430% |
| T. Rowe Price Retirement 2030 (TRRCX) | 73 bps | Vanguard Target Retirement 2030 Fund Inv. (VTHRX) | 17 bps | TDF Large Blend | 429% |

| Fund in Plan | Exp. ratio | Vanguard alternative | Exp. ratio | Investment style | % fee excess |
|---|---|---|---|---|---|
| T. Rowe Price Retirement 2040 (TRRDX) | 76 bps | Vanguard Target Retirement 2040 Fund Inv. (VFORX) | 18 bps | TDF Large Blend | 422% |
| T. Rowe Price Retirement 2045 (TRRKX) | 76 bps | Vanguard Target Retirement 2045 Fund Inv. (VTIVX) | 18 bps | TDF Large Blend | 422% |
| T. Rowe Price Retirement 2050 (TRRMX) | 76 bps | Vanguard Target Retirement 2050 Fund Inv. (VFIFX) | 18 bps | TDF Large Blend | 422% |
| T. Rowe Price Retirement 2055 (TRRNX) | 76 bps | Vanguard Target Retirement 2055 Fund Inv. (VFFVX) | 18 bps | TDF Large Blend | 422% |
| T. Rowe Price Retirement 2020 (TRRBX) | 67 bps | Vanguard Target Retirement 2020 Fund Inv. (VTWNX) | 16 bps | TDF Large Blend | 419% |
| T. Rowe Price Retirement 2035 (TRRJX) | 75 bps | Vanguard Target Retirement 2035 Fund Inv. (VTTHX) | 18 bps | TDF Large Blend | 417% |
| T. Rowe Price Retirement 2025 (TRRHX) | 70 bps | Vanguard Target Retirement 2025 Fund Inv. (VTTVX) | 17 bps | TDF Large Blend | 412% |
| T. Rowe Price Retirement 2015 (TRRGX) | 63 bps | Vanguard Target Retirement 2015 Fund Inv. (VTXVX) | 16 bps | TDF Large Blend | 394% |
| T. Rowe Price Retirement 2010 (TRRAX) | 59 bps | Vanguard Target Retirement 2010 Fund Inv. (VTENX) | 16 bps | TDF Large Blend | 369% |

| Fund in Plan | Exp. ratio | Vanguard alternative | Exp. ratio | Investment style | % fee excess |
|---|---|---|---|---|---|
| T. Rowe Price Retirement 2005 (TRRFX) | 59 bps | Vanguard Target Retirement Income Fund Inv. (VTINX) | 16 bps | Retirement Income Large Blend | 369% |
| T. Rowe Price Retirement Income (TRRIX) | 57 bps | Vanguard Target Retirement Income Fund Inv. (VTINX) | 16 bps | Retirement Income Large Blend | 356% |
| Vanguard Instl Index Instl (VINIX) | 4 bps | Vanguard Instl Index Instl Plus (VIIIX) | 2 bps | Large Blend | 200% |
| Federated Investors Treas. Obligations (TOIXX) | 20 bps | Vanguard Prime Money Market Institutional (VMRXX) | 10 bps | U.S. Money Market | 200% |
| Vanguard Total Int'l Stock Index I (VTSNX) | 12 bps | Vanguard Total Int'l Stock Index Instl Plus (VTPSX) | 10 bps | Foreign Large Blend | 120% |

71.    BB&T Defendants, and Cardinal, also failed to prudently investigate and use the lowest cost share class of certain mutual funds in the Plan, which would have provided an identical, but less expensive version of the exact same investment with the identical manager and an identical mix of investments:

a.      Included the retail version of the Fidelity Contrafund, (FCNTX), which charges 67 basis points, 24% higher than the 54 basis point Class K shares (FCNKX). There is no purchase minimum for Class K shares.

b.     Used the Vanguard Institutional Index Fund institutional share class
(VINIX), which at 4 basis points is double the cost of the 2 basis point
institutional plus share class (VIIIX). Although the Plan's current $137
million investment is less than the required minimum for the institutional
plus shares of $200 million, mutual funds regularly waive these minimums
for large 401(k) plans if the fiduciary requests a waiver. Prudent fiduciaries
seeking to benefit their plans by reducing expenses regularly request such
waivers. Upon information and belief, Defendants failed to request such a
waiver.

## B. Excessive fees compared to separate accounts

72.     Aside from excessive fees compared to other mutual funds that were
available to the Plan, BB&T Defendants, and Cardinal, also failed to adequately
investigate (or failed to come to a reasoned decision) offering non-mutual fund
alternatives, such as collective trusts and separately managed accounts. Each mutual fund
in the Plan charged fees greatly in excess of the rates BB&T Defendants, and Cardinal,
could have obtained for the Plan by using these comparable products.

73.     According to the United States Department of Labor, separate accounts,
which require a minimum investment of $15 million to $25 million per account, are
available to "large plans … with total assets of over $500 million[.]" *Study of 401(k) Plan
Fees and Expenses*, April 13, 1998. By using separate accounts, "[t]otal investment
management expenses can commonly be reduced to one-fourth of the expenses incurred

36

through retail mutual funds." *Id*. As the BB&T Plan had assets of well over $1 billion at all relevant times, separate accounts were readily available to the Plan.

74. Separate accounts have a number of advantages over mutual funds, including the ability to negotiate fees, and greater control by the plan sponsor or fiduciary over the investment guidelines. In a mutual fund, all investors are charged the same fee, and investors have no ability to modify the fund's investment guidelines, which are set by the fund's investment adviser. In a separate account, the plan sponsor can negotiate the best possible fee for the plan, and can tailor the investment guidelines to better fit the demographics of the workforce.

75. While certain of the Plan's options were institutional *mutual fund* shares, they did not capture the far lower expenses available given the size of the Plan's investment in each fund. Each of the Plan's mutual funds also had a retail share class. Had the Plan obtained separate accounts with expenses of one-fourth the costs of the retail shares, the Plan's expenses would have been reduced dramatically:

| Retail share of Plan fund | Retail exp. ratio | Separate account rate as per DOL: 1/4 of the cost of retail | Exp. ratio of Plan's share class | % fee excess over DOL rate |
|---|---|---|---|---|
| Sterling Capital International Fund (BIQAX) | 141 bps | 35 bps | 116 bps | 331% |

| Retail share of Plan fund | Retail exp. ratio | Separate account rate as per DOL: 1/4 of the cost of retail | Exp. ratio of Plan's share class | % fee excess over DOL rate |
|---|---|---|---|---|
| Sterling Capital Small Cap Value Equity Fund Class A (SPSAX) | 124 bps | 31 bps | 103 bps | 332% |
| BB&T Mid Cap Growth Fund (OVCBX) | 123 bps | 31 bps | 99 bps | 319% |
| Sterling Capital Special Opportunities Fund Class A (BOPAX) | 121 bps | 30 bps | 99 bps | 330% |
| Sterling Capital Mid Value Fund Class A (OVEAX) | 118 bps | 30 bps | 93 bps | 310% |
| Sterling Capital Equity Income Fund Class A (BAEIX) | 120 bps | 30 bps | 97 bps | 323% |
| Brandywine Blue Fund (BLUEX) | 119 bps | 30 bps | 119 bps | 397% |
| Harbor International Fund Investor (HIINX) | 110 bps | 28 bps | 74 bps | 264% |
| Sterling Capital Behavioral Large Cap Value Equity Fund A (BBTGX) | 106 bps | 27 bps | 85 bps | 315% |

| Retail share of Plan fund | Retail exp. ratio | Separate account rate as per DOL: 1/4 of the cost of retail | Exp. ratio of Plan's share class | % fee excess over DOL rate |
|---|---|---|---|---|
| T. Rowe Price Mid-Cap Growth Fund Advisor Class (PAMCX) | 103 bps | 26 bps | 78 bps | 300% |
| T. Rowe Price Retirement Target Date Fund Series, Advisor (2005–2055) | 84–101 bps | 21–25 bps | 59–76 bps | 281%–304% |
| T. Rowe Price Retirement Balanced Fund Advisor Class (PARIX) | 82 bps | 21 bps | 57 bps | 271% |
| Sterling Capital Total Return Bond Fund Class A (BICAX) | 81 bps | 20 bps | 59 bps | 295% |
| Fidelity Contrafund (FCNTX) | 67 bps | 17 bps | 67 bps | 394% |

76.     Sterling Capital Management LLC itself offered its other institutional clients separately-managed accounts in the same investment styles as the Plan's proprietary mutual funds, but at much lower cost. Sterling Capital's advertising materials state that the minimum investment for these separate accounts is $10 million, with fee schedules that decline as assets increase. The Plan's investments in the Sterling Capital

mutual funds are far above that threshold—five of the six options have at least $150–$200 million invested, and the remaining option has $65 million.

77.    Sterling Capital's advertised fee schedule for a Large Cap Value separate account starts at 60 basis points, and declines to 40 basis points on incremental assets over $50 million. Based on the Plan's $228 million investment in the Sterling Capital Behavioral Large Cap Value mutual fund (a.k.a. Select Equity Fund), the Plan would have paid only 43 basis points under the separate account fee schedule. Thus, BB&T Defendants, and Cardinal, could have cut the 85 basis point mutual fund fee in half simply by converting the mutual fund to a separate account.

78.    Similarly, Sterling Capital advertises a "Special Opportunities Portfolio" with a declining fee schedule that starts at 70 basis points on the first $25 million in assets, and declines to 40 basis points on all incremental assets above $75 million. Based on the Plan's $222 million investment in the Sterling Capital Special Opportunities mutual fund, BB&T Defendants, and Cardinal, could have reduced the 96 basis point mutual fund fee paid by the Plan by *more than half* by converting the mutual fund to a separate account.

79.    Based on Sterling Capital's advertised fee schedules, Defendants could have obtained similar savings for each of the other Sterling Capital mutual funds in the Plan. Had BB&T Defendants, and Cardinal, obtained those institutional rates, the Plan would have saved *over $4 million* in investment management expenses in 2014 alone.

Doing so would have reduced the revenue to BB&T and its subsidiaries, and reduced participants' losses of retirement assets due to excessive fees.

80.     Aside from Sterling Capital, many other investment managers, including those that managed the Plan's non-proprietary mutual fund options, also offered separate account versions of their mutual funds with the same manager at a much lower cost than the fees paid by mutual fund investors.

81.     Moreover, unlike mutual funds, which by law must charge the same fee to all investors, separate account fee schedules are subject to negotiation. Indeed, industry data show that actual fee schedules are typically lower than advertised fee schedules, particularly when a plan has a large amount of assets to invest, as the Plan did here. Accordingly, the fee savings that BB&T Defendants, and Cardinal, could have obtained for the Plan were even greater than the amounts reflected in the investment managers' advertised fee schedules. By using almost exclusively mutual funds, BB&T Defendants and Cardinal squandered the ability to negotiate lower fees for the benefit of the Plan.

### C. Excessive fees compared to collective trusts

82.     Collective trusts also would have provided much lower investment management fees than the Plan's mutual funds. Collective trusts are a common investment vehicle in large 401(k) plans, and are accessible even to midsize plans with $100 million in assets or more. Anne Tergesen, *401(k)s Take a New Tack*, WALL ST. J. (Sept. 25, 2015), available at http://www.wsj.com/articles/some-funds-in-your-401-k-arent-really-mutual-funds-after-all-1443173400. According to investment consulting firm

41

Callan Associates Inc., for plans with over $1 billion in assets, collective trusts charge an average of 54 basis points, compared to an average of 101 basis points for retail mutual funds, and 85 basis points for institutional mutual fund shares. Twenty-four of the 27 mutual funds that have been in the Plan had expense ratios far in excess of the average collective trust rate:

| Fund in Plan | Expense ratio | % excess over collective trust avg. (54 bps) |
|---|---|---|
| Brandywine Blue Fund (BLUEX) | 119 bps | 220% |
| Sterling Capital International (BBTIX) | 116 bps | 215% |
| Sterling Capital Small Cap (SPSCX) | 103 bps | 191% |
| BB&T Mid Cap Growth (OCAAX) | 99 bps | 183% |
| Sterling Capital Special Opportunities (BOPIX) | 99 bps | 183% |
| Sterling Capital Equity Income (BEGIX) | 97 bps | 180% |
| Sterling Capital Mid Cap Value (OVEIX) | 93 bps | 172% |
| Sterling Capital Select Equity/Lg. Cap (BBISX) | 85 bps | 157% |
| Sterling Capital Total Return Bond (BIBTX) | 59 bps | 109% |

| Fund in Plan | Expense ratio | % excess over collective trust avg. (54 bps) |
|---|---|---|
| T. Rowe Price Mid Cap Growth (RPMGX) | 78 bps | 144% |
| Harbor International (HAINX) | 74 bps | 137% |
| Fidelity Contrafund (FCNTX) | 67 bps | 124% |
| T. Rowe Price Retirement 2055 (TRRNX) | 76 bps | 141% |
| T. Rowe Price Retirement 2050 (TRRMX) | 76 bps | 141% |
| T. Rowe Price Retirement 2045 (TRRKX) | 76 bps | 141% |
| T. Rowe Price Retirement 2040 (TRRDX) | 76 bps | 141% |
| T. Rowe Price Retirement 2035 (TRRJX) | 75 bps | 139% |
| T. Rowe Price Retirement 2030 (TRRCX) | 73 bps | 135% |
| T. Rowe Price Retirement 2025 (TRRHX) | 70 bps | 156% |
| T. Rowe Price Retirement 2020 (TRRBX) | 67 bps | 124% |
| T. Rowe Price Retirement 2015 (TRRGX) | 63 bps | 117% |
| T. Rowe Price Retirement 2010 (TRRAX) | 59 bps | 109% |
| T. Rowe Price Retirement | 59 bps | 109% |

Case 1:15-cv-00732-CCE-JEP   Document 88   Filed 12/19/16   Page 43 of 87

| Fund in Plan | Expense ratio | % excess over collective trust avg. (54 bps) |
|---|---|---|
| 2005 (TRRFX) | | |
| T. Rowe Price Retirement Income (TRRIX) | 57 bps | 106% |

83.     The Plan's "target date funds" demonstrate the fee savings available through collective trusts. Since 2009, the Plan has included a series of "target date funds," in which each fund has a "target" retirement date and changes its asset allocation to become more conservative as the target date approaches. Until the end of 2014, BB&T Defendants and Cardinal used mutual funds managed by T. Rowe Price for the target date option, which charged up to 76 basis points. As of January 2, 2015, these Defendants replaced the mutual funds with collective trust versions of the T. Rowe Price target date funds. Each of the collective trusts charges 49 basis points, meaning the mutual fund versions were up to 55% more expensive.

84.     These Defendants could have used the Plan's bargaining power to obtain high-quality, low-cost alternatives to mutual funds, in order to negotiate the best possible price for the Plan. By failing to adequately investigate (or failing to come to a reasoned decision) offering  these institutional alternatives, failing to try to obtain reduced fees for the Plan, and foregoing these alternatives without any prudent or loyal reason to do so while maintaining high-cost mutual funds that generated revenue for BB&T Corporation

and its subsidiaries, Defendants caused the Plan to pay millions of dollars per year in unnecessary fees.

### D. Defendants retained poorly performing funds

85.     The high fees were not justified by superior investment performance. BB&T Defendants and Cardinal retained proprietary funds in the Plan that consistently and historically underperformed, further demonstrating that the reason the funds were retained in the Plan was to maintain the revenue stream to BB&T Corporation and its subsidiaries from the excess fees charged by the funds.

86.     The Plan's most expensive option through January 2012 was the BB&T and Sterling Capital International Fund, which paid BB&T and Sterling Capital over 150 basis points. As of December 31, 2010, the fund had been underperforming its benchmark for years according to its prospectus, trailing its index by an average of approximately 5%—500 basis points—per year over one, five, and ten-year periods. Not only did these Defendants place this fund in the Plan lineup, but they also failed to prudently monitor its performance, and retained it in the Plan despite its many years of abysmal performance. The Plan was one of the last investors in the fund, as these Defendants retained it in the Plan until the fund was closed and liquidated on January 31, 2012.

87.     The Sterling Capital Select Equity Fund (a.k.a. Sterling Capital Large Cap Value Fund), also consistently underperformed its appropriate benchmarks. This fund paid BB&T and Sterling Capital over 80 basis points to attempt to outperform a market

45

index through "active" management, yet the fund consistently underperformed the S&P 500 Index and the Russell 1000 Value Index, appropriate benchmarks for large cap value funds.

88.     In 2009, the Plan had approximately $150 million invested in this fund, which at the time was called the BB&T Large Cap Fund. At that time, the BB&T Large Cap Fund had a track record of poor performance that warranted its removal. As of June 30, 2009, over the prior 3-year, 5-year, and 10-year periods, the fund had underperformed one of its benchmarks, the Russell 1000 Value Index, by roughly *2% per year*. Between 2002 and 2008, the fund had underperformed the index in six of the past seven calendar years, and was on pace to do so again in 2009. This performance record placed the fund among the bottom 17 percent of large company value funds over the prior 3-year, 5-year, and 10-year periods. Given the fund's consistently poor performance, a prudent investor acting exclusively in the interests of Plan participants would have removed the BB&T Large Cap Fund from the Plan. Defendants failed to do so.

89.     By February 2010, the BB&T Large Cap Fund had been renamed the Sterling Capital Select Equity Fund. As of December 31, 2010, the Sterling Capital Select Equity Fund was the Plan's largest mutual fund at $167 million. As of that date, the fund had continued to significantly underperform its benchmarks, trailing both the Russell 1000 Value and S&P 500 indices by 300–400 basis points over a one-year period, and an average of 200–300 basis points over a five-year period. Assuming there was some prudent or loyal reason why the fund had not already been removed due to its poor

performance in previous years, a prudent fiduciary acting in the interests of Plan participants would have removed the Select Equity Fund at least by 2010. Instead, these Defendants kept the fund in the Plan, continuing to provide a steady stream of 85 basis points in revenue to BB&T Corporation and its subsidiaries.

90.     These Defendants' retention of the Sterling Capital Select Equity Fund ensured that the Plan would sustain continued losses due to poor performance, as the fund continued to significantly underperform its benchmarks over the next three years—a predictable result given its track record. The fund's performance data as of June 30, 2012 shows that it had underperformed the Russell 1000 Value Index by approximately seven percent in 2009, three percent in 2010, and six percent in 2011, and was on pace to do so again in 2012. Accordingly, even if there had been some prudent or loyal basis to have retained the fund in prior years despite its sustained abysmal performance, a prudent fiduciary surely would have removed the fund by 2012. These Defendants again failed to do so, causing the Plan millions of dollars in losses.

### Defendants included short-term, minimal return fixed income options while failing to offer a longer duration stable value fund

91.     Stable value funds are a common investment in 401(k) plans. Stable value funds provide preservation of principal. And "[b]ecause they hold longer-duration instruments, SVFs generally outperform money market funds, which invest exclusively in short-term securities." *Abbott v. Lockheed Martin Corp.*, 725 F.3d 803, 806 (7th Cir. 2013); *see also* Paul J. Donahue, *Plan Sponsor Fiduciary Duty for the Selection of Options in Participant-Directed Defined Contribution Plans and the Choice Between*

*Stable Value and Money Market*, 39 AKRON L. REV. 9, 20–27 (2006). Indeed, even during the period of market turbulence in 2008, "stable value participants received point-to-point protection of principal, with no sacrifice of return[.]" Paul J. Donahue, *Stable Value Re-examined*, 54 RISKS AND REWARDS 26, 28 (Aug. 2009), available at http://www.soa.org/library/newsletters/risks-and-rewards/2009/august/rar-2009-iss54-donahue.pdf. Many large 401(k) plans have stable value funds.

92.     Until 2012, the plan did not offer a stable value fund. Instead, the Plan included two short-duration fixed income options which BB&T Defendants and Cardinal knew would not provide a meaningful long-term retirement asset because of below-inflation returns of under 1% per year: (1) the proprietary BB&T One-Year Bank Investment Contract (replaced in 2012 by the BB&T Corporation Associate Insured Deposit Account), which provides an investment in a BB&T "business savings deposit account," and (2) the Federated Investors Treasury Obligations Fund, a money market mutual fund. As of year-end 2009, the Plan had $120 million invested in the BB&T One-Year Bank Investment Contract, and $139 million invested in the Federated Treasury Obligations Fund.

93.     BB&T Corporation has profited from the proprietary One-Year Bank Investment Contract and Associate Insured Deposit Account because the company collects fees for administration of the account and retains the investment earnings when the average yield of the contract's underlying investments exceeds the credited interest rate. However, the Plan and its participants have been harmed by its inclusion and

48

retention in the Plan. Since 2010, the One-Year Bank Investment Contract/Associated Insured Deposit Account returned between 0.62% and 0.77%—less than one percent per year.

94.     For each of the last four years, from 2011 through 2014, the Federated Investors Treasury Obligations Fund returned 0.01%—one one-hundredth of one percent—per year. During the same period, the fund charged annual management fees of 20 basis points—*twenty times higher* than its return. The year before that, in 2010, the fund returned 0.02%—two one-hundredths of one percent.

95.     For five of the last six years, the One-Year Bank Investment Contract and Federated Treasury Obligations Fund did not even keep up with the rate of inflation. This was expected because these funds, in contrast with stable value funds, use very short-duration investment vehicles, such as short-term U.S. Treasury notes, which provide minimal returns. Given the expected returns of money market funds and similar short-term investments, a prudent fiduciary would have known that the One-Year Bank Investment Contract and Treasury Obligations Fund would not provide participants any meaningful retirement benefits. Indeed, accounting for inflation, participants investing in these options actually lost money. Accordingly, a prudent and loyal fiduciary would have removed these options and instead offered a stable value fund, which would have provided significantly higher returns while still offering protection of principal.

96.     Hueler Analytics is the industry standard for returns of stable value funds. "The Hueler Analytics Stable Value Pooled Fund Universe includes data on 15 funds

49

nationwide with assets totaling over $105 billion." See http://hueler.com (last visited Oct.

8, 2015). Thus, the Hueler data represents a reasonable estimate of the returns of a typical

stable value fund. The returns of the funds in the Hueler universe on average have far

exceeded the returns of the Federated Treasury Obligations Fund (TOIXX) and the

BB&T Bank Investment Contract in the Plan:

| Year | TOIXX return | BIC return | Hueler return |
|------|------------|-----------|--------------|
| 2009 | 10 bps | 140 bps | 312 bps |
| 2010 | 2 bps | 77 bps | 312 bps |
| 2011 | 1 bp | 77 bps | 269 bps |
| 2012 | 1 bp | 67 bps | 226 bps |
| 2013 | 1 bp | 64 bps | 184 bps |
| 2014 | 1 bp | 62 bps | 169 bps |

97.     Hueler returns dating back three years, five years, ten years, fifteen years,

and twenty years reflect similar disparities between money market funds and stable value

funds.

98.     In light of stable value funds' clear advantages and enhanced returns

compared to other fixed income options, when deciding which fixed income investment

options to include in a 401(k) plan, a prudent fiduciary would consider using a stable

value fund.

99.     For a number of years, Plan fiduciaries failed to adequately investigate the

possibility of including a stable value fund, and declined to include a stable value option

in the Plan without any prudent or loyal reason to do so.

100.    Moreover, given that the Federated Treasury Obligations Fund and BB&T Bank Investment Contract had multiple consecutive years of minimal returns and clearly were not generating any meaningful retirement benefits for participants, a prudent and loyal fiduciary monitoring the Plan's investments on an ongoing basis would have removed these funds, particularly once the Plan began offering a stable value fund.

101.    By failing to offer a stable value fund and retaining the other fixed income investments, these Defendants caused tens of millions of dollars in losses to the Plan.

**Defendants used a "unitized" structure for the BB&T Common Stock Fund and managed it in a way that caused substantial losses compared to BB&T stock**

102.    The Plan's largest investment option is the BB&T Common Stock Fund, at over $600 million in assets. Instead of allowing participants to invest directly in shares of BB&T Corporation common stock (traded on the New York Stock Exchange as BBT), BB&T Defendants and Cardinal provided participants units in an account that included BB&T stock and cash. The cash portion was invested without bids in the Sterling Capital Prime Money Market Fund—yet another proprietary fund—which charged 51 basis points in annual fees, a greatly excessive fee for managing a money market fund. Money market funds charge far less in management fees for what is essentially managing cash. As noted in the chart at paragraph 71, Vanguard's Prime Money Market Fund charges only 10 basis points. Any additional fees charged to "manage" the stock fund as a whole were excessive because a single stock does not require investment management. The BB&T entity involved in "managing" the stock fund also had a clear conflict of interest and incentive to increase the stock fund's cash levels in order to generate additional

51

revenue for BB&T and Sterling Capital through the fees charged in the high-cost proprietary money market fund.

103.    The BB&T Common Stock Fund's cash holdings, excessive fees, conflicts of interest, and mismanagement had the effect of diluting the returns that participants received compared to the returns of BB&T stock available to any investor outside of the Plan. As of June 30, 2015, the most recent date for which performance information was available, the BB&T Common Stock Fund trailed the performance of BB&T stock over one, five, and ten-year periods. Thus, BB&T employees received lower returns than any investor walking in off the street who invested in BB&T stock. The lower returns caused by a unitized stock fund's cash holdings is described as "cash drag" or "investment drag." *George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 793 (7th Cir. 2011).

104.    The use of a unitized structure can also encourage frequent trading, with the associated transaction costs further reducing the fund's returns. The reduction in returns caused by high transaction costs in a unitized fund is known as "transactional drag." *Id*. at 793–94.

105.    Moreover, even though with unitization the cash holdings should result in outperformance during periods when the stock declines in value, the opposite occurred with the BB&T Common Stock Fund. As of March 31, 2015, BB&T stock was down by 0.4% over a one-year period. The BB&T Common Stock Fund performed worse than the underlying stock, losing 1.07% over the same period. Accordingly, any purported benefit

from the fund's cash holdings was entirely negated by the excessive fees, mismanagement, conflicts of interest, and excessive cash held in the fund.

106. There are a number of methods that these Defendants could have used to reduce or eliminated the underperformance of the BB&T Common Stock Fund compared to BB&T stock, which other companies offering company stock in their 401(k) plans frequently use:

      a.    Instead of a "unitized" structure that gave participants a mix of stock and cash, Defendants could have used a share accounting structure, which would have allowed participants to own shares of BB&T stock directly. This would have eliminated the "cash drag" and "transactional drag" and provided participants in the Plan the same undiluted returns of BB&T stock available to any investor on the street.

      b.    These Defendants could have eliminated the need to hold cash by using a three-day settlement period for participants who sell their shares, which is the standard period for every brokerage account.

      c.    While BB&T Defendants told participants that unitization allows the Plan "to trade BB&T stock without the normal three-day settlement period"—falsely suggesting that unitization is the only means to avoid three-day settlement—these Defendants could have used a

direct ownership system and offered the equivalent of a two-day

loan for participants desiring the quicker settlement.

d.      Diligently monitoring the fund's cash needs and limiting the cash

holdings so as to minimize cash drag.

e.      Imposing trading restrictions so as to reduce the need for cash and to

reduce transaction costs generated by frequent trading.

f.      Investing the fund's cash holdings in an option with lower fees than

the 51 basis point Sterling Capital money market fund.

107.    ERISA requires fiduciaries to perform a cost-benefit analysis of potential

solutions to cash drag and transactional drag in a unitized stock fund. See *George*, 641

F.3d at 795. These Defendants selected and maintained the unitized structure for the

BB&T Common Stock Fund without engaging in a reasoned decision-making process, or

coming to a reasoned decision, to determine whether the diminished returns caused by the

fees and cash holdings outweighed any purported benefits of unitization, and without

adequately considering whether the use of an alternative structure would better serve the

interests of participants.

108.    As a result of these Defendants' use of a unitized structure and allowing the

fund to hold excessive cash and fees while failing to adequately investigate potential

alternatives, the Plan suffered millions of dollars of losses compared to the undiluted

performance of BB&T Corporation common stock.

**Defendants concealed their fiduciary breaches**

109.    BB&T Defendants concealed their breaches of fiduciary duty and prohibited transactions through a series of false and misleading statements and by omitting disclosure of material information, thereby preventing Plaintiffs from discovering all Defendants' breaches and violations.

110.    BB&T Defendants falsely told participants that they engaged in "*[o]versight of plan fees . . . The fees charged for the investments and for administering your plan are evaluated regularly to make sure they are reasonable*" (emphasis added). This and other similar statements concealed the facts that all Defendants:

  a.    failed to assess the reasonableness of the Plan's investment management and administrative fees;

  b.    retained high-cost proprietary BB&T and Sterling Capital mutual funds for the purpose of benefiting BB&T and driving revenues to BB&T and its subsidiaries;

  c.    failed to prudently consider alternative options such as separate accounts or collective trusts with lower fees;

  d.    failed to obtain bids for recordkeeping;

  e.    mismanaged the BB&T Common Stock Fund by holding excessive cash in it, charged excessive fees for "managing" the fund and

55

managing the cash in it, and had a conflict of interest by using a proprietary entity to "manage" the cash held.

111.    BB&T Defendants also falsely represented that "*[t]he Plan Sponsor* [BB&T Corporation] *pays the administrative fees for the Plan*" (emphasis added). In account statements sent to participants, BB&T Defendants informed participants that recordkeeping fees were paid by BB&T and "not charged to your account," and that "[n]o administrative fees were deducted from your account this quarter." These false and misleading statements and other similar statements caused participants to believe that they paid no administrative fees and that BB&T generously paid the expenses, concealing the facts that BB&T actually *received* millions of dollars in excessive administrative fees annually, which were paid by participants from their mutual fund investments.

112.    As to the BB&T Common Stock Fund, in guides distributed to participants, BB&T Defendants stated that their use of a unitized fund structure had "*a significant advantage: we are able to trade BB&T stock without the normal three-day settlement period.*" (emphasis added). This misleading statement concealed the fact that the unitized structure as managed by BB&T had a very significant *disadvantage*—that it caused the fund to underperform BB&T stock. BB&T Defendants' statement also suggested that unitization was the only way to trade BB&T stock without a three-day settlement period, which is false. All Defendants could have provided one-day settlement to participants who desired and were willing to pay the costs for it.

113.    BB&T Defendants further misrepresented the vehicle in which the fund's cash buffer is invested. The summary plan description currently available on BB&T's website states that the fund's cash balance is invested in the Sterling Capital Prime Money Market Fund. However, that fund was liquidated in December 2012.

114.    BB&T Defendants further concealed the underperformance of the BB&T Common Stock Fund by reporting only the return of the fund without a comparison to the return of BB&T stock. Instead of using the stock return as the benchmark, all Defendants used the S&P 500 index, which concealed the underperformance of the BB&T Common Stock Fund compared to BB&T stock.

115.    BB&T Defendants also informed participants that they could "approximate" the number of BB&T shares owned by dividing the value of the account by the price of BB&T stock. This concealed the fact that participants would have owned significantly *more* shares if the fund had not been unitized.

**Defendants also concealed other information they are required to provide**

116.    Approximately four months ago, on June 22, 2015, Plaintiff Kirouac through undersigned counsel requested from the Plan administrator certain Plan-related documents under 29 U.S.C. §1024(b)(4) and 29 C.F.R. §2550.404c-1. On July 21, 2015, the Administrator—identified by counsel as "BB&T"—responded by providing limited documents, but withheld a number of other requested documents required to be produced under 29 U.S.C. §1024(b)(4), and are thus liable for penalties of up to $110 per day under 29 U.S.C. §1132(c) and 29 C.F.R. §2575.502c-1.

117.    Among the materials that BB&T withheld was the Plan's Investment Policy

Statement, or IPS, even though controlling authority requires a plan administrator to

disclose an IPS that is incorporated into a plan document, as it is here under Plan §§8.14

and 10.1.5(b). *Faircloth v. Lundy Packing Co.*, 91 F.3d 648, 656 (4th Cir. 1996). Other

withheld materials included expense disclosures from the Plan's recordkeeper, the

recordkeeping contract, and other fee-related information that would have disclosed

important facts about Defendants' fiduciary breaches, such as the amounts of revenue

sharing payments and any consultant reports regarding the Plan's fees. By withholding

that information, BB&T Defendants continued their campaign of concealment.

## ERISA'S FIDUCIARY STANDARDS AND PROHIBITED TRANSACTIONS

118.    ERISA imposes strict fiduciary duties of loyalty and prudence upon the

Defendants as fiduciaries of the Plan. 29 U.S.C. §1104(a) states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the
> interest of the participants and beneficiaries and –
>
> (A)     for the exclusive purpose of
>
> > (i) providing benefits to participants and their beneficiaries; and
> > (ii) defraying reasonable expenses of administering the plan; [and]
>
> (B)     with the care, skill, prudence, and diligence under the circumstances
> then prevailing that a prudent man acting in a like capacity and
> familiar with such matters would use in the conduct of an enterprise
> of like character and with like aims.

119.    Under 29 U.S.C. §1103(c)(1), with certain exceptions not relevant here,

> the assets of a plan shall never inure to the benefit of any employer
> and shall be held for the exclusive purposes of providing benefits to

58

participants in the plan and their beneficiaries and defraying
reasonable expenses of administering the plan.

120.    ERISA's fiduciary duties "are the highest known to the law." *Tatum v. RJR*

*Pension Inv. Comm.*, 761 F.3d 346, 355–56 (4th Cir. 2014).

121.    Fiduciaries who exercise any authority or control over plan assets,

including the selection of plan investments and service providers, must act prudently and

solely in the interest of participants in the plan: "a fiduciary of a defined contribution,

participant-driven, 401(k) plan created to provide retirement income for employees who

is given discretion to select and maintain specific investment options for participants—

must exercise prudence in selecting and retaining available investment options." *DiFelice*

*v. U.S. Airways, Inc*., 497 F.3d 410, 418 (4th Cir. 2007). In determining whether a

fiduciary has selected investments prudently, courts "examine the totality of the

circumstances[.]" *Id*. Moreover, "the prudence of investments … offered by a plan must

be judged individually," meaning "a fiduciary must initially determine, and continue to

monitor, the prudence of *each* investment option available to plan participants." *Id*. at 423

(emphasis original).

122.    ERISA fiduciaries selecting plan investments and service providers "must

also scrupulously adhere to a duty of loyalty, and make any decisions in a fiduciary

capacity with 'an eye single to the interests of the participants and beneficiaries.'" *Id*. at

418–19 (quoting *Kuper v. Iovenko*, 66 F.3d 1447, 1458 (6th Cir. 1995)). "Corporate

officers must 'avoid placing themselves in a position where their acts [or interests] as

officers or directors of the corporation will prevent their functioning with the complete

59

loyalty to participants demanded of them as trustees of a pension plan.'"

*Id*. at 419 (quoting *Donovan v. Bierwirth*, 680 F.2d 263, 271 (2d Cir. 1982)).

123.    ERISA also imposes explicit co-fiduciary duties on plan fiduciaries. 29

U.S.C. §1105(a) provides a cause of action against a fiduciary for knowingly

participating in a breach by another fiduciary and knowingly failing to cure any breach of

duty. The statute states, in relevant part, that:

> In addition to any liability which he may have under any other provision of
> this part, a fiduciary with respect to a plan shall be liable for a breach of
> fiduciary responsibility of another fiduciary with respect to the same plan in
> the following circumstances:
>
> (1)    if he participates knowingly in, or knowingly undertakes to
> conceal, an act or omission of such other fiduciary, knowing
> such act or omission is a breach; or
>
> (2)    if, by his failure to comply with section 404(a)(1) in the
> administration of his specific responsibilities which give risk
> to his status as a fiduciary, he has enabled such other
> fiduciary to commit a breach; or
>
> (3)    if he has knowledge of a breach by such other fiduciary,
> unless he makes reasonable efforts under the circumstances to
> remedy the breach.

124.    The general duties of loyalty and prudence imposed by 29 U.S.C. §1104 are

supplemented by a detailed list of transactions that are expressly prohibited by 29 U.S.C.

§1106, and are considered "*per se*" violations because they entail a high potential for

abuse. Section 1106(a)(1) states, in pertinent part, that:

> [A] fiduciary with respect to a plan shall not cause the plan to engage in a
> transaction, if he knows or should know that such transaction constitutes a
> direct or indirect –

60

(A)      sale or exchange, or leasing, of any property between the plan and a party in interest;

\* \* \*

(C)      furnishing of goods, services, or facilities between the plan and party in interest;

(D)      transfer to, or use by or for the benefit of a party in interest, of any assets of the plan…

Section 1106(b) provides, in pertinent part, that:

[A] fiduciary with respect to the plan shall not –

(1)      deal with the assets of the plan in his own interest or for his own account,

(2)      in his individual or in any other capacity act in a transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interest of the plan or the interest of its participants or beneficiaries, or

(3)      receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

125.      29 U.S.C. §1132(a)(2) authorizes a plan participant to bring a civil action for appropriate relief under 29 U.S.C. §1109. Section 1109(a) provides in relevant part:

Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

126.      29 U.S.C. §1132(a)(3) provides a cause of action against a non-fiduciary "party in interest" who knowingly participates in prohibited transactions or knowingly receives payments made in breach of a fiduciary's duty, and authorizes "appropriate

equitable relief" such as restitution or disgorgement to recover ill-gotten proceeds from the non-fiduciary.

## CLASS ACTION ALLEGATIONS

127. 29 U.S.C. §1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to recover for the Plan the remedies provided by 29 U.S.C. § 1109(a).

128. In acting in this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the Plan, as an alternative to direct individual actions on behalf of the Plan under 29 U.S.C. §1132(a)(2) and (3), Plaintiffs seek to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. In light of BB&T Defendants' concealment of their misconduct, all Defendants' fiduciary breaches and other ERISA violations went undetected for years, and Plaintiffs are entitled to recover for the harm sustained during the time the breaches were concealed. While these Defendants' long campaign of self-interested and imprudent conduct in managing the Plan likely began even earlier, Plaintiffs seek a starting date for the class of January 1, 2007, the date of the previous Plan restatement. Plaintiffs seek to certify the following class, and to be appointed as representatives of the class:

> All participants and beneficiaries of the BB&T Corporation 401(k) Savings Plan from January 1, 2007 through the date of judgment, excluding the Defendants.

129. This action meets the requirements of Rule 23 and is certifiable as a class action for the following reasons:

a.  The Class includes over 30,000 members and is so large that joinder of all its members is impracticable.

b.  There are questions of law and fact common to this Class because the Defendants owed fiduciary duties to the Plan and to all participants and beneficiaries and took the actions and omissions alleged herein as to the Plan and not as to any individual participant. Thus, common questions of law and fact include the following, without limitation: who are the fiduciaries liable for the remedies provided by 29 U.S.C. §1109(a); whether the fiduciaries of the Plan breached their fiduciary duties to the Plan; what are the losses to the Plan resulting from each breach of fiduciary duty; and what are the profits of any breaching fiduciary that were made through the use of Plan assets by the fiduciary.

c.  Plaintiffs' claims are typical of the claims of the Class because each Plaintiff was a Plan participant during the time period at issue in this action and all participants in the Plan were harmed by Defendants' misconduct.

d.  Plaintiffs are adequate representatives of the Class because they were participants in the Plan during the Class period, have no interest that is in conflict with the Class, are committed to the vigorous representation of the Class, and have engaged experienced and competent attorneys to represent the Class.

e.     Prosecution of separate actions for these breaches of fiduciary duties by

individual participants and beneficiaries would create the risk of (A)

inconsistent or varying adjudications that would establish incompatible

standards of conduct for Defendants in respect to the discharge of their

fiduciary duties to the Plan and personal liability to the Plan under 29

U.S.C. §1109(a), and (B) adjudications by individual participants and

beneficiaries regarding these breaches of fiduciary duties and remedies for

the Plan would, as a practical matter, be dispositive of the interests of the

participants and beneficiaries who are not parties to the adjudication or

would substantially impair or impede those participants' and beneficiaries'

ability to protect their interests. Therefore, this action should be certified as

a class action under Rule 23(b)(1)(A) or (B).

130.     A class action is the superior method for the fair and efficient adjudication

of this controversy because joinder of all participants and beneficiaries is impracticable,

the losses suffered by individual participants and beneficiaries may be small and thus it

would be impracticable for individual members to enforce their rights through individual

actions, and the common questions of law and fact predominate over individual

questions. Given the nature of the allegations, no class member has an interest in

individually controlling the prosecution of this matter, and Plaintiffs are aware of no

difficulties likely to be encountered in the management of this matter as a class action.

Alternatively, then, this action may be certified as a class under Rule 23(b)(3) if it is not certified under Rule 23(b)(1)(A) or (B).

131.    Plaintiffs' counsel, Schlichter, Bogard & Denton LLP and Nichols Kaster, PLLP, will fairly and adequately represent the interests of the Class and meet all requirements to serve as class counsel under Rule 23(g). The firms have agreed to advance the costs of this action contingent upon the outcome, and are aware that no fee can be awarded without the Court's approval.

## COUNT I

### Breach of Duties of Loyalty and Prudence—Excessive Administrative Fees

132.    Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs as though fully set forth here.

133.    This Count alleges breach of fiduciary duties against BB&T Corporation, BB&T's Board of Directors, the Board's Compensation Committee, the Employee Benefits Plan Committee,  the individual directors and committee members, and Cardinal.

134.    As alleged above, each of these Defendants were fiduciaries under 29 U.S.C. §§1002(21) or 1102(a)(1).

135.    The scope of the fiduciary duties and responsibilities of these Defendants includes discharging their duties with respect to the Plan solely in the interest of, and for the exclusive purpose of providing benefits to Plan participants and beneficiaries and defraying reasonable expenses of administering the plan, and acting with the care, skill,

prudence, and diligence required by ERISA. These Defendants are directly responsible for ensuring that the Plan's fees are reasonable for the services provided.

136.     If a 401(k) plan overpays for recordkeeping services due to the fiduciaries' "failure to solicit bids" from other recordkeepers, the fiduciaries have breached their duty of prudence. See *George*, 641 F.3d at 798–99. Similarly, "us[ing] revenue sharing to benefit [the plan sponsor and recordkeeper] at the Plan's expense" while "failing to monitor and control recordkeeping fees" and "paying excessive revenue sharing" is a breach of fiduciary duties. *Tussey v. ABB, Inc*., 746 F.3d 327, 336 (8th Cir. 2014).

137.     These Defendants failed to engage in a prudent and loyal process in the selection and retention of the  Plan's recordkeeper. Instead of soliciting competitive bids from outside vendors on a flat per-participant basis or soliciting bids at all, these Defendants used BB&T Corporation or its subsidiary Branch Banking and Trust Company to provide these services. This not only benefited BB&T or its subsidiary by allowing those entities to receive millions of dollars in unreasonable compensation and profits without bids, but also caused Plan participants millions of dollars of losses. This conduct was a breach of the duties of loyalty and prudence.

138.     These Defendants failed to engage in a prudent and loyal process to ensure that the compensation paid to BB&T or its subsidiary was reasonable for the administrative services provided to the Plan. These Defendants allowed BB&T to receive uncapped, asset-based revenue sharing, yet failed to prudently assess or monitor the amount of those payments to determine if they were reasonable. As the assets in the Plan

grew, the revenue sharing payments to BB&T or its subsidiary grew by a similar percentage, even though the services provided by BB&T or its subsidiary remained the same. This caused the recordkeeping compensation paid to BB&T or its subsidiary to become even more excessive than it had been. Through these actions and omissions, BB&T Defendants as well as BB&T Corporation and its subsidiary were benefitted at the expense of participants. This conduct was a breach of the duties of loyalty and prudence.

139.  Each Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count, to restore to the Plan any profits made through use of Plan assets, and is subject to other equitable or remedial relief as appropriate. Each Defendant also knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, and knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach, and thus each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

# COUNT II

## Breach of Duties of Loyalty and Prudence—
## Excessive Investment Management Fees and Performance Losses

140. Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs as though fully set forth here.

141. This Count alleges breach of fiduciary duties against BB&T Corporation, BB&T's Board of Directors, the Board's Compensation Committee, the Employee Benefits Plan Committee, the individual directors and committee members, and Cardinal.

142. The scope of the fiduciary duties and responsibilities of these Defendants includes managing the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries, defraying reasonable expenses of administering the plan, and acting with the care, skill, diligence, and prudence required by ERISA. These Defendants are directly responsible for ensuring that the Plan's fees are reasonable, selecting, monitoring, and recommending prudent investment options, properly evaluating and monitoring the Plan's investments on an ongoing basis and eliminating imprudent ones, and taking all necessary steps to ensure that the Plan's assets were invested prudently.

143. As the Supreme Court recently confirmed, ERISA's "duty of prudence involves a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble*, 135 S. Ct. at 1829.

144. These Defendants selected and retained as Plan investment options mutual funds with high expenses and poor performance relative to other investment options that were readily available to the Plan at all relevant times. This included the use of both proprietary and non-proprietary mutual funds with expense ratios far in excess of other options available to the Plan, including separate accounts, collective trusts, lower-cost mutual funds, and lower-cost share classes with the identical investment manager and investments, and retaining the proprietary BB&T and Sterling Capital funds despite sustained poor performance. In so doing, these Defendants failed to make Plan investment decisions based solely on the merits of the investment funds and what was in the interest of participants, and instead made investment decisions that would drive revenues and profits to BB&T Corporation and its subsidiaries. Defendants therefore failed to discharge their duties with respect to the Plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plan, and instead acted for the purpose of benefiting BB&T Corporation and its subsidiaries, in breach of their fiduciary duty of loyalty under 29 U.S.C. §1104(a)(1)(A).

145. These Defendants selected and retained as Plan investment options mutual funds with poor performance histories and high expenses relative to other investment options that were readily available to the Plan at all relevant times, including separate accounts, collective trusts, lower-cost mutual funds, and lower-cost share classes with the identical investment manager and investments. In failing to adequately consider lower

69

cost or better-performing investments for the Plan, Defendants failed to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims. Defendants therefore breached their duties under 29 U.S.C. §1104(a)(1)(B).

146.    Defendants failed to engage in a prudent process for the selection and retention of Plan investment options. Instead, these Defendants used more expensive funds with inferior performance that paid revenue sharing and generated investment management fee revenues for BB&T Corporation and its subsidiaries, and ultimately benefited BB&T entities rather than the Plan and its participants. A prudent investigation not tainted by self-interest would have revealed to a reasonably prudent fiduciary that the BB&T and Sterling Capital mutual funds and the other excessive-cost mutual funds in the Plan were inferior to other options available to the Plan, which had much lower costs and better performance. Had a prudent and loyal fiduciary conducted such an investigation, it would have concluded that the Plan's investment options were selected and retained for reasons other than the best interest of the Plan and its participants and were causing tens of millions of dollars in lost retirement savings due to excessive and unreasonable fees and underperformance relative to prudent investment options available to the Plan.

147.    Each Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count, to restore to the Plan any profits made through use of Plan assets,

and is subject to other equitable or remedial relief as appropriate. Each Defendant also knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, and knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach, and thus each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

## COUNT III

### Breach of Duties of Loyalty and Prudence— Use of Short-Term Fixed Income Options Instead of Stable Value Fund

148.    Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs as though fully set forth here.

149.    This Count alleges breach of fiduciary duties against BB&T Corporation, BB&T's Board of Directors, the Board's Compensation Committee, the Employee Benefits Plan Committee, the individual directors and committee members, and Cardinal.

150.    The scope of the fiduciary duties and responsibilities of these Defendants includes direct responsibility for evaluating and monitoring the Plan's investments on an ongoing basis and eliminating imprudent ones, and ensuring that the Plan offers prudent investment options that will provide meaningful financial benefits to participants.

151.    These Defendants maintained as Plan investment options the BB&T Corporation One-Year Bank Investment Account, which invested in a business savings

account, and the Federated Investors Treasury Obligations Fund, a money market fund. Both of these funds hold very short-term instruments and for many consecutive years have generated only minimal returns that did not keep pace with inflation, and thus did not provide any meaningful retirement benefits to participants. Prudent fiduciaries know that such minimally returning funds have not kept pace with inflation and will not keep pace with inflation. These Defendants failed to make a reasoned decision (or failed to engage in a prudent process) as to whether it would be in participants' exclusive best interest to instead offer a stable value fund, which invests in longer-term instruments and thus would have provided significantly higher returns than the BB&T and Federated funds without a material increase in risk. Once the Plan finally began offering a stable value fund, these Defendants continued to retain the BB&T and Federated funds, even though Defendants knew that the funds had failed to keep pace with inflation for years and were not providing any meaningful retirement benefit. A prudent and loyal fiduciary monitoring the Plan's investments on an ongoing basis would have removed the BB&T and Federated funds years ago. Maintaining these funds in the Plan caused the Plan tens of millions of dollars in losses compared to what the assets in those funds would have earned if invested in a stable value fund. This conduct was a breach of the duties of loyalty and prudence.

152.    Each Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count, to restore to the Plan any profits made through use of Plan assets,

and is subject to other equitable or remedial relief as appropriate. Each Defendant also knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, and knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach, and thus each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

## COUNT IV

### Breach of Duties of Loyalty and Prudence—BB&T Common Stock Fund

153.    Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs as though fully set forth here.

154.    This Count alleges breach of fiduciary duties against BB&T Corporation, BB&T's Board of Directors, the Board's Compensation Committee, the Employee Benefits Plan Committee, the individual directors and committee members, and Cardinal.

155.    The scope of the fiduciary duties and responsibilities of these Defendants includes employing appropriate methods to determine whether the Plan's investments are structured prudently and in a manner that serves the exclusive purpose of providing benefits to participants, evaluating and monitoring the Plan's investments on an ongoing basis and eliminating imprudent ones, and ensuring that the Plan's fees are reasonable.

156.    When 401(k) plan participants suffer losses from "cash drag" and excessive fees in a unitized stock fund, ERISA fiduciaries must perform a cost-benefit analysis of

potential solutions—to "actually determine[] whether the costs of making changes to the [company stock fund] outweigh[] the benefits, or vice versa." *George*, 641 F.3d at 795. A fiduciary's failure "to balance the relevant factors and make a reasoned decision as to the preferred course of action—under circumstances in which a prudent fiduciary would have done so is a breach of the prudent man standard of care." *Id*. at 796 (citing *DiFelice*, 497 F.3d at 420-21).

157.     These Defendants used a unitized structure for the BB&T Common Stock Fund, investing a portion of the fund's assets in a proprietary money market fund that allowed BB&T Corporation and its subsidiary Sterling Capital to collect additional revenues. Mismanagement of the fund due to the fund's cash holdings, fees, and conflicts of interest caused the Plan millions of dollars in losses compared to BB&T stock without cash. There were a number of alternatives available to Defendants used by other companies offering company stock in their 401(k) plans that would have reduced or eliminated the difference in performance. These Defendants could have used a share accounting structure, with a three-day settlement period as is standard in all brokerage accounts, which would have allowed participants to own shares of BB&T stock directly and to obtain the full return of the stock, instead of units of stock and cash which provided diluted returns. If participants trading shares desired one-day settlement of their trades instead of the customary three-day settlement period, these Defendants could have arranged for participants desiring the quicker settlement to obtain it through a share accounting structure and pay the additional cost for that quicker settlement directly. Other

options to reduce the underperformance of the stock fund compared to BB&T stock included monitoring the fund's cash needs and limiting the cash holdings, imposing trading restrictions so as to reduce the need for cash and to reduce transaction costs generated by frequent trading, or selecting a lower-fee option for the vehicle in which the cash was invested. These Defendants selected and maintained the unitized structure without engaging in a reasoned decision-making process to determine whether the purported benefits of unitization outweighed the harm to participants from the unitized structure, and without adequately considering whether to implement measures to reduce the harm caused by excessive fees and cash holdings. These Defendants also mismanaged the BB&T Common Stock Fund by allowing it to hold excessive amounts of cash and to be assessed excessive fees, and created a conflict of interest for the BB&T entity that determined the amount of cash to hold in the fund. This conduct was a breach of the duties of loyalty and prudence. As a result of Defendants' breaches of fiduciary duty, the Plan suffered millions of dollars of losses.

158. Each Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count, to restore to the Plan any profits made through use of Plan assets, and is subject to other equitable or remedial relief as appropriate. Each Defendant also knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, and knew of the breach by the other Defendants and

Case 1:15-cv-00732-CCE-JEP   Document 88   Filed 12/19/16   Page 75 of 87

failed to make any reasonable effort under the circumstances to remedy the breach, and thus each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

**COUNT V**

**Failure to Monitor Fiduciaries**

159.    Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs as though fully set forth here.

160.    This Count alleges breach of fiduciary duties against the Board of Directors of BB&T Corporation, and the individual directors.

161.    As alleged above, these Defendants are fiduciaries under 29 U.S.C. §1002(21), and are thus bound by the duties of loyalty and prudence.

162.    The Board of Directors of BB&T Corporation is a named fiduciary under Plan §10.1.1 responsible for appointing and removing members of the Employee Benefits Plan Committee, and appointing and removing trustees. Also, the Plan's financial statements filed with the United States Departments of Labor and Treasury and the Securities and Exchange Commission state that the Board of Directors is "responsible for the oversight of the Plan," and that "certain of the Board's responsibilities have been delegated to the Employee Benefits Plan Committee."

163.    Given that the Board of Directors had overall oversight responsibility for the Plan, and the explicit fiduciary responsibility to appoint and remove members of the Employee Benefits Plan Committee, the Defendant Board of Directors and its individual

76

members had a fiduciary responsibility to monitor the performance of the other fiduciaries, including the Compensation Committee, Cardinal and the Employee Benefits Plan Committee.

164.    A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when they are not.

165.    To the extent any of the Board of Directors' fiduciary responsibilities were delegated to the Employee Benefits Plan Committee or another fiduciary, the Board's monitoring duty included an obligation to ensure that any delegated tasks were being performed prudently and loyally.

166.    The Board of Directors of BB&T Corporation and the individual directors breached their fiduciary monitoring duties by, among other things:

a.      failing to monitor their appointees, failing to evaluate their performance or have a system in place for doing so, and standing idly by as the Plan suffered enormous losses as a result of their appointees' imprudent actions and omissions with respect to the Plan;

b.      failing to monitor their appointees' fiduciary process, which would have alerted any prudent fiduciary to the potential breaches because of the widespread use of proprietary funds from which BB&T Corporation and its subsidiaries received profits in violation of ERISA;

77

c.   failing to ensure that the monitored fiduciaries had a prudent process in place for evaluating the Plan's administrative fees and ensuring that the fees were competitive, including a process to identify and determine the amount of all sources of compensation to the Plan's recordkeeper and the amount of any revenue sharing payments; a process to prevent the recordkeeper from receiving uncapped revenue sharing that would increase the recordkeeper's compensation to unreasonable levels even though the services provided remained the same; and a process to periodically obtain competitive bids to determine the market rate for the services provided to the Plan;

d.   failing to ensure that the monitored fiduciaries considered the ready availability of comparable and better performing investment options that charged significantly lower fees and expenses than the Plan's BB&T and Sterling Capital funds and other high-cost mutual funds;

e.   failing to ensure that the monitored fiduciaries had a prudent process in place for managing the BB&T Common Stock Fund, including a process to determine a prudent structure for the fund; a process to monitor and control the fund's cash levels, cash drag, fees, conflicts of interest, and performance compared to BB&T stock; and a process for evaluating the potential solutions to the fund's underperformance compared to BB&T stock to prevent further losses to the Plan; and

f.     failing to remove appointees whose performance was inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments, and options that did not even keep up with inflation, all to the detriment of Plan participants' retirement savings.

167.    As a consequence of these breaches of the fiduciary duty to monitor, the Plan suffered substantial losses. Had the Board of Directors and its individual member Defendants discharged their fiduciary monitoring duties prudently as described above, the losses suffered by the Plan would have been minimized or avoided. Therefore, as a direct result of the breaches of fiduciary duty alleged herein, the Plan, the named Plaintiffs, and other Class members lost tens of millions of dollars of retirement savings.

168.    Each Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count, to restore to the Plan any profits made through use of Plan assets, and is subject to other equitable or remedial relief as appropriate. Each Defendant also knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, and knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach, and thus each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

## COUNT VI

## 29 U.S.C. §1106(a)—Prohibited Transactions between plan and party in interest

169.    Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs as though fully set forth here.

170.    This Count alleges prohibited transactions against BB&T Corporation, the Board of Directors, the Board's Compensation Committee, the Employee Benefits Plan Committee, and the individual directors and committee members.

171.    These Defendants caused the Plan to use BB&T and Sterling Capital mutual funds as investment options and to use BB&T Corporation or its subsidiary Branch Banking and Trust Company as the Plan's trustee and recordkeeper.

172.    BB&T Corporation, Sterling Capital Management LLC, and Branch Banking and Trust Company are all parties in interest because they are entities providing services to the Plan and their employees are covered by the Plan.

173.    Accordingly, by causing the Plan to use BB&T funds and services, these Defendants caused the Plan to engage in transactions constituting an exchange of property between the Plan and a party in interest, a direct or indirect furnishing of services between the Plan and a party in interest for more than reasonable compensation, and a transfer to or use of Plan assets by or for the benefit of a party in interest.

174.    Under 29 U.S.C. §1109(a), these Defendants are liable to restore all losses suffered by the Plans as a result of these prohibited transactions and to disgorge all revenues received by BB&T Corporation and its subsidiaries from the fees paid by the

80

Plan to BB&T Corporation and its subsidiaries as well as other appropriate equitable or remedial relief.

## COUNT VII

**29 U.S.C. §1106(b)—Prohibited Transactions between plan and fiduciary**

175.    Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs as though fully set forth here.

176.    BB&T Corporation, the Board of Directors, the Board's Compensation Committee, and the individual directors and Compensation Committee members violated 29 U.S.C. §1106(b) as follows:

a.    In causing the Plan to use proprietary BB&T and Sterling Capital investment options and BB&T Corporation or its wholly-owned subsidiary Branch Banking and Trust Company as the Plan's trustee and recordkeeper, these Defendants dealt with the assets of the plan in their own interest or for their own account, in violation of 29 U.S.C. §1106(b)(1).

b.    In causing the Plan to use proprietary BB&T funds and services, these Defendants acted in a transaction involving the Plan on behalf of BB&T Corporation or its wholly-owned subsidiaries Sterling Capital Management LLC and Branch Banking and Trust Company, parties whose interests were adverse to the interests of the Plan, its participants and beneficiaries, in violation of 29 U.S.C. §1106(b)(2).

81

177.    By receiving revenue sharing from the Plan's mutual funds, BB&T Corporation or Branch Banking and Trust Company received consideration for their own personal accounts from parties dealing with the Plan in connection with transactions involving the assets of the Plan, in violation of 29 U.S.C. §1106(b)(3).

178.    By receiving fees from the BB&T and Sterling Capital mutual funds in the Plan, including the proprietary money market fund in the BB&T Common Stock Fund, BB&T Corporation and Sterling Capital Management LLC received consideration for their own personal accounts from parties dealing with the Plan in connection with transactions involving the assets of the Plan, in violation of 29 U.S.C. §1106(b)(3).

179.    For the reasons discussed above, the Defendants referenced in this Count were fiduciaries and parties in interest with respect to the Plan.

180.    As a direct result of these prohibited transactions, the Plan, directly or indirectly, paid millions of dollars in investment management and administrative fees that were prohibited by ERISA and suffered millions of dollars in losses.

181.    Under 29 U.S.C. §1109(a), these Defendants are liable to restore all losses suffered by the Plans as a result of the prohibited transactions and to disgorge all revenues received by BB&T Corporation and its subsidiaries from the fees paid by the Plan to BB&T Corporation and its subsidiaries, as well as other appropriate equitable or remedial relief.

# COUNT VIII

## 29 U.S.C. §1132(a)(3)—other equitable relief based on receipt of ill-gotten proceeds

182.     Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs as though fully set forth here.

183.     This Count seeks equitable relief from BB&T Corporation, Sterling Capital Management LLC, and Branch Banking and Trust Company.

184.     Under 29 U.S.C. §1132(a)(3), a court may award "other appropriate equitable relief" to redress "any act or practice" that violates ERISA. A defendant may be liable under that section regardless of whether it is a fiduciary. A nonfiduciary transferee of ill-gotten proceeds is subject to equitable relief if it had actual or constructive knowledge of the circumstances that rendered the transaction or payment unlawful.

185.     BB&T Corporation, Sterling Capital Management LLC, and Branch Banking and Trust Company knew or should have known that the act or practice of using proprietary BB&T funds and services in the Plan allowed BB&T Corporation and its subsidiaries to benefit financially through excessive fees paid by the Plan and at the expense of the Plan's participants.

186.     Each of these Defendants knew or should have known that the act or practice of using proprietary BB&T funds and services in the Plan constituted a direct or indirect furnishing of services between the Plan and a party in interest for more than reasonable compensation or a transfer of assets of the Plan to a party in interest.

187. Each of these Defendants knew or should have known that the act or practice of using proprietary BB&T funds and services in the Plan constituted transactions in which Plan fiduciaries dealt with the assets of the plan in their own interest or for their own account, transactions involving the Plan on behalf of parties whose interests were adverse to the interests of the Plan, its participants and beneficiaries, or transactions in which a Plan fiduciary received consideration for its own personal account from parties dealing with the Plan in connection with transactions involving the assets of the Plan.

188. Because each of these Defendants is an employer whose employees are covered by the Plan, the act or practice of using proprietary BB&T funds and services in the Plan resulted in the assets of the Plan inuring to the benefit of an employer, in violation of 29 U.S.C. §1103(c)(1).

189. Accordingly, each of these Defendants participated in the prohibited transactions described above, knowingly received excessive fees paid from Plan assets, and had assets of the Plan inure to their benefit.

190. Therefore, to the extent any ill-gotten proceeds and profits are not disgorged under the fiduciary relief provisions of 29 U.S.C. §1109(a), the Court should order restitution or disgorgement as appropriate equitable relief under 29 U.S.C. §1132(a)(3) to restore these monies to the Plan.

## PRAYER FOR RELIEF

For these reasons, Plaintiffs, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully request that the Court:

- find and declare that Defendants have breached their fiduciary duties as described above;

- find and adjudge that Defendants are personally liable to make good to the Plan all losses to the Plan resulting from each breach of fiduciary duties or prohibited transaction, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duties;

- determine the method by which plan losses and fiduciary profits should be calculated, and order Defendants to provide all accountings necessary to determine the amounts Defendants must make good to the Plan under 29 U.S.C. §1109(a);

- find and adjudge that Defendants must disgorge all sums of money received from their use of assets of the Plan;

- impose a constructive trust on any monies by which Defendants were unjustly enriched as a result of breaches of fiduciary duty or prohibited transactions, and cause Defendants to disgorge such monies and return them to the Plan;

- remove the fiduciaries who have breached their fiduciary duties and enjoin them from future ERISA violations;

- surcharge against Defendants and in favor of the Plan all amounts involved in any transactions which an accounting reveals were improper, excessive and/or in violation of ERISA;

- order equitable restitution against the Defendants;

- certify the Class, appoint each of the Plaintiffs as a class representative, and appoint Schlichter, Bogard & Denton LLP as Lead Class Counsel and Nichols Kaster, PLLP as additional Class Counsel;

- award to the Plaintiffs and the Class their attorney's fees and costs under 29 U.S.C. §1132(g)(1) and the common fund doctrine;

- order the payment of interest to the extent it is allowed by law; and

- grant other equitable or remedial relief as the Court deems appropriate.

December 19, 2016

/s/ Kai H. Richter
NICHOLS KASTER, PLLP
Kai H. Richter, MN No. 0296545*
Carl F. Engstrom, MN No. 0396298*
4600 IDS Center
80 S 8th Street
Minneapolis, MN 55402
(612) 256-3200, (612) 338-4878 (fax)
krichter@nka.com
cengstrom@nka.com

*Proposed Additional Class Counsel and Attorneys for Bowers Plaintiffs*

*appearing by *special appearance*

Respectfully submitted,

/s/ Jerome J. Schlichter
SCHLICHTER BOGARD & DENTON LLP
Jerome J. Schlichter, MO No. 32225*
Troy A. Doles, MO No. 47958*
Heather Lea, MO No. 49872*
Sean E. Soyars, MO No. 57317*
100 South Fourth Street, Suite 1200
St. Louis, Missouri 63102
(314) 621-6115, (314) 621-5934 (fax)
jschlichter@uselaws.com
tdoles@uselaws.com
hlea@uselaws.com
ssoyars@uselaws.com

*Proposed Lead Class Counsel and Attorneys for Smith Plaintiffs*

*appearing by *special appearance*

/s/ David B. Puryear, Jr.
PURYEAR & LINGLE, PLLC
David B. Puryear, Jr.
North Carolina State Bar No. 11063
5501-E Adams Farm Lane
Greensboro, NC 27407
(336) 218-0227
puryear@puryearandlingle.com

*Local Counsel for all Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on December 19, 2016, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which sent notification of such filing to all counsel of record.

/s/ Jerome J. Schlichter