**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| ROBERT SIMS, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>BB&T CORPORATION, et al.,<br><br>Defendants. | No. 1:15-cv-732-CCE-JEP<br>1:15-cv-841-LCB-JEP |

**MEMORANDUM IN SUPPORT OF**
**THE BB&T DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Ronald R. Davis
Brent F. Powell
WOMBLE BOND DICKINSON (US) LLP
One West Fourth Street
Winston-Salem, NC 27101

Michael J. Prame*
Mark L. Bieter*
Justin M. Holmes*
GROOM LAW GROUP, CHARTERED
1701 Pennsylvania Ave., NW
Washington, DC 20006

**By special appearance*

## Table of Contents

STATEMENT OF THE CASE ..... 1
STATEMENT OF UNDISPUTED FACTS ..... 4
A. The Plan ..... 4
B. Plan Investment Options ..... 5
C. Plan Recordkeeping ..... 7
D. Sterling Accounting Credit ..... 9
QUESTIONS PRESENTED ..... 9
STANDARD OF REVIEW ..... 10
ARGUMENT ..... 11
I. PLAINTIFFS' CLAIMS ARE TIME-BARRED UNDER ERISA § 413. ..... 11
A. All Claims Based on Acts or Omissions Between January 1, 2007 and September 3, 2009 are Time Barred. ..... 11
B. ERISA's Three-Year Statute of Limitations Bars Claims Related to Excessive Fees and Underperformance Before September 4, 2012. ..... 12
II. DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' STOCK FUND CLAIM (COUNT IV). ..... 15
III. DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' RECORDKEEPING CLAIMS (COUNTS I, VI & VII). ..... 18
A. Plaintiffs Have Not Established a Plan Loss. ..... 18
B. Providing Recordkeeping Services Is Not a Prohibited Transaction. ..... 20
IV. DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' CLAIMS RELATED TO THE PLAN'S INVESTMENT OPTIONS (BESIDES THE STOCK FUND) (COUNTS II, III, VI, VII.) ..... 21
A. ERISA Permits the Plan's Use of Affiliated Mutual Funds. ..... 21
B. Summary Judgment Should Be Entered in Favor of Defendants With Regard to Plaintiffs' Claims Related to the Mutual Funds' Fees. ..... 24
i. The Assets Were Invested in the Lowest-Cost Share Class. ..... 24
ii. The Fees Were Reasonable as a Matter of Law. ..... 24
C. Plaintiffs' Claims Related to the Alleged Failure to Use Other Types of Investment Products Lack Merit. ..... 27
i. ERISA Does Not Require the Use of Separate Accounts/CITs. ..... 27
ii. ERISA Does Not Preclude the Use of Actively Managed versus

Passively Managed Funds. .......... 28

iii. BB&T Defendants Did Not Breach Their Fiduciary Duties By Offering the BIC and Money Market Fund. .......... 29

VII. SUMMARY JUDGMENT SHOULD BE ENTERED IN FAVOR OF DEFENDANTS ON PLAINTIFFS' CLAIM BASED ON FUND UNDERPERFORMANCE (COUNT II). .......... 31

## Table of Authorities

**Cases**

*Adamson v. Columbia Gas Transmission, LLC*,
579 F. App'x 175 (4th Cir. 2014) .......... 15

*Brotherston v. Putnam Investments, LLC*,
NO. 15-13825, 15-14128, 2017 WL 1196648
(D. Mass. March 30, 2017) .......... passim

*Browning v. Tiger's Eye Benefits Consulting*,
313 F. App'x 656 (4th Cir. 2009) .......... 11

*David v. Alphin*,
817 F. Supp. 2d 764 (W.D.N.C. 2011) .......... 11, 21

*DiFelice v. U.S. Airways, Inc.*,
436 F. Supp. 2d 756 (E.D. Va. 2006) .......... 17

*DiFelice v. U.S. Airways, Inc.*,
497 F.3d 410 (4th Cir. 2007) .......... 30, 32

*Dupree v. Prudential Ins. Co. of Am.*,
No. 99-8337, 2007 WL 2263892 (S.D. Fla. Aug. 10, 2007) .......... 21

*Hecker v. Deere*,
556 F.3d 575 (7th Cir. 2009) .......... passim

*Henderson v. Emory Univ.*,
252 F. Supp. 3d 1344 (N.D. Ga. 2017) .......... 30

*Henry v. Champlain Enterprises, Inc.*,
445 F.3d 610 (2d Cir. 2006) .......... 18

*In re Northrop Grumman Corp. ERISA Litig.*,
No. 06-06213, 2015 WL 10433713 (C.D. Cal. Nov. 24, 2015) .......... 12

*In re Williams Co. ERISA Litig.*,
271 F. Supp. 2d 1328 (N.D. Okla. 2003) .......... 17

*Kirschbaum v. Reliant Energy, Inc.*,
526 F.3d 243 (5th Cir. 2008) .......... 17

*Lanfear v. Home Depot, Inc.*,
679 F.3d 1267 (11th Cir. 2012) .......... 17

*Larson v. Northrop Corp.*,
21 F.3d 1164 (D.C. Cir. 1994) .......... 11

*Leber v. Citigroup, Inc.*,
No. 07 Civ. 9329, 2010 WL 935442 (S.D.N.Y. March 16, 2010) .......... 19, 21, 22

*Loomis v. Exelon Corp.*,
658 F.3d 667 (7th Cir. 2011) .......... 24, 27

*Martin v. Consultants & Adm'rs, Inc.*,
966 F.2d 1078 (7th Cir. 1992) .......... 12

*Meiners v. Wells Fargo & Co.*,
No. 16-3981, 2017 WL 2303968 (D. Minn. May 25, 2017) .......... 26, 28, 29

*Pension Ben. Guar. Corp. v. Morgan Stanley Inv. Mgmt., Inc.*,
712 F.3d 705 (2d Cir. 2013) .......... 31

*Pfizer Inc. ERISA Litig.*, No. 04-10071,
2013 WL 1285175 (S.D.N.Y. Mar. 29, 2013) .......... 34

*Plasterers' Local Union No. 96 Pension Plan v. Pepper*,
663 F.3d 210 (4th Cir. 2011) .......... 17

*Renfro v. Unisys Corp.*,
671 F.3d 314, 326-28 (3d Cir. 2011) .......... 24

*Shirk v. Fifth Third Bancorp*,
No 05-049, 2009 WL 3150303 (S.D. Ohio Sept. 30, 2009) .......... 12

*Tatum v. RJR Pension Inv. Comm.*,
761 F.3d 346 (4th Cir. 2014) .......... 10, 16, 31

*Taylor v. United Technologies Corp.*,
No. 3:06cv1494, 2009 WL 535779 (D. Conn. March 3, 2009) .......... 28

*Terraza v. Safeway Inc.*,
241 F. Supp. 3d 1057 (N.D. Cal. 2017) .......... 28

*Tibble v. Edison Int'l*,

729 F.3d 1110, 1135 (9th Cir. 2013), *vacated on other grounds*, 135 U.S. 1823 (2015) .......... 24, 27

*Williams v. Genex Servs., LLC*, 809 F.3d 103 (4th Cir. 2015) .......... 10

*Wilson Land Corp. v. Smith Barney Inc.*, No. 5:97-CV-519-BR(2), 1999 WL 1939270 (E.D.N.C. May 17, 1999) .......... 12

*Young v. General Motors Inv. Mgmt. Corp.*, 550 F. Supp. 2d 416 (S.D.N.Y.2008) *aff'd on other grounds*, 325 F. App'x. 31 (2d Cir. 2009). .......... 12, 13

**Statutes**

15 U.S.C. § 80a-22(b) .......... 22

29 U.S.C. § 1104(a)(2) .......... 16, 17

29 U.S.C. § 1108 .......... 11

29 U.S.C. § 1108(b) .......... 19

29 U.S.C. § 1108(b)(2) .......... 20

29 U.S.C. § 1113(1) .......... 11

29 U.S.C. § 1113(2) .......... 11, 12

**Rules**

Fed. R. Civ. Pr. 8 .......... 16

Fed. R. Civ. Pr. 15 .......... 16

**Regulations**

29 C.F.R. § 2550.404c-1(b)(3) .......... 26, 29

42 Fed. Reg. 18,734 (April 8, 1977) .......... 21

56 Fed. Reg. 10,730 (Mar. 13, 1991) .......... 21

56 Fed. Reg. 10,723 (Mar. 13, 1991) .......... 21

**Other Authorities**

1974 U.S.C.C.A.N. 5038 ........................................................................................ 16

1974 U.S.C.C.A.N. 5085-86 .................................................................................. 16

H.R.Rep. No. 93-1280 ............................................................................................ 16

## STATEMENT OF THE CASE

BB&T's culture and value system is the foundation for its relationship with its employees. The corporation's cultural statement emphasizes that, "[t]o attract and retain outstanding employees, we must reward them financially and create an environment where they can learn to grow." Just last month, BB&T announced that with the passage of federal tax-reform legislation, it would share the savings with its employees through bonuses and an increase to the minimum hourly wage.[1] As BB&T's Chairman and CEO described in the announcement, "By far and away, our associates are our most important asset. They're the biggest reason we're able to serve our clients each and every day in an extraordinary way."

BB&T's sponsorship of retirement plans is another way it financially rewards its employees. This lawsuit focuses on the BB&T Corporation 401(k) Savings Plan ("Plan"), but BB&T also sponsors a defined benefit pension plan. BB&T is one of the approximately 20 percent of Fortune 500 companies—and 5 percent of *all* companies—that still provides a pension plan for its employees.

From 2007 to 2016, BB&T contributed **$824 million** to 401(k) Plan participants' accounts, an average of more than $80 million per year.[2] During the same period, it also contributed **$1.9 billion** to the employees' pension plan. Even though BB&T has

---

[1] *See* December 22, 2017 News Release https://bbt.mediaroom.com/2017-12-22-BB-T-invests-152-million-of-tax-reform-benefits-into-associates-and-communities.

[2] *See* BB&T Pension Plan and BB&T 401(k) Savings Plan Form 5500s, Schedule H regarding employer contributions, 2007-16.

contributed nearly **$2.75 billion** over the last ten years to assist employees with their retirement, Plaintiffs theorize that BB&T used the 401(k) Plan's assets to enhance its bottom line.

Plaintiffs' claims replicate those asserted in almost 40 other lawsuits Plaintiffs' counsel has filed against banks and other financial institutions nationwide. In pursuing their industry challenge, Plaintiffs' counsel argues that fiduciaries of bank-sponsored plans breached their duties under ERISA by investing 401(k) plan assets in products managed by affiliates and/or by retaining their affiliates to provide recordkeeping services. Counsel further claim that the expenses associated with the use of affiliated products and service providers unreasonably decrease participants' account balances while increasing corporate profits. They also second guess the quality of "actively managed" mutual funds used in the plans' investment lineups, and argue that passively managed funds would have yielded superior results at less cost.

The factual record established during discovery reveals that Plaintiffs' cookie-cutter claims are without merit in this case, that the Plan was managed and administered in accordance with the governing legal standards, and that participants benefited greatly from the Plan's prudent management. For example:

- Over the entire class period, BB&T matched employee contributions dollar-for-dollar *up to 6%* of compensation—a generous match level well beyond that provided by many of its competitors. BB&T's Executive Management repeatedly refused to adopt recommendations to reduce the match even though doing so would have saved the corporation tens of millions of dollars a year.

- After 2007, BB&T stopped charging participants for recordkeeping services (approximately $2 million annually) and BB&T itself has absorbed the entire cost of recordkeeping since then.

- After 2006, not one BB&T-affiliated fund was added to the Plan's lineup. *Ten* affiliated funds were removed, and *eighteen* funds and collective trusts managed by competitors were added to the lineup. BB&T was an industry leader in reducing the number of affiliated products and adding competitors' products to the Plan.

If, as Plaintiffs claim, BB&T and its Executive Management team sought to use BB&T's retirement plans to enhance the corporation's bottom line, they could have undertaken cost-saving measures adopted by many other banks, including freezing their pension plans (as more than half of Fortune 500 companies have since 2008), reducing the corporate match to their 401(k) plans, and having 401(k) participants pay for recordkeeping services. BB&T also could have reduced the rate of future benefit accruals in the pension plan, which pays retired employees up to 35 percent of their highest average annual salary for the rest of their lives. BB&T's Executive Management chose instead to continue investing in BB&T's employees while having the corporation shoulder more – not less – of the Plan's costs.

Plaintiffs are pursuing this action on behalf of all participants and beneficiaries in the Plan since January 1, 2007. As discussed below, all claims related to the period January 1, 2007 through September 3, 2009 are barred by ERISA's six-year statute of limitations.[3] Furthermore, claims related to the Plan's investment expenses and performance that predate September 3, 2012 are barred by ERISA's three-year "actual

[3] Plaintiffs' initial complaint was filed September 4, 2015.

knowledge" limitations period, based on the disclosures that participants received regarding expenses and performance of the investment options.

Discovery also confirmed what has been clear since the Plan was established in 1982: consistent with its cultural statement, BB&T has gone to considerable effort to support its employees' retirement goals. The Plan was well managed by its fiduciaries with assistance from outside investment and other experts, and the fees and expenses borne by participants were closely monitored, minimized, and kept well within the range that many other courts have found reasonable. Further, the investment lineup included an appropriate mix of investment options with varying risk profiles, including an increasing number of options managed by BB&T's competitors.

BB&T's treatment of its employees exceeded the standards that ERISA sets, and Defendants respectfully ask that the Court recognize as much by granting summary judgment on all of Plaintiffs' claims.

## STATEMENT OF UNDISPUTED FACTS

### A. The Plan

BB&T established the Plan in 1982. *See* Complaint ¶¶ 5, 7, 9. It is maintained pursuant to a written plan document, the "BB&T Corporation 401(k) Savings Plan" ("Plan Document"). *Id.* ¶¶ 5, 7; Exhibit A.

Eligible BB&T employees can contribute a portion of their compensation to the Plan, and BB&T matches those contributions dollar-for-dollar for the first 6% of compensation. *See* Exhibit A at Sections 2.1, 2.2; Exhibit F at BBT000090. Participants

decide how to allocate their contributions and BB&T's matching contributions among the Plan's investment options and may move their investments to other options at any time. *See* Exhibit A at Section 7.1; Exhibit F at BBT000090-98.

The Plan Document describes the responsibilities of the Plan fiduciaries. *See* Exhibit A at BBT000369-70; Complaint ¶ 24. It provides that the Compensation Committee of the BB&T Board of Directors (the "Committee") is to "determine from time to time the investment funds to be made available to participants" and "to adopt an investment policy statement" for the Plan. *See* Exhibit A at BBT00370; Complaint ¶ 24. The Committee is composed of outside directors, none of whom is an officer or employee of BB&T. *See* Reeder Decl. ¶ 16.

**B. Plan Investment Options**

Under the Plan's Investment Policy Statement ("IPS"), the Committee "review[s] the 401(k) Savings Plan's investment program to determine whether" the investment options are "reasonable relative to typical practices, BB&T's participant profile, and long-term capital market expectations." *See* Exhibit B at BBT000257. The IPS states that the Committee may receive advice from "third-party consultants to assist it in evaluating the types of investment options to offer Plan participants." *Id.* at BBT000247.

In early 2009, the Committee engaged Cardinal Investment Advisors ("Cardinal"), an independent investment advisor that agreed to take on a fiduciary role in reviewing the Plan's investment options and making recommendations regarding the investment

lineup.[4] *See* Exhibit C, at BBT004309-15; Exhibit D at BBT169890. Cardinal monitored the investment options and their compliance with the IPS, and prepared quarterly reports summarizing its analyses. *See* Reeder Decl. ¶ 14 Cardinal's analyses, among other things, compared the performance of the Plan options to that of benchmarks described in the IPS and identified specific options the Committee should evaluate further, with an eye towards possible removal and replacement. *See id*. Over time, Cardinal recommended the removal or addition of specific options for the Committee's consideration. *Id*.

Cardinal met quarterly with the 401k and Pension Review Team, which consists of representatives of BB&T's Human Systems division, Asset Management division, and senior leadership, to review the investment options and to give those representatives notice of potential changes, so their teams would be prepared to implement those decisions if they were approved by the Committee. *See* Reeder Decl. ¶ 17.

Cardinal representatives also attended Committee meetings in person at least once a year. *Id.* ¶ 14-15. With Cardinal's analyses and recommendations, the Committee monitored and selected the Plan's investment options, adding and removing options over time. In 2007 and 2008, for example, the Plan fiduciaries removed eight affiliated funds and added 15 unaffiliated funds. *Id.* ¶ 18. After 2006, only unaffiliated funds were added to the Plan. *Id.* ¶ 19.

At all times, participants could invest in a wide array of options offering different risk and return characteristics and investment objectives. *Id.* The Plan's investment

[4] Prior to 2009, the Committee engaged Hewitt Investment Group and RLP Consulting, LLC as outside investment advisors. *See* Reeder Decl. ¶ 13.

options included both actively managed and index mutual funds, T. Rowe Price target date mutual funds, a money market fund, a BB&T stock fund, a Morley stable value fund, and collective investment trusts. *See e.g.,* Exhibit E at BBT000017; Exhibit F at BBT000099-100; Reeder Decl. ¶¶ 20, 23-28. Throughout the class period, BB&T also offered participants the opportunity to invest in hundreds of additional unaffiliated options through a brokerage window. BB&T did not collect fees for offering the brokerage window. *See* Reeder Decl. ¶ 21.

The expense ratios for the Plan's investment options ranged from approximately 4 to 130 basis points (.04% to 1.3%). *See* Exhibits F at BBT000099, L at BBT000071; Complaint ¶ 39. The expense ratios charged to participants for BB&T-affiliated funds were the same as those charged to all investors in those funds. *See* McAlister Decl. ¶¶ 5-6.

### C. Plan Recordkeeping

BB&T's Retirement and Institutional Services division ("RIS") [5] provides recordkeeping and administrative services, including participant communications, enrollment and deferral processing, call center support, compliance testing, and completion of regulatory and other required forms. Those services were reflected in administrative service agreements. *See, e.g.,* Exhibit G at BBT243746-53.

In 2007, participants paid a $10 annual administrative fee for recordkeeping services. Participants who invested in two Plan options, the Bank Investment Contract

[5] RIS has had different names throughout the relevant period, including "Employee Benefit Operations and Administration."

(the "BIC") and the BB&T Common Stock Fund, also were charged 15 basis points annually. *See, e.g.*, Hancock Decl. ¶ 4; Reeder Decl. ¶ 5. Since January 2008, Plan participants have not been charged for recordkeeping services and BB&T Corporation has absorbed the cost of providing recordkeeping services for the Plan. *See* Reeder Decl. ¶¶ 4; Exhibit H at BBT258326-28.

For purposes of cost accounting and to compare RIS to other business units, BB&T Corporation internally credits RIS for its support of the Plan. *See* McCulloch Decl. ¶ 4. The internal credit is not an actual transfer of money within BB&T to RIS; it is simply an accounting entry. *See id*. The internal credit is not charged to the Plan or participants. In 2008, that internal accounting credit was calculated based on the formula that previously had been used to charge Plan participants —$10 annually per participant and 15 basis points on assets in the BIC and BB&T Common Stock Fund. After 2008, the internal credit amount was changed to $58.60 per participant. *See* Reeder Decl. ¶ 5-6.

The amount of the accounting credit after 2008 was based on a request for proposal ("RFP") to independent third-party recordkeepers that BB&T Human Systems conducted in 2007. *See* Hancock Decl. ¶ 6. In 2012 and 2015, outside consulting firms reviewed the $58.60 accounting credit and concluded that it was in line with what other recordkeepers would charge to provide the same services. *Id.* at ¶ 7; Exhibits I, J.

### D. Sterling Accounting Credit

RIS receives a second intracompany accounting credit of 15 basis points in connection with services it provides to Sterling Capital Management ("Sterling").[6] *See* McCulloch Decl. ¶ 3. Sterling is a subsidiary of BB&T that, among other things, creates and operates the affiliated mutual funds. That internal credit did not result in a transfer of money from Sterling to RIS; it is simply an accounting entry that allows BB&T management to compare costs of different business units. *See id.* ¶ 4; Exhibit Q at BBT000207-10. The credit is not charged to the Plan or the participants and otherwise does not affect the expense ratios paid by participants. Those expense ratios are the same for all investors in that share class, whether Plan participants or not. McCulloch Decl. ¶ 8; McAlister Decl. ¶¶ 5-6.

## QUESTIONS PRESENTED

I. Claims under ERISA are time barred if not brought within the *shorter* of either (a) six years after "the date of the last action which constituted a part of the breach or violation" or (b) three years from the date of "actual knowledge." Plaintiffs' initial Complaint was filed on September 4, 2015. Does the six-year limit bar **all** Plaintiffs' claims for acts or omissions prior to September 4, 2009?

ERISA reduces the limitations period further to three years based on actual knowledge of the breach or violation. In this case, BB&T Plan participants were informed prior to September 2012: (1) of the fees of the investments available in the Plan, and (2) of the performance of those investments. Should Plaintiffs' actual knowledge of these facts bar their excessive fee and underperformance claims before September 4, 2012?

[6] Until 2009, BB&T's investment management division was known as BB&T Asset Management. BB&T acquired Sterling in 2010, and the mutual funds were re-branded with the Sterling name.

The Plan included BB&T affiliated mutual funds. Because Plaintiffs knew the Plan used BB&T funds long before September 4, 2012, are their prohibited transaction claims arising before that date time-barred?

II. Participants could invest in BB&T stock through an investment option that used a "unitized" structure. Defendants' expert testified it is permissible and widespread to use a unitized stock fund, and Plaintiffs' expert admitted that unitized stock funds are *not* imprudent. Based on the evidence, should the Court grant Defendants' summary judgement on Plaintiffs' Stock Fund Claim (Count IV)?

III. RIS provides recordkeeping services for the Plan. Since 2008, the Plan and its participants have paid nothing for recordkeeping services—BB&T absorbed the entire cost. When neither the Plan nor its participants have suffered any loss for the cost of recordkeeping, should the Court grant summary judgment on Plaintiffs' breach of fiduciary duty claim (Count I)?

ERISA provides a statutory exemption to ERISA's prohibited transaction rules to allow affiliates to provide recordkeeping services. In this case, no Plan or participant assets were used to pay for those services. Under these circumstances, was the use of RIS not a prohibited transaction (Counts VI and VII) as a matter of law?

IV. The use of affiliated investment products in 401(k) plans has been approved by the Department of Labor and is expressly exempt from ERISA's prohibited transaction rules. In this case, the Plan included affiliated investment options that (a) were the least expensive share class, and (b) charged fees that various federal circuit courts of appeals have held to be reasonable as a matter of law. Was it permissible to include such investment products, even though they were affiliated with BB&T (Counts II, III, VI, VII)?

V. The Fourth Circuit has held that the prudence of a fiduciary's actions cannot be measured in hindsight, but instead involves an evaluation of plan procedures. Discovery confirms that BB&T followed the procedural steps that the Fourth Circuit identified in *Tatum v. RJR Pension Inv. Comm*. Have BB&T's actions in following *Tatum* eliminated second-guessing claims for a breach of fiduciary duty for fund underperformance claim (Count II)?

## **STANDARD OF REVIEW**

Under Rule 56, a court "shall grant summary judgment if the movant shows there is no genuine dispute of material fact" and is entitled to judgment as a matter of law.

"[S]ummary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of her case and does not make, after adequate time for discovery, a showing sufficient to establish that element." *Williams v. Genex Servs., LLC*, 809 F.3d 103, 109 (4th Cir. 2015)

To prevail on a claim for breach of fiduciary duty under ERISA, Plaintiffs must establish the following elements: (1) a fiduciary duty, (2) a breach of that duty, and a (3) loss resulting from that breach. *Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 358 (4th Cir. 2014). For claims alleging a violation of ERISA's prohibited transaction rules, Plaintiffs must establish that the relevant transactions involved the Plan or Plan assets, and that the transactions were not specifically exempted under ERISA. *See* 29 U.S.C. § 1108.

## ARGUMENT

### I. PLAINTIFFS' CLAIMS ARE TIME-BARRED UNDER ERISA § 413.

#### A. All Claims Based on Acts or Omissions Between January 1, 2007 and September 3, 2009 are Time Barred.

Claims under ERISA are time barred if not brought within the *shorter* of either (a) six years after "the date of the last action which constituted a part of the breach or violation" or (b) three years from the date that plaintiff had "actual knowledge" of the breach or violation. ERISA § 413(1)-(2), 29 U.S.C. § 1113(1)-(2). Plaintiffs filed their initial Complaint on September 4, 2015. Accordingly, claims based on actions or omissions prior to September 4, 2009 are barred by ERISA's six-year statute of repose.

The only exception to the six-year period is in the case of fraud or concealment. *See* ERISA § 413(2). The Fourth Circuit requires a showing of purposeful, intentional deceit for a party to extend the period under the exception. *See Browning v. Tiger's Eye Benefits Consulting*, 313 F. App'x 656, 663 (4th Cir. 2009) (fraud or concealment exception requires a showing that a party "engaged in a course of conduct *designed* to conceal evidence of their alleged wrongdoing") (emphasis added) (quoting *Larson v. Northrop Corp.*, 21 F.3d 1164, 1172 (D.C. Cir. 1994); *David v. Alphin*, 817 F. Supp. 2d 764, 779-80 (W.D.N.C. 2011) ("The court finds the phrase 'course of conduct designed' to be synonymous with a requirement of 'intent.'"), *aff'd on other grounds*, 704 F.3d 327 (4th Cir. 2013). To rely on the exception, Plaintiffs must establish "some trick or contrivance intended to exclude suspicion and prevent inquiry." *Martin v. Consultants & Adm'rs, Inc.*, 966 F.2d 1078, 1095 (7th Cir. 1992) (internal citations omitted). "Concealment by mere silence is not enough." *Wilson Land Corp. v. Smith Barney Inc.*, No. 5:97-CV-519-BR(2), 1999 WL 1939270, at *6 (E.D.N.C. May 17, 1999).

With discovery now complete, there is no evidence of intentional misconduct from January 1, 2007 to September 3, 2009 (or any other time) designed to conceal information from class members. Accordingly, Defendants are entitled to summary judgement as to claims based on acts or omissions prior to September 4, 2009.

### B. ERISA's Three-Year Statute of Limitations Bars Claims Related to Excessive Fees and Underperformance Before September 4, 2012.

While September 3, 2009 is the farthest back Plaintiffs' lawsuit could extend, ERISA reduces the limitations period if the claim is not brought within "three years after

the earliest date on which the plaintiff had actual knowledge of the breach or violation." 29 U.S.C. § 1113(2). In another case brought by Plaintiffs' counsel, a district court recently granted summary judgment on excessive fee claims beyond the three-year statutory limitations period where the plan participants were provided with fee information for Plan investments in quarterly statements and through an online portal. *See In re Northrop Grumman Corp. ERISA Litig.*, No. 06-06213, 2015 WL 10433713, at *19-22 (C.D. Cal. Nov. 24, 2015); *see also Shirk v. Fifth Third Bancorp*, No 05-049, 2009 WL 3150303, at *6 (S.D. Ohio Sept. 30, 2009) (granting summary judgment on excessive fee claims because plan participants were provided materials disclosing plan investment fees); *Young v. General Motors Inv. Mgmt. Corp.*, 550 F. Supp. 2d 416, 420 (S.D.N.Y.2008) (dismissing claims because "[t]he allegedly excessive fees that form the central basis of th[e] claim were readily apparent from the information provided to all Plan participants more than three years before Plaintiffs filed . . . suit. It is undisputed that Plaintiffs had actual knowledge that the Plans offered the Fidelity Funds as investment options and the quarterly performance summaries provided to Plan participants clearly disclosed the fees and expenses associated with the Fidelity Funds[.]"), *aff'd on other grounds*, 325 F. App'x. 31 (2d Cir. 2009).

Like the participants in the cases cited above, BB&T Plan participants were informed more than three years before their suit: (1) of the fees of the investments available in the Plan, (2) of the performance of those investments, and (3) that some of those investments were affiliated with BB&T. Specifically, participants had access to

annual summary plan descriptions during the class period that informed them of the fees associated with the investments options – including proprietary investment options that bore the "BB&T" brand, highlighting the affiliation. *See e.g.* Exhibit E at BBT000016, Exhibit K at BBT000039, Exhibit L at BBT000067, Exhibit F at BBT000099. Additionally, investment performance and fee information was provided through the online PlanTrac resource available to all participants. *See* Reeder Decl. ¶ 9. Finally, participants received quarterly account statements, also available online, that informed them of each investment option's performance over time. *See, e.g.*, Exhibit U at PLABBT000004; Reeder Decl. ¶ 10.

The three-year statute of limitations period also bars Plaintiffs' prohibited transactions claims as to BB&T's use of affiliated mutual funds. *See Brotherston v. Putnam Investments, LLC*, NO. 15-13825, 15-14128, 2017 WL 1196648, at *11 (D. Mass. March 30, 2017) (three-year statute of limitations bars prohibited transactions claims since they arose "not from an intricate financial transaction" but from plaintiffs being "well aware that the parties involved were all Putnam entities"). As confirmed by the exhibits cited above, Plaintiffs knew of the Plan's use of BB&T funds long before September 4, 2012.

Consequently, Plaintiffs had actual knowledge of the facts underlying Count II and Counts VI and VII related to the investment fees, expenses and performance as to bar claims based on acts or omissions prior to September 4, 2012.

## II. DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' STOCK FUND CLAIM (COUNT IV).

Count IV alleges that BB&T Defendants breached their fiduciary duties by using a unitized structure for the BB&T Common Stock Fund ("Stock Fund"). As a unitized investment product, the Stock Fund includes shares of BB&T stock and a small amount of cash, typically around 0.5% of the aggregate value of the fund. *See* Reeder Decl. ¶ 28. The cash is set aside to allow participants to receive distributions or to transfer investments to other Plan options without having to wait for a sale of stock to settle, which typically takes several days. The cash portion is invested in a money market fund. Conrad Decl., Report ¶ 63.

Plaintiffs allege that the unitized structure of the Stock Fund caused participants to pay excessive fees and suffer from "cash drag" when BB&T stock performed well. *See* Complaint ¶¶ 155-56. BB&T's expert, Dr. Jennifer Conrad, opined "Plaintiffs' claim that the Plan should not have used a unitized structure conflicts with the current practice in 401(k) Plans and cannot be a basis for damages calculations." *See* Conrad Decl., Report ¶¶ 61-62. Dr. Conrad highlighted the widespread use of unitized structures in 401(k) plans. *Id.*

By contrast, Plaintiffs' proffered expert, Dr. Gerald Buetow, did not offer *any* opinions on the unitized structure of the Stock Fund and provided *no* related damages calculation. He also admitted during his deposition that unitized company stock funds are *not* imprudent. *See* Exhibit T at 228. Accordingly, the Court should enter summary judgment as to Count IV because Plaintiffs can establish neither a breach of duty nor a

loss in relation to their challenge to the unitized structure of the Stock Fund. *See Adamson v. Columbia Gas Transmission, LLC*, 579 F. App'x 175, 178 (4th Cir. 2014) (affirming summary judgment where defendant's expert offered unrebutted expert testimonial evidence).

Rather than advance the claim in the Complaint, Dr. Buetow introduced an entirely novel theory: that, because participants "often follow naïve diversification strategies" and "over-concentrated their portfolios" in the Stock Fund, the fiduciaries should have *completely removed* the Stock Fund from the lineup. *See* Exhibit V ¶ 160 (100 percent of participants' allocation to Stock Fund would have been "invested far more appropriately" in a large cap passive mutual fund).

As an initial matter, Plaintiffs never pled the lack of diversification theory. They did not seek leave to amend their complaint to advance this claim before the Court's March 1, 2017 deadline for amending pleadings.[7] *See* ECF 69 at 5, ECF 70; *see also* Fed. R. Civ. Pr. 8, 15. They raised this issue for the first time in their expert reports in the fall of 2017, well after fact discovery closed. Allowing Plaintiffs to proceed with the new theory would prejudice BB&T because it did not have an opportunity to conduct discovery on that theory.

More fundamentally, Dr. Buetow's lack of diversification theory contravenes ERISA, which exempts 401(k) and other eligible individual retirement plans ("EIAPs") from ERISA's fiduciary duty to diversify. *See* 29 U.S.C. § 1104(a)(2). The courts have

[7] Plaintiffs did not seek to add this claim in December 2016, for example, when they proposed to amend their complaint to add Cardinal as a party. *See* ECF 85.

confirmed that, because 401(k) plans are exempt from ERISA's duty to diversify, plan participants cannot maintain a claim based on a sponsor's failure to diversify investments in company stock—or on the sponsor's offering company stock in the first place. *Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 356-57 (4th Cir. 2014) ("legislative history and federal regulations clarify that the diversification and prudence duties do not prohibit a plan trustee from holding single-stock investments as an option in a plan that includes a portfolio of diversified funds. Moreover, the diversification duty does not apply to investments that fall within the exemption for employer stocks provided for in §1104(a)(2)") (citing H.R.Rep. No. 93-1280 (1974) (Conf. Rep.), *reprinted* at 1974 U.S.C.C.A.N. 5038, 5085-86, "if the participant instructs the plan trustee to invest the full balance of his account in, e.g., a single stock, the trustee is not to be liable for any loss because of a failure to diversify or because the investment does not meet the prudent man standards" so long as the investment does not "contradict the terms of the plan"); *Kirschbaum v. Reliant Energy, Inc.*, 526 F.3d 243, 249 (5th Cir. 2008) ("ERISA exempts an EIAP from the duty to diversify with regard to the purchase or holding of company stock."); *Lanfear v. Home Depot, Inc.*, 679 F.3d 1267, 1275-76 (11th Cir. 2012) ("Section 1104(a)(2) provides an exemption from the diversification requirement … for plans structured as EIAPs"); *DiFelice v. U.S. Airways, Inc.*, 436 F. Supp. 2d 756, 787 (E.D. Va. 2006) ("As has been recognized by the courts, 'Congress enacted this exemption because it believed that, in permitting unlimited investment in employer securities, such plans are a 'device for expanding the national capital base among

employees—an effective merger of the role of capitalist and worker.'") (*quoting In re Williams Co. ERISA Litig.*, 271 F. Supp. 2d 1328, 1331-32 (N.D. Okla. 2003)). Accordingly, any new claim related to lack of diversification lacks merit.

## III. DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' RECORDKEEPING CLAIMS (COUNTS I, VI & VII).

### A. Plaintiffs Have Not Established a Plan Loss.

Plaintiffs allege that using RIS as recordkeeper for the Plan constituted both a breach of fiduciary duty (Count I) and a prohibited transaction (Counts VI and VII). As discussed above, in order to prevail on their claim, Plaintiffs must establish not only a breach of fiduciary, but also that the Plan suffered a loss. *Plasterers' Local Union No. 96 Pension Plan v. Pepper*, 663 F.3d 210, 217 (4th Cir. 2011) ("[W]hile certain conduct may be a breach of an ERISA fiduciary's duties under § 1104, that fiduciary can only be held liable upon a finding that the breach actually caused a loss to the plan.").

Defendants are entitled to summary judgment on Plaintiffs' recordkeeping claims because, even assuming Plaintiffs were to prove a breach (which they cannot), they cannot establish that the Plan suffered a loss. Since 2008, the Plan and its participants have not paid anything for recordkeeping services—BB&T itself absorbed the entire cost. *See* Reeder Decl. ¶ 4; Hancock Decl. ¶ 5.

Defendants anticipate Plaintiffs will argue that the intracompany cost accounting credit that RIS receives for services provided for Sterling in relation to Plan investments should be considered "revenue sharing," and that the Plan suffered a loss because RIS did not rebate those accounting credits to participants. Plaintiffs' arguments are without

merit for four independent reasons, any one of which requires entry of judgment in favor of BB&T Defendants.

First, because there is no actual transfer of money between Sterling and RIS, there is no money for RIS to rebate to the Plan. As discussed above, the internal accounting credit related to RIS's services to Sterling was not a cash payment. *See* McCulloch Decl. ¶ 4.

Second, because BB&T Corporation absorbed the full cost of recordkeeping for the Plan after 2007, rebating to participants who received those services for free would result in an impermissible windfall. *Henry v. Champlain Enterprises, Inc.*, 445 F.3d 610, 624 (2d Cir. 2006) ("The aim of ERISA is 'to make the plaintiffs whole, but not to give them a windfall.'") (internal citations omitted).

Third, on a consolidated accounting basis, BB&T Corporation, which includes both Sterling and RIS, makes no additional money as a result of the internal allocation among its business units. Put another way, the cost to participants does not increase *at all* due to the internal allocation of credit. Participants pay the same expense ratios charged to all investors in Sterling mutual funds, and they pay nothing to RIS for recordkeeping services. The internal accounting credit has no economic impact on them or the Plan. *See* McCulloch Decl. ¶¶ 4, 8, McAlister Decl. ¶¶ 5-6.

Fourth, BB&T's contribution to the Plan of more than $800 million for the class period[8] also exceeds by many hundreds of millions of dollars the amount Plaintiffs

---

[8] *See* BB&T 401(k) Savings Plan Form 5500s Form H, 2007-16.

maintain BB&T should have rebated to the Plan, inclusive of interest. Given that level of company contribution, Plaintiffs cannot rationally maintain that BB&T used the Plan to enhance its bottom line or that participants were harmed through an internal accounting credit that had no impact on the costs borne by participants.

### B. Providing Recordkeeping Services Is Not a Prohibited Transaction.

Plaintiffs assert that, in causing the Plan to use RIS as recordkeeper, the BB&T Defendants violated the prohibited transaction rules set forth in ERISA § 406. *See* Complaint ¶¶ 173, 176-77. To the contrary, the provision of recordkeeping services to a Plan is statutorily exempt from ERISA's prohibited transaction rules.

Section 408(b) of ERISA identifies specific transactions that are exempt from the prohibitions of section 406. *See* 29 U.S.C. § 1108(b); *See Leber v. Citigroup, Inc.*, No. 07 Civ. 9329, 2010 WL 935442, at *9 (S.D.N.Y. March 16, 2010). As relevant here, section 408(b)(2) provided that the prohibitions in section 406 "shall not apply" to "reasonable arrangements with a party in interest for . . . services necessary for the establishment or operation of the plan, if no more than reasonable compensation is paid therefor." 29 U.S.C. § 1108(b)(2).

It is undisputed that recordkeeping services are "services necessary for the . . . operation of" the Plan. *See* Complaint ¶ 44 ("Recordkeeping is a service necessary for every defined contribution plan."). Moreover, as discussed above, RIS and, more broadly, BB&T, did not receive any compensation from participants after 2007 for providing recordkeeping services to the Plan. To the contrary, BB&T absorbed the entire

cost. *See* Hancock Decl. ¶ 5; Reeder Decl. ¶ 4. Since RIS performed services necessary to the Plan *at no cost to the Plan*, the statutory exemption under ERISA section 408(b)(2) applies, and Plaintiffs cannot establish a violation of the prohibited transaction rules in ERISA section 406.

## IV. DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' CLAIMS RELATED TO THE PLAN'S INVESTMENT OPTIONS (BESIDES THE STOCK FUND) (COUNTS II, III, VI, VII.)

### A. ERISA Permits the Plan's Use of Affiliated Mutual Funds.

Throughout the Complaint, Plaintiffs theorize that the BB&T Defendants breached ERISA's fiduciary duties of prudence and loyalty by including in the investment lineup "high-cost proprietary investment funds managed by BB&T and its subsidiary." *See* Complaint ¶ 1. The use of affiliated investment products, however, is not improper under ERISA. *See Putnam*, 2017 WL 2634361, at *3 ("courts have upheld . . . financial services institutions' practice of offering their own investment products to their own sponsored plans") (citing *Hecker v. Deere*, 556 F.3d 575, 586 (7th Cir. 2009) (finding "no statute or regulation prohibiting a fiduciary from selecting funds from one management company"); *Dupree v. Prudential Ins. Co. of Am.*, No. 99-8337, 2007 WL 2263892, at *45 (S.D. Fla. Aug. 10, 2007) (a plan sponsor selecting its own investment products "does not give rise to an inference of disloyalty, especially where these practices are universal among plans of the financial services industry").

The U.S. Department of Labor, the federal agency charged with regulating employee benefit plans, also has approved the use of affiliated investment products since

1977, going so far as to recognize that it would be "contrary to normal business practice for a company whose business is financial management to seek financial management services from a competitor." *See Participant Directed Individual Account Plans*, 56 Fed. Reg. 10,723, 10,730 (Mar. 13, 1991).

In addition, the use of affiliated products is exempt from ERISA's prohibited transaction rules pursuant to the Prohibited Transaction Exemption 77-3 ("PTE 77-3") issued by the DOL in 1977.[9] *See Alphin*, 817 F. Supp. 2d at 776-77 n.9 (PTE 77-3 "expressly [permits] investment by benefit plans in mutual funds advised or underwritten by the plan's sponsors or its affiliates."); *Leber*, 2010 WL 935442, at *10 (dismissing prohibited transactions claim based on PTE 77-3; "the complaint alleges the very type of activity that the exemption expressly allows to occur—the investment by a plan in its affiliated mutual funds on the terms generally available to other investors").

The requirements of PTE 77-3 are satisfied here: First, in accordance with PTE 77-3(a), the Plan does not pay investment advisory fees to the affiliated advisor. McAlister Decl. ¶ 7. The only investment management fees are paid by the mutual funds themselves, *id.*, which is consistent with the requirements of 77-3. *See Leber,* 2010 WL 935442, at *10-11 (concluding that the "only specific allegations of wrongdoing with respect to those [affiliated] investments involve the advisory fees those funds paid their own managers, fees the exemption expressly allows to be paid").

[9] In issuing PTE 77-3, the DOL concluded the use of proprietary mutual funds was "in the interests of plans and of their participants and beneficiaries; [and … protective of the rights of participants and beneficiaries." Prohibited Transactions Exemption 77-3, 42 Fed. Reg. 18,734 (April 8, 1977).

Second, consistent with PTE 77-3 (b) and (c), the Plan pays neither a redemption fee nor a sales commission. *See* McAlister Decl. ¶ 7.

Finally, pursuant to PTE 77-3 (d), all other dealings between the Plan and the investment company, Sterling Capital Funds, are "on a basis no less favorable to" Plan participants than to other Sterling fund investors. The expense ratios for the affiliated funds in the Plan are the same as those charged to other investors in the marketplace. *See id.* ¶¶ 5-6. Indeed, to comply with the Investment Company Act, Sterling must offer mutual fund share classes at the same expense ratio to all investors, including the Plan. *See* 15 U.S.C. § 80a-22(b). Moreover, as discussed in the following section, the Plan used the lowest-cost share class. Accordingly, the Plan's use of the affiliated funds was on equal or more favorable terms than an outside investor in the same funds, PTE 77-3 applies, and BB&T's offering of Sterling funds in the Plan is exempt from being a prohibited transaction.

Even if PTE 77-3 did not apply, however, Plaintiffs' prohibited transaction claim would still fail since the transactions did not involve the Plan or Plan assets, as ERISA section 406 requires. Neither the Sterling Capital Funds' payment of management fees to Sterling Capital Management nor the internal accounting credit between Sterling and RIS involved Plan or participant assets. *See Hecker*, 556 F.3d at 584; McCulloch Decl. ¶¶ 4, 8.

The Court, therefore, should enter judgment against Plaintiffs on their breach of fiduciary duty and prohibited transaction claims related to the Plan's use of affiliated

funds.

### B. Summary Judgment Should Be Entered in Favor of Defendants With Regard to Plaintiffs' Claims Related to the Mutual Funds' Fees.

#### i. The Assets Were Invested in the Lowest-Cost Share Class.

Mutual funds often have different share classes that charge different expenses. Contrary to Plaintiffs' allegations, discovery established that the Committee made sure that the Plan was invested in the least-expensive share class of each investment option, or in a share-class that provided rebates making it the lowest-cost option for Plan participants. *See* Conrad Decl., Report ¶¶ 75-79. For example, in the case of the Fidelity Contrafund K-share class, the Plan did not use the lowest-cost *share class*, but Fidelity rebated a portion of its fees and the rebate was passed along to Plan participants. *See* Conrad Decl., Report ¶¶ 75-79. Based on that rebating, the K-share class was *less expensive* than any other publically available share class. *See id*.[10] This conforms with the conclusions of Plaintiffs' proffered investment expert, who acknowledged that the Plan used the least-expensive share class. *See* Exhibit T at 228-29.

#### ii. The Fees Were Reasonable as a Matter of Law.

In a series of decisions in other fee cases, including three circuit court rulings, courts have concluded, as a matter of law, that investment expenses up to 2% annually do not violate ERISA. In *Renfro v. Unisys Corp.*, the Third Circuit affirmed the dismissal of

[10] To the extent Plaintiffs attempt to take issue with the share class for the Vanguard Index Plus Investment option, it is undisputed that the institutional share class required a minimum investment of $200 million, significantly higher than Plan assets invested in the fund. Once plan assets reached an appropriate threshold, the Plan switched to the institutional class. *See* Conrad Decl., Report ¶ 79.

an excessive fee suit in which the fund expense ratios ranged from 0.1% to 1.21%. *See* 671 F.3d 314, 326-28 (3d Cir. 2011). Shortly after that, in *Tibble v. Edison Int'l*, the Ninth Circuit affirmed the dismissal of excessive fee claims when ratios ranged from 0.03% to 2.0%. *See* 729 F.3d 1110, 1135 (9th Cir. 2013), *vacated on other grounds*, 135 U.S. 1823 (2015). Similarly, the Seventh Circuit in *Hecker v. Deere* held that the excessive fee allegations failed to state a plausible claim where the plan offered an array of investments with ratios from 0.07% to over 1%. *See* 556 F.3d at 587; *see also Loomis v. Exelon Corp.*, 658 F.3d 667, 670-72 (7th Cir. 2011) (dismissing breach of fiduciary duty claims where plan investment fees ranged from 0.03% to 0.96%).

Last year, the District of Massachusetts followed suit in a case Plaintiffs' counsel brought against another financial institution. *See Putnam*, 2017 WL 1196648, at *7 (granting summary judgment as to prohibited transaction claim since range of fees for Putnam funds used in the Putnam Retirement Plan—0.00% to 1.65%—was reasonable). The court emphasized that "all of the Putnam mutual funds the Plan invested in were also offered to investors in the general public; therefore their expense ratios were 'set against the backdrop of market competition.'" *Id.* at *6 (quoting *Hecker*, 556 F.3d at 586).

Here, it is undisputed that at all relevant times the range of fees for the Plan's investment options was between 0.04% and 1.30%, a range that falls squarely within those that courts have found acceptable. *See* Exhibits F at BBT000099, L at BBT000071; Complaint ¶ 39. This Court should adopt the rationale of the other courts that have addressed the issue and conclude that such a range does not violate ERISA.

The analyses that the Plan's investment consultants provided through the years confirms as much. In 2016, for example, Cardinal conducted a fee benchmarking analysis comparing the expense ratios of Plan's investment options with those of a broader universe of similar funds. *See* Exhibit M at CARDINAL 000950. For all 23 of the Plan's mutual funds, the investment fees were below the 50th percentile of the peer group, and 9 of the 12 non-target date funds had fees below the 25th percentile. *Id.* at CARDINAL 000926. A similar Cardinal study in 2015 found that fees for almost all Plan investment options were below the 25th percentile of the peer group. *See* Exhibit J at BBT33596; Exhibit N at BBT003875. Even before the class period, in 2006, another investment consultant concluded that the Plan's investment expenses were reasonable. *See* Exhibit O at BBT218831 ("[T]he expense ratios of the mutual funds are consistent with typical expense ratios of funds used within large 401(k) plans.").

Accordingly, the expenses for the Plan's investment options fit within the range that other courts have held do not violate ERISA. Those expenses also have been reviewed consistently by outside consultants and found to be reasonable. Moreover, besides the investment options available in the Plan, participants were free to select from thousands of non-BB&T investment options through the brokerage window. *See Hecker*, 556 F.3d at 586. As the participants had access to a wide-array of investment options with varying levels of fees, investment styles and risk, this Court should grant Defendants summary judgment on Plaintiffs' excessive fee claim in Count II.

### C. Plaintiffs' Claims Related to the Alleged Failure to Use Other Types of Investment Products Lack Merit.

#### i. ERISA Does Not Require the Use of Separate Accounts/CITs.

Plaintiffs allege that Defendants should have used separately managed accounts or collective investment trusts ("CITs") rather than mutual funds as Plan investment options. *See* Complaint ¶ 143. Plaintiffs' alternative investment product theory fails as a matter of law, as recognized by numerous courts including the Seventh and Ninth Circuits.

DOL regulations do not require any particular *type* of investment product in a plan, *see Hecker*, 556 F.3d at 586; they require only "a broad range of investment alternatives," 29 C.F.R. § 2550.404c-1(b)(3), including "at least three" that are diversified, have materially different risk and return characteristics, and allow participants to achieve a portfolio "within the range normally appropriate" for their needs. *Id.*

Consistent with the DOL regulations, courts have concluded that ERISA does not require fiduciaries to prefer one type of investment type over another, even if an option might be less expensive. *See Hecker*, 556 F.3d at 586 ("Nothing in ERISA requires every fiduciary to scour the market to find and offer the cheapest possible fund, which might, of course, be plagued by other problems."); *Meiners v. Wells Fargo & Co.*, No. 16-3981, 2017 WL 2303968, at *3 (D. Minn. May 25, 2017). That includes use of CITs instead of mutual funds, which offer participants advantages that are unavailable in CITs or other investments. *See Loomis*, 658 F.3d at 671-72 (identifying disadvantages of "privately held trusts or co-mingled pools" that lack "the mark-to-market benchmark provided by a

retail mutual fund"); *Tibble*, 729 F.3d at 1134 ("Non-mutual fund alternatives such as co-mingled pools are not subject to the same 'reporting, governance, and transparency requirements' as mutual funds."). These courts appropriately recognize that mutual funds have distinct regulatory and transparency features that make them attractive to individual investors, and that the other investment options proposed by Plaintiffs lack those same features. In sum, a fiduciary does not have a duty to use CITs or other types of investment products in lieu of mutual funds.

[REDACTED] Reeder Decl. ¶¶ 25-26. Accordingly, Plaintiffs' claim that BB&T Defendants should not have used mutual funds fails as a matter of law and otherwise lacks foundation.

**ii. ERISA Does Not Preclude the Use of Actively Managed versus Passively Managed Funds.**

Plaintiffs also claim that BB&T Defendants should not have used actively managed mutual funds, but instead should have used passively managed index funds with purportedly "similar investment styles." *See* Complaint. ¶ 69. As an initial matter, the investment styles of the passively managed funds are far from "similar" to actively managed funds. Passively managed funds simply mimic the investments within a particular market index. By contrast, actively managed funds—involving research, monitoring, and trading by the fund's investment advisor—seek a higher return through

differentiation from market indices.[11] Moreover, numerous courts have rejected claims based on the use of active as opposed to passively managed funds. *See Taylor v. United Technologies Corp.*, No. 3:06cv1494, 2009 WL 535779, at *10 (D. Conn. March 3, 2009) (granting summary judgment on claim that defendant breached fiduciary duties by offering actively managed options), *affirmed*, 2009 WL 4255159 (2d Cir. 2009); *Terraza v. Safeway Inc.*, 241 F. Supp. 3d 1057, 1084 (N.D. Cal. 2017) ("courts have rejected the notion that offering a majority of actively-managed investment options constitutes a breach of fiduciary duty"); *Wells Fargo & Co.*, 2017 WL 2303968, at *2-3. Similarly, the Court should reject such a comparison here.

Furthermore, Plaintiffs' expert conceded that the use of actively managed funds in a 401(k) plan is not imprudent. *See* Exhibit T at 42 (testifying that actively managed funds could be considered for use in 401(k) plans; "I'm not precluding actively managed portfolios" in those plans). Conversely, despite relying on "decades of experience" consulting with "hundreds" of 401(k) plans, he could not identify a single one that offered *only* passive funds. *See* Exhibit T at 118-19.

**iii. BB&T Defendants Did Not Breach Their Fiduciary Duties By Offering the BIC and Money Market Fund.**

In Count III, Plaintiffs allege that BB&T Defendants breached their fiduciary duties by (1) not providing a stable value fund as an option in the Plan before 2012, and (2) not removing the Bank Investment Contract ("BIC") and the Federated Investors

[11] *See, e.g., Active v. Passive Investing*, Bloomberg, Dec. 4, 2017, https://www.bloomberg.com/quicktake/active-vs-passive-investing.

Treasury Obligations Fund ("Treasury Fund"). *See* Complaint ¶¶ 150-51. Plaintiffs claim participants were harmed since the BIC and Treasury Fund "failed to keep pace with inflation for years," causing them to lose "tens of millions of dollars" compared to investing in a stable value fund. *Id.*

There is nothing imprudent about offering other low-risk, asset preservation focused investment options like the BIC or a money market fund alongside a stable value fund, since the offering of multiple options contributes to a sufficiently diverse investment lineup. This reasoning follows the broader principle that different investors have different investment needs, and offering participants choices is consistent with the goals of ERISA. 29 C.F.R. § 2550.404c-1(b)(3) (DOL regulation requiring plan fiduciaries to offer an array investment options). The BIC, the Treasury Fund, and the Morley Stable Value Fund fulfill different investment objectives by focusing on different investment horizons for expected returns and, with varying risk and reward profiles that differ based on, among other things, limitations on withdrawals and whether the product is federally insured, collateralized by BB&T, or is subject to the financial wherewithal of the company managing the investment product. *See* Wermers Decl., Report ¶¶ 110-11.

At its root, Plaintiffs' claim amounts to an argument that the Plan may have had *too many* investment options that, in their opinion, have similar investment styles and risk. Having too many investment options, however, does not violate ERISA. *See e.g. Henderson v. Emory Univ.*, 252 F. Supp. 3d 1344, 1350 (N.D. Ga. 2017).

Accordingly, summary judgment should be granted in favor of the BB&T Defendants on Plaintiffs' stable value fund claims in Count III.

## VII. SUMMARY JUDGMENT SHOULD BE ENTERED IN FAVOR OF DEFENDANTS ON PLAINTIFFS' CLAIM BASED ON FUND UNDERPERFORMANCE (COUNT II).

Plaintiffs originally alleged that Plan fiduciaries retained certain "poorly performing" funds, the Sterling Capital International Fund and the Large Cap Fund (later renamed the Sterling Capital Select Equity Fund), in violation of their fiduciary duties. During discovery, Plaintiffs' proffered expert, Dr. Buetow, identified several additional funds that, based on his hindsight analysis, he believes should have been removed from the Plan's investment lineup.

Second-guessing decisions based on subsequent performance, however, is not the test for whether a fiduciary complied with ERISA in selecting that option. As the Fourth Circuit concluded, "[w]hether a fiduciary's actions are prudent cannot be measured in hindsight." *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 424 (4th Cir. 2007). Judicial review of plan investment decisions instead involves an evaluation of a plan's *procedures* when making those decisions:

> A prudent fiduciary need not follow a uniform checklist [to satisfy fiduciary obligations]. Courts have found that a variety of actions can support a finding that a fiduciary acted with procedural prudence, including, for example, appointing an independent fiduciary, seeking outside legal and financial expertise, holding meetings to ensure fiduciary oversight of the investment decision, and continuing to monitor and receive regular updates on the investment's performance.

*Tatum*, 761 F.3d at 358 (citations omitted); *Pension Ben. Guar. Corp. v. Morgan Stanley Inv. Mgmt., Inc.*, 712 F.3d 705, 716 (2d Cir. 2013) (courts are to "focus on a fiduciary's conduct in arriving at an investment decision, not on its results.'").

Discovery confirmed that BB&T followed the procedural steps that the Fourth Circuit identified in *Tatum*. The Compensation Committee, the fiduciary responsible for selection and monitoring of the Plan's investment options, engaged an independent third-party investment advisor, Cardinal, which (a) agreed to take on a fiduciary role in reviewing and recommending investments, and (b) monitored the investments throughout the year and tracked the investments' compliance with Plan investment policies, as established and updated over the years. *See, e.g.,* Exhibit D at BBT169890; Exhibit N; Reeder Decl. ¶¶ 14-15, 18. Cardinal's analysis, among other things, compared the performance of Plan options to recognized benchmarks, and Cardinal identified specific options the Committee should put on a watch list with an eye towards possible removal and replacement. *See id.* In this regard, Cardinal met quarterly with the 401k and Pension Review Group, comprised of representatives of BB&T's Human Systems division, Asset Management division, and senior leadership, to review the Plan investments and to give them advance notice of potential changes so they would be prepared to take action if the Committee approved any changes. *See* Reeder Decl. ¶ 17.

Cardinal also presented recommendations in written reports and presentations that were provided to the Committee members in advance of their meetings. The members thoroughly reviewed those reports, and during the meetings, which were held at least

once a year and sometimes more, discussed Cardinal's analysis and asked questions about their recommendations. *See* Exhibits R and S. After this review, the Committee would decide what action to take regarding the investments. *See* Reeder Decl. ¶ 15. The Committee's reliance on the investment advice of an independent expert like Cardinal is fully supported by ERISA case law. *See*, *e.g.*, *DiFelice*, 497 F.3d at 421 (plan fiduciary fulfilled duty of prudence by, among other actions, retaining independent consultants to advise whether to remove funds; "[a]lthough plainly independent advice is not a 'whitewash' . . . it does provide 'evidence of a thorough investigation'") (citations omitted).

Accordingly, discovery in the case established that, even if some of the investments did not perform as well as Plaintiffs would have liked, they still cannot establish a breach because the Plan fiduciaries complied with their duties under ERISA by following a prudent evaluation process.

In addition, Plaintiffs have not established the required element of *loss* for any of their mutual fund underperformance claims, since they have not proposed a viable damages calculation methodology. In calculating damages, Dr. Buetow assumed that *all* Plan participants would have placed *all* their investments in his proposed Vanguard index alternative option. *See* Exhibit V ¶¶ 92-157 (calculating damages for various mutual funds "if one assumes" all investments in those funds had been placed from the beginning of the class period in a Vanguard index alternative).

Dr. Buetow, however, conceded that he had never seen a 401(k) plan that included *only* passive index funds—which is the only damages standard he offers. *See* Exhibit T at 118-19. And, as discussed above, courts have concluded that passive funds are not appropriate comparators for active funds. *See, e.g., Putnam*, 2017 WL 1196648, at *7. Having no damage theory other than the one inappropriately based on a passive index fund lineup, Plaintiffs cannot satisfy the loss element of their claim.

As Plaintiffs have established neither breach nor loss, summary judgment should be granted as to their underperformance claims.

WHEREFORE, BB&T Defendants respectfully request that the Court grant summary judgment as to all counts in Plaintiffs' Consolidated Amended Complaint.[12]

Respectfully submitted,

*<u>/s/ Mark Bieter</u>*
Michael J. Prame*
Mark L. Bieter*
Justin M. Holmes*
GROOM LAW GROUP, CHARTERED
1701 Pennsylvania Ave., NW
Washington, DC 20006
Phone: (202) 861-9383
Fax" (202) 659-4503

**Appearing by special appearance*

*<u>/s/ Brent F. Powell</u>*
Ronald R. Davis (NCSB #20408)
Brent F. Powell (NCSB #41938)
WOMBLE BOND DICKINSON (US) LLP
One West Fourth Street
Winston-Salem, NC 27101
Telephone: (336) 721-3600
Facsimile: (336) 721-3660
Email: ron.davis@wbd-us.com
brent.powell@wbd-us.com

*Attorneys for BB&T Defendants*

[12] Two additional Counts, Count V and Count VIII, are derivative of Plaintiffs' other counts addressed in this brief. *See In re Pfizer Inc. ERISA Litig.*, No. 04-10071, 2013 WL 1285175, *10 (S.D.N.Y. Mar. 29, 2013) (dismissing fiduciary duty claims derivative of other unsuccessful allegations). Accordingly, judgment in favor of Defendants on those other counts results in judgment in Defendants' favor on Counts V and VIII.

## CERTIFICATE OF COMPLIANCE WITH WORD COUNT

I hereby certify, in reliance on the word-count feature in Microsoft Word, that this brief contains 8,917 words, including headings, footnotes and citations.

/s/ *Brent F. Powell*
Brent F. Powell

## CERTIFICATE OF SERVICE

I hereby certify that on January 31, 2018, I filed the foregoing document using the courts CM/ECF system, which will automatically send notification of filing to the following parties:

Kai H. Richter*
krichter@nka.com

Carl F. Engstrom*
cengstrom@nka.com

Jerome J. Schlichter*
jschlichter@uselaws.com

Michael A. Wolff*
mwolff@uselaws.com

Troy A. Doles*
tdoles@uselaws.com

Adam W. Hansen*
ahansen@nka.com

Heather Lea*
hlea@uselaws.com

Sean E. Soyars*
ssoyars@uselaws.com

David B. Puryear, Jr.
puryear@puryearandlingle.com

**Attorneys for Plaintiffs**

**Appearing by special appearance*

/s/ *Brent F. Powell*
Brent F. Powell