IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

ROBERT SIMS, et al.,              )
                                  )
              Plaintiffs,         )
                                  )
      v.                          )          1:15-CV-732
                                  )
BB&T CORPORATION, et al.,         )
                                  )
              Defendants.         )

## MEMORANDUM OPINION AND ORDER

Catherine C. Eagles, District Judge.

In this ERISA action, the plaintiffs have sued the defendants alleging that they breached their fiduciary duties to the BB&T 401(k) Savings Plan and engaged in prohibited transactions in connection with fees and investment options. The defendants have moved for partial summary judgment. The motion will be granted in part and denied in part.

## FACTUAL BACKGROUND

In 1982, BB&T Corporation established the BB&T Corporation 401(k) Savings Plan. Doc. 315-1 at 8. Eligible BB&T employees can contribute some of their compensation to personal retirement accounts invested through the Plan. Doc. 315-1 at 28–37. The Plan is a Defined Contribution Plan under ERISA. Doc. 315-7 at 5.

The Plan offers participants a number of investment options including stock mutual funds, bond funds, and a guaranteed interest option called the Bank Investment Contract. *See, e.g.*, Doc. 315-6 at 12–14 (2009 options); Doc. 315-7 at 13–15 (2012

options); Doc. 315 at ¶¶ 33–34. It also gives participants the option to use a self-directed brokerage account with TD Ameritrade. Doc. 315-7 at 15; Doc. 315 at ¶ 21. Participants decide how to allocate their contributions among the Plan's investment options and may move their investments to other options at any time. Doc. 315-2 at 11–12.

The Plan's governing document establishes a Compensation Committee, members of which are Plan fiduciaries. Doc. 315-1; Doc. 315-2 at 19-21. The Compensation Committee is responsible for "adopt[ing] an investment policy statement" for the Plan and "determin[ing] from time to time the investment funds to be made available to participants." Doc. 315-2 at 20. The Compensation Committee engages a consultant to assist it in evaluating the types of investments options to offer Plan participants. *See* Doc. 315 at ¶ 13; Doc. 315-4.

BB&T and its affiliates, including Sterling Capital Management, offer mutual funds and other proprietary investment options to the Plan, as well as to other retirement plans, pension funds, and customers.[1] Until 2007, the Plan offered only investment options from BB&T or its affiliates. Doc. 328-35 at 36 (consultants 2007 investment review). Non-proprietary funds were added to the Plan beginning in 2007, *see* Doc. 315 at ¶ 18, but many proprietary mutual funds remain as Plan options. *See, e.g.*, Doc. 315 at ¶ 34; Doc. 315-7 at 13–15 (2012 options). These funds—proprietary and otherwise—

---

[1] Before 2010, BB&T's investment management division was known as BB&T Asset Management. BB&T acquired Sterling in 2010 and the BB&T Asset Management mutual funds were rebranded with the Sterling name at that time. Doc. 319 at ¶ 3.

generally charge the Plan fees for their services. *See, e.g.*, Doc. 328-8 at 11 (May 2012 report showing fees paid from the Plan to proprietary and non-proprietary funds).

## LEGAL STANDARD

Summary judgment is appropriate if "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue exists only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

The moving party has the initial burden of demonstrating the absence of any material issue of fact. *Ruffin v. Shaw Indus., Inc.*, 149 F.3d 294, 300–01 (4th Cir. 1998) (per curiam) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) and *Liberty Lobby*, 477 U.S. at 248–49).[2] Once the moving party meets its initial burden, the non-moving party must come forward with evidentiary material demonstrating the existence of a genuine issue of material fact requiring a trial. *Id.*

The Court will construe the evidence and all reasonable inferences in favor of the plaintiff, the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam). The Court has reviewed the evidence referenced in the parties' briefs, but it

---

[2] The Court omits internal citations, alterations, and quotation marks throughout this opinion, unless otherwise noted. *See United States v. Marshall*, 872 F.3d 213, 217 n. 6 (4th Cir. 2017).

has not scoured the record to locate support for factual assertions in the briefs that are not accompanied by a citation to evidence. *See Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001); *see also Cray Commc'ns, Inc. v. Novatel Comp. Sys., Inc.,* 33 F.3d 390, 396 (4th Cir. 1994) (noting that the district court is "well within its discretion in refusing to ferret out the facts that counsel had not bothered to excavate").

## ANALYSIS

### I.    Statute of limitations

ERISA requires that a plaintiff bring suit within the earlier of six years of the breach or violation or three years after a plaintiff has actual knowledge of the breach or violation. 29 U.S.C. § 1113(1), (2) (West, Westlaw through P.L. 115-185). This lawsuit was filed on September 4, 2015. Doc. 1.[3]

The defendants move for partial summary judgment as to all claims based on acts or omissions occurring more than six years before suit was filed, Doc. 322 at 10, and as to all claims relating to investment expenses incurred and performance issues arising more than three years before suit was filed. *Id.* at 10–11.

### A. Acts or omissions before September 3, 2009

Section 103 provides "that in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or

---

[3] This case was consolidated with a related case that was filed on October 8, 2015. Doc. 33. The defendants have not asserted that the later filing date in this related case affects the statute of limitations analysis.

violation."[4] 29 U.S.C. § 1113.[5]  The Supreme Court also has stated that courts should read the fraudulent concealment tolling doctrine into every federal statute of limitation, *Supermarket of Marlinton, Inc. v. Meadow Gold Dairies, Inc.*, 71 F.3d 119, 122 (4th Cir. 1995) (citing *Holmberg v. Armbrecht*, 327 U.S. 392, 397 (1946)), and the Fourth Circuit has noted in an unpublished opinion that ERISA's fraud or concealment provision "encompasses at a minimum" the common law fraudulent concealment doctrine. *Browning v. Tiger's Eye Benefits Consulting*, 313 F. App'x 656, 663 (4th Cir. 2009). The plaintiffs have the burden of proof to establish that the statute of limitation should be tolled by fraudulent concealment.  *See, e.g.*, *Supermarket of Marlinton*, 71 F.3d at 122.

To toll the statute of limitations under the fraudulent concealment doctrine to allow claims based on acts or omissions occurring more than six years ago, the plaintiffs must show (1) that defendants engaged in fraud or a course of conduct designed to conceal evidence of their alleged wrongdoing and (2) that the plaintiffs were not on actual or constructive notice of that evidence, despite (3) their exercise of diligence.  *See SD3 II LLC v. Black & Decker (U.S.) Inc.*, 888 F.3d 98, 108 (4th Cir. 2018); *Supermarket of Marlinton*, 71 F.3d at 122; *see also Browning*, 313 F. App'x at 663 (noting that "when the defendant acts to prevent or delay the plaintiff's discovery of the breach," the statute

---

[4] Going forward, the Court will generally use the ERISA section numbers in the text as opposed to the United States Code title sections, though the Court will attempt to provide citations to relevant Code sections in Title 29.  Unless Title 29 is specifically cited, the reference is to the ERISA section, not the United States Code section.

[5] This functions essentially as a statute of repose.  *David v. Alphin*, 704 F.3d 327, 339 (4th Cir. 2013).

of limitations is tolled "until the plaintiff in the exercise of reasonable diligence discovered or should have discovered the alleged fraud or concealment").

The plaintiffs contend that the statute of limitations should be tolled because the defendants had a duty to provide information to Plan participants, the defendants did not disclose this information, and the information contained "facts that would have alerted [the] participants that BB&T had breached its duties through self-dealing." Doc. 327 at 23–24. The plaintiffs have not identified evidence in support of these contentions sufficient to create a disputed question of material fact as to fraudulent concealment.

First, to a large extent the plaintiffs do not clearly articulate the information the defendants allegedly failed to disclose, and their evidentiary citations often direct the Court to pages of information, to a declaration identifying documents but not to the document itself, and to pages of previous briefing. *See supra* pp. 3-4. Second, the plaintiffs do not provide the Court with a clear analysis of how this information relates to their claims or how the allegedly secret information was necessary to put the plaintiffs on notice of their claims. [6]

Finally, even as to those pieces of information that the plaintiffs have specifically identified and that the Court has been able to link to a substantive claim, the plaintiffs

---

[6] It is not the Court's job to undertake the analysis and legal research needed to support the plaintiffs' perfunctory arguments. *Lab. Corp. of Am. Holdings v. Kearns*, 84 F. Supp. 3d 447, 459–60 (M.D.N.C. 2015); *see also* Local Rule 7.2(a) (requiring litigants to refer to statutes, rules, and authorities in support of their arguments); *Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.,* 424 F.3d 1293, 1320 n. 3 (Fed. Cir. 2005) (refusing to address an undeveloped argument in a footnote); *Hughes v. B/E Aerospace, Inc.,* No. 1:12CV717, 2014 WL 906220, at *1 n. 1 (M.D.N.C. Mar. 7, 2014) ("A party should not expect a court to do the work that it elected not to do.").

have not directed the Court to any statute, regulation or authority that requires the defendants to disclose such information to Plan participants or any evidence beyond a failure to affirmatively disclose. Fraudulent concealment means more than a mere failure to disclose disparate pieces of information, even in the fiduciary context. Rather, it requires fraud, *SD3*, 888 F.3d at 108, or, at the very least, a course of conduct designed to conceal, *Supermarket of Marlinton*, 71 F.3d at 123, and "affirmatively directed at deflecting litigation." *Pocahontas Supreme Coal Co., Inc. v. Bethlehem Steel Corp.*, 828 F.2d 211, 219 (4th Cir. 1987). The plaintiffs have not pointed to any such evidence.

The plaintiffs also contend that the defendants "made purposeful misstatements in response to Plan participant questions about fee income received by BB&T" that fraudulently concealed their wrongdoing. Doc. 327 at 23–24. However, the only allegedly "purposeful misstatement" they identify was the Plan's 2007 Summary Plan Description that followed a general inquiry about fees by some Plan participants in 2006. *See* Doc. 327 at 12, 24 (citing TAD Decl. ¶ 32). The plaintiffs maintain that the 2007 Summary Plan Description did not identify fee income BB&T receives from proprietary mutual funds in which the Plan invests. Doc. 327 at 12; *see also* Doc. 327 at 24 (citing for continued misstatements to the TAD Decl. ¶¶ 10, 69, which cite Doc. 328-8 and Doc. 328-79). This is insufficient to establish fraudulent concealment, which cannot be based on "failing to admit illegal conduct upon general inquiry," such as the 2006 fee inquiry. *Supermarket of Marlinton*, 71 F.3d at 123; *see also Pocahontas*, 828 F.2d at 219 (requiring more than an unpursued inquiry).

Beyond this, the plaintiffs have not directed the Court's attention to specific misstatements or explained how the misstatements prevented the plaintiffs from being on notice of their claims. In the absence of sufficient evidence of fraudulent concealment, the six-year statute of repose is not tolled. The defendants are entitled to summary judgment on all claims based on acts or omissions occurring before September 3, 2009.[7]

## B. Acts or omissions between September 4, 2009, and September 3, 2012

The defendants assert that ERISA's three-year statute of limitation applies to bar Counts II, VI, and VII to the extent those claims are based on the Plan's investment expenses and performance issues before September 4, 2012. Doc. 322 at 19–21. As to these claims, the defendants contend that plan-wide communications establish that plaintiffs had actual knowledge of the facts underlying their claims more than three years before suit was filed.

The defendants have the burden of proving facts showing that the statute of limitation bars the plaintiffs' claims. *David*, 704 F.3d at 339. The Court concludes that the defendants have not met their burden to show that the plaintiffs had actual knowledge more than three years before the suit was filed and will deny summary judgment on the defendants' three-year statute of limitation defense.

The law is unsettled as to what standard the Court should apply in evaluating actual knowledge, *Browning*, 313 F. App'x at 660–61, 661 n. 1 (discussing potential circuit split), but it does appear clear that actual knowledge of the facts supporting one

---

[7] In dismissing these claims, the Court makes no decision as to whether evidence of acts or omissions before September 3, 2009, are or are not admissible at trial.

claim would not bar another claim based on different facts. In view of the complicated facts underlying the multiple claims at issue in this case and some lack of clarity in the briefing as to the facts that the plaintiffs contend constitute breaches and violations—and thus of which the plaintiffs would need actual knowledge for the three-year statute to apply—summary judgment is inappropriate.[8]

This, of course, does not guarantee that the Court ultimately will hold that the three-year statute of limitation is not applicable. Rather, it gives the defendants a chance to prove at trial that the limitation is applicable to each particular claim.

## II.    The Claims

### A. Breach of fiduciary duty claims

ERISA is a comprehensive statute that imposes a number of detailed duties and responsibilities on Plan fiduciaries, *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 251–52, (1993), including "the proper management, administration, and investment of [plan] assets, the maintenance of proper records, the disclosure of specified information, and the avoidance of conflicts of interest." *Mass. Mut. Life Ins. Co. v. Russell,* 473 U.S. 134, 142–143 (1985); *see also* 29 U.S.C. § 1104(a) (West, Westlaw through P.L. 115-185). Among other things, Section 404(a) specifically imposes fiduciary duties of prudence and loyalty on fiduciaries. 29 U.S.C. § 1104(a)(1)(A) (duty of loyalty), § 1104(a)(1)(B) (duty of prudence); *see also Cent. States, Se. & Sw. Areas Pension Fund v. Cent. Transport, Inc.*, 472 U.S. 559, 570–71 (1985) (noting that Section 404(a)(1) imposes "strict

_____

[8] Neither party has addressed how the actual knowledge requirement applies in the ERISA class action context. This question may benefit from additional briefing.

standards of trustee conduct . . . most prominently, a standard of loyalty and a standard of care").

The duty of loyalty requires an ERISA fiduciary to "discharge his duties . . . solely in the interest of the participants and beneficiaries." 29 U.S.C. § 1104(a)(1)(A). "Fiduciaries must also scrupulously adhere to a duty of loyalty, and make any decisions in a fiduciary capacity with an eye single to the interests of the participants and beneficiaries." *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 418–19 (4th Cir. 2007).

The duty of prudence requires ERISA fiduciaries to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). This includes "a continuing duty to monitor investments and remove imprudent ones." *Tibble v. Edison Intern.*, 135 S. Ct. 1823, 1828 (2015). "When deciding whether a plan fiduciary has acted prudently, a court must inquire whether the individual trustees, at the time they engaged [or failed to engage] in the challenged transactions, employed the appropriate methods to investigate the merits of the investment and to structure the investment." *DiFelice*, 497 F.3d at 420.

Section 409(a) makes fiduciaries liable for breach of these duties and specifies that each fiduciary must personally "make good to the plan any losses to the plan resulting from each such breach" and "restore to the plan any profits of such fiduciary [that] have been made through use of assets of the plan by the fiduciary." *Mertens*, 508 U.S. at 252; *see also* 29 U.S.C. § 1109(a) (West, Westlaw through P.L. 115-185). While the ERISA

statute does not define "losses," courts have generally applied the law of trusts to find that a loss occurs when there is a difference between the current value of the Plan as compared to what the Plan would have been worth had the breach not occurred. *See, e.g.*, *Coyne & Delany Co. v. Selman*, 98 F.3d 1457, 1466 (4th Cir. 1996) (finding that a defined benefit plan incurred a loss when it imprudently paid out $160,000 for services to a non-participant because it had "less money available to pay benefits"); *Roth v. Sawyer-Cleator Lumber Co.*, 61 F.3d 599, 603 (8th Cir. 1995) (explaining how loss should be measured and citing to *Donovan*); *Donovan v. Bierwirth*, 754 F.2d 1049, 1056 (2nd Cir. 1985) (explaining how loss should be measured in light of trust law).

In sum, the elements of a claim for breach of fiduciary duty under ERISA are: (1) that the defendant was a fiduciary of the ERISA plan; (2) that the defendant breached its fiduciary responsibilities under the plan; and (3) that the plan suffered a loss from the defendant's breach. *See, e.g.*, *Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 361 (4th Cir. 2014) (discussing breach and loss requirements); *Blair v. Young Phillips Corp.*, 235 F. Supp. 2d 465, 470 (M.D.N.C. 2002) (stating elements and citing *Griggs v. E.I. DuPont de Nemours & Co.*, 237 F.3d 371, 379–80 (4th Cir. 2001)).

At trial, the plaintiffs bear the burden of proof on these elements. *Tatum*, 761 F.3d at 361–62. As to proof of loss resulting from the breach, this is a low burden—the plaintiff only need establish "that there was some sort of loss to the Plan." *Plasterers' Local Union No. 96 Pension Plan v. Pepper*, 663 F.3d 210, 220 (4th Cir. 2011); *see also* *Tatum*, 761 F.3d at 362–63 (plaintiff need only establish a prima facie loss). Once the plaintiff meets this low burden, the burden shifts to the defendants to disprove loss.

*Tatum*, 761 F.3d at 361–65.[9]  At summary judgment, the defendants bear the burden of establishing an absence of disputed questions of material fact.

The plaintiffs allege in five separate counts that the defendants breached their fiduciary duties of loyalty and prudence.

### 1. Count I

In the complaint, the plaintiffs alleged that the defendants breached their duties of loyalty and prudence when they failed to solicit bids for the Plan's recordkeeping services and failed to monitor and control recordkeeping fees, and instead used BB&T's Retirement and Institutional Services division, RIS, to provide recordkeeping services. Doc. 88 at ¶¶ 136–38.  The plaintiffs alleged that the Plan suffered a loss because RIS's fees were excessive, uncapped, and asset-based.  *Id.*  The defendants maintain that the Plan did not incur a loss from recordkeeping fees because the defendants absorbed the full cost of recordkeeping starting in 2008.  Doc. 322 at 25.

---

[9] The circuit courts of appeals differ in how to apply the burden of proof on the element of loss and amount of loss.  The Fourth, Fifth and Eighth Circuits shift the burden to the defendants to disprove loss once the plaintiff establishes a prima facie case of loss.  *See, e.g., Pioneer Centres Holding Co. Emp. Stock Ownership Plan & Tr. v. Alerus Fin., N.A.*, 858 F.3d 1324, 1336–37 (10th Cir. 2017) (discussing circuit split); *Martin v. Feilen*, 965 F.2d 660, 671 (8th Cir.1992) (shifting burden).  The Second, Sixth, Ninth, Tenth and Eleventh Circuits do not shift the burden.  *E.g., Pioneer Centres,* 858 F.3d at 1336-37.  Further, the majority of circuits that have addressed the issue (the Second, Sixth, Seventh, Eighth, Ninth and D.C. Circuits) resolve any uncertainties in calculating the amount of loss in favor of the plaintiff even if they do not shift the burden of disproving loss to the defendants.  *See id.* 1137 n. 9 (discussing cases); *Roth*, 61 F.3d at 602 ("To the extent that there are ambiguities in determining loss, we resolve them against the trustee in breach"); *Donovan*, 754 F.2d at 1056 ("Once a breach of trust is established, uncertainties in fixing damages will be resolved against the wrongdoer.").

First, to the extent this claim is based on fees that the Plan paid directly to RIS before 2008, ERISA's six-year statute of limitation bars it. *See supra* Analysis, Section I. To this extent, summary judgment on this count is appropriate.

Second, it is undisputed that after 2008 the Plan did not pay any recordkeeping fees directly to RIS and that BB&T paid these recordkeeping fees to RIS.[10] The plaintiffs have disclaimed any intent to proceed on this aspect of Count 1,[11] and in any event they cannot show that the Plan suffered any loss from the payment of these fees by BB&T. That BB&T paid RIS via an "internal credit" rather than with money does not cost the Plan anything or result in any loss to the Plan. To this extent, summary judgment on this count is appropriate.

There is a third aspect to this claim, however, as to which summary judgment is not appropriate. There is evidence that the Plan paid a fee to Sterling for Plan assets invested in Sterling funds.[12] Sterling is owned by BB&T, *see supra* n.1, and thus the investment funds it offers are proprietary to BB&T. Sterling also paid RIS for services in connection with these same investments.

---

[10] The defendants' evidence is that the BB&T Corporation provides RIS with an internal accounting credit in exchange for RIS providing recordkeeping services to the Plan. Doc. 316 at ¶¶ 5–7; *see also* Doc. 315-9. There is no evidence that the Plan directly paid RIS for recordkeeping after 2008.

[11] Doc. 366 at 66–67 (Mr. Doles: "We do not have a claim that that [$]58.60 [recordkeeping fee paid by BB&T to RIS] should be returned to the plan.").

[12] As the Court understands it, the defendants and the various funds often call this fee an "expense ratio." The fee covered the costs and expenses for running the fund and managing the Plan's assets in it and, one assumes, was a way Sterling—and thus BB&T—made money.

For other plans that paid recordkeeping fees to RIS and other fees to Sterling for assets invested in Sterling investment funds, it appears that Sterling also paid fees to RIS for services and that RIS "rebated" these fees from Sterling back to the plans. As to the BB&T Plan, however, RIS did not rebate any Sterling-paid fees back to the Plan, nor did the Plan ever ask RIS for such a rebate. Had such rebates been paid to the Plan, BB&T would have made less money and the Plan would have increased in value. The plaintiffs contend that BB&T's own financial interests, not the interests of the Plan, motivated this failure to consider asking and failure to ask for a rebate, in violation of the duty of loyalty, and that these failures resulted in excessive overall Plan fees in violation of the duty of prudence.

There are a number of uncertainties in the current record as to several potentially material facts, including how this process worked in practice as between Sterling and RIS, between RIS and the Plan, between Sterling, RIS and other plans, and between RIS and other mutual funds.[13] Moreover, even under the defendants' evidence these practices were opaque and confusing. While the Court appreciates and may ultimately agree with the defendants' argument that it makes no sense for RIS to give a rebate to the Plan when the Plan did not pay RIS for its recordkeeping services, there is unfortunately

_____

[13] While it appears to be undisputed that RIS gave rebates to other plans invested in Sterling funds, Doc. 366 at 43, there does not appear to be any evidence in the current record as to whether those other plans paid RIS for recordkeeping services themselves or whether someone else paid for those services, as here. On the other hand, there does not appear to be anything in the current record to indicate that the defendants ever evaluated the rebate question as part of a larger examination of the Plan's total fees and expenses.

quite a lot about plan fees and expenses and their jargon that does not make intuitive sense. The Court concludes that resolution of this claim requires a clearer factual record and that the matter is inappropriate for summary judgment. As the Fourth Circuit noted in *Tatum*, "the evaluation is not a general one, but rather must depend on the character and aim of the particular plan and decision at issue and the circumstances prevailing at the time." 761 F.3d at 358; *see also Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2471 (2014) (noting that resolution of the breach issue is "context specific").

The Court concludes that the defendants have not met their burden to establish the absence of disputed questions of material fact as to this aspect of the plaintiffs' claim. Summary judgment on this part of Count I is denied.

## 2. Count II

The plaintiffs allege that the defendants breached their duties of loyalty and prudence when they included in the Plan mutual funds that had excessive fees and were underperforming and when they failed to consider lower cost, better performing investment options such as separate accounts and index funds.[14] Doc. 88 at ¶¶ 144, 145.

The defendants' briefing separately addresses the plaintiffs' assertions on underperforming funds, excessive fees, and failure to offer separate accounts. The Court

---

[14] While not completely clear in the briefing, the plaintiffs clarified at oral argument that the plaintiffs are contesting the defendants' failure to consider removing and failure to remove the following funds since the fourth quarter of 2009: the BIC, the BB&T Large Cap Fund, the BB&T Small Cap Fund, the BB&T Mid Cap Growth Fund, the BB&T Mid Cap Value Fund, the BB&T International Fund, the Brandywine Blue Fund, and the Fidelity Contrafund. *See* Doc. 329-1 at ¶ 24; Doc. 366 at 121 (referencing slide 65 citing to paragraphs 22–28 of Doc. 329-1).

will addresses these arguments in turn and, for the reasons presented below, will deny summary judgment on Count II.

### a. Underperforming Funds

The plaintiffs assert that the defendants breached their duties when they maintained several underperforming funds in the Plan.[15]

### i. Breach

The plaintiffs have presented evidence that BB&T management, not the Compensation Committee, made decisions about what funds to keep in the Plan and interfered with the independence of the third-party consultants that the Plan retained to provide advice, particularly when it came to BB&T proprietary funds. They rely on both internal BB&T documents and expert opinion testimony that the management-influenced process used to select and evaluate funds was inconsistent with industry practices. As a result, the plaintiffs contend that the defendants' processes were inadequate and funds, particularly BB&T proprietary funds on which BB&T made money, were kept in the Plan when there were other, better performing funds that met similar investment goals.

The plaintiffs have established disputed questions of material fact on whether the defendants breached their fiduciary duties of prudence and loyalty in maintaining the underperforming funds in the Plan. *See Dudenhoeffer*, 134 S. Ct. at 2471; *Tatum*, 761 F.3d at 358.

---

[15] It is not clear from the briefing whether the plaintiffs contend all of the funds identified in footnote fourteen are underperforming or whether this "underperformance" claim is limited to some of these funds. However, the defendants' summary judgment arguments on this Count are not directed at specific funds.

### ii.    Loss

The defendants maintain that the plaintiffs have not established a loss from inclusion of the allegedly underperforming funds because "they have not proposed a viable damages calculation methodology" for establishing the amount of loss to the Plan. Doc. 322 at 40.  The defendants cited no case to support their assertion that the plaintiffs must meet this high standard, which is at odds with Fourth Circuit precedent.  In *Plasterers' Local Union No. 96 Pension Plan v. Pepper*, the Fourth Circuit held that a prima facie showing of loss only requires that the plaintiff show "that there was some sort of loss to the Plan."  663 F.3d at 220.  A full damages calculation methodology is far greater a showing than "some sort of loss to the Plan."[16]

### b.  Excessive Fees

The plaintiffs assert that many investment funds charged excessive fees and that the defendants breached their duties when they maintained these funds in the Plan.  They have provided evidence that BB&T executive management knew that the fees were high and could be lowered substantially; that Plan consultants found the fees to be unreasonable and yet BB&T management interfered with presentation of this information to the Compensation Committee and that the Compensation Committee did not otherwise appropriately investigate the reasonableness of the fees; and that at one point investment management fees—many of which went to BB&T proprietary funds—were higher than

---

[16] If and when the Court reaches the issue of the amount of loss to be awarded to the Plan, further briefing may be helpful in light of the evidence at trial.  As summarized, *supra* n. 9, the Circuits are not entirely consistent in how they deal with proof of the amount of loss.

average in 19 of the 25 investment options.  Whether these acts and omissions constitute breaches of the fiduciary duties of loyalty and prudence is a question of fact not appropriate for resolution at summary judgment.  *See Dudenhoeffer*, 134 S. Ct. at 2471; *Tatum*, 761 F.3d at 358.

### c.  Separate Accounts

As part of their excessive fee claim, the plaintiffs have pointed to evidence that when the defendants began offering lower-cost separate accounts[17] to the BB&T Defined Benefit Plan, they did not consider these separate accounts as an option for the Defined Contribution Plan here.  Doc. 327 at 39.  Nor did they evaluate this possibility thereafter.  In their briefing, the defendants isolate this evidence and characterize it as a separate claim that the defendants "breached a fiduciary duty to select alternatives to mutual funds," including separate accounts and collective trusts.  Doc. 332 at 18; *see also* Doc. 322 at 34.

At oral argument the plaintiffs clarified that they do not contend that the defendants had a fiduciary duty to offer alternatives to mutual funds—a claim that would fail, as the defendants have pointed out, because there is generally no duty to prefer one investment type over another.  Doc. 332 at 18–19 (citing cases).  Rather, the plaintiffs

---

[17] None of the parties have directed the Court's attention to evidence explaining what a "separate account" is.  The Court understands that a "separate account" is a portfolio of stocks, bonds, and/or other assets purchased with the assets of a single investor, such as a retirement plan.  At oral argument, the parties appeared to agree that it is somewhat similar, but not identical, to a mutual fund in that it is made up of a portfolio of stocks.  *See* Doc. 366 at 79-80, 90-91, 93-94, 98, 109; *see also* Doc. 328-35 at 17 (explaining that a separate account is made up of securities held by a single investor).

offer the alleged failure to consider lower-cost separate accounts as simply some evidence in support of their excessive fee claim. Doc. 366 at 94.

To the extent the complaint can be read to assert a claim for breach of fiduciary duty for failing to offer separate accounts, the plaintiffs have abandoned that claim and the defendants are entitled to summary judgment. To the extent a failure to consider separate accounts is part of a larger excessive fee claim, summary judgment is denied.

### 3. Count III

The plaintiffs allege that the defendants breached their duties of loyalty and prudence when they kept the Bank Investment Contract—known as "BIC"—in the Plan. The BIC is an investment vehicle that provides a "guaranteed [interest] rate that is set each calendar year." Doc. 328-43 at 13. The plaintiffs allege in the complaint that the BIC has minimal returns that have not kept pace with inflation and that the defendants should have offered a stable value fund instead. Doc. 88 at ¶ 151. The plaintiffs further allege that the defendants should have removed the BIC from the Plan line-up after the Morley Stable Value Fund was added in 2012 because of the BIC's minimal returns. *Id.*; Doc. 315 at ¶ 24.

The defendants' briefing makes fairly narrow challenges to these claims and the evidence is disputed. Because the defendants have not met their burden, the Court will deny summary judgment on Count III.

### 4. Count IV

The plaintiffs contend that the defendants breached their duties of loyalty and prudence when they kept the Common Stock fund in the Plan and present three theories

of breach.[18]  The defendants have established that there are no disputed questions of material fact as to any of these three theories of liability and that they are entitled to summary judgment on Count IV.

### a. Unitized Structure

The plaintiffs allege that the defendants breached their duties when they kept the Common Stock fund in a "unitized structure" whereby Plan participants bought "units" in a fund comprised of BB&T stock and cash in a proprietary money market fund.  Doc. 88 at ¶¶ 102, 157.  The defendants maintain that the plaintiffs cannot establish either a breach of fiduciary duty or a loss on this theory.  Their undisputed evidence is that unitized structures were commonly used and prudent.  *See* Doc. 320 at ¶ 62.  The plaintiffs' expert, Dr. Buetow, agreed that unitized structures were "probably not" imprudent.  Doc. 333-4 at 3–4.  The plaintiffs have not explained—much less presented evidence—that the defendants' decision to employ a unitized structure was imprudent or that the defendants maintained that structure for disloyal reasons.  In sum, there is no evidence that maintaining the Common Stock fund in a unitized structure is a breach of the defendants' fiduciary duties.

The Court will grant summary judgment on Count IV to the extent it is based on maintaining the Common Stock fund in a unitized structure.

---

[18] The Common Stock fund is an investment product that includes shares of BB&T stock and a small amount of cash, typically around 0.5% of the aggregate value of the fund.  *See* Doc. 315 at ¶ 28.  The cash portion is invested in the Sterling Capital Prime Money Market Fund.  Doc. 315-7 at 18.  As previously noted, Sterling is a BB&T affiliate and this money market fund is proprietary to BB&T.

### b. High Allocation

The plaintiffs contend that the defendants breached their fiduciary duties when they maintained the Common Stock fund in light of Plan participants' individual decisions to allocate large amounts of the Plan's assets to it and that the defendants should have either removed it or limited allocations to it. The defendants maintain that as a matter of law, this "high allocation" does not constitute a breach of fiduciary duty.

The Fourth Circuit has rejected claims that fiduciaries breach their duties by including company stock in a defined contribution plan or by allowing high allocations to company stock. *DiFelice*, 497 F.3d at 424–25; *Tatum*, 761 F.3d at 356–57 (noting that the duty of prudence does "not prohibit a plan trustee from holding single-stock investments . . . in a plan that includes a portfolio of diversified funds"). The Court will grant summary judgment on Count IV to the extent it is based on a high allocation of Plan assets to the Common Stock fund.[19]

### c. Incorrect Market Information

The plaintiffs contend that the defendants breached their fiduciary duties when they provided Plan participants with incorrect information on the market returns for the Common Stock fund as compared with the BB&T stock. *See* Doc. 327 at 29–30. The defendants maintain that the plaintiffs have offered no theory or evidence for how the Plan suffered a loss based on this theory. Doc. 332 at 12.

---

[19] The defendants also assert that this theory goes beyond the scope of the complaint. The Court need not address this contention as it is granting summary judgement on the merits.

At oral argument, the plaintiffs conceded that they do not have evidence of loss. Doc. 366 at 28 (Mr. Doles: "I will acknowledge that we can't show a loss at this time."). Moreover, this claim was not specifically asserted in the complaint and the defendants were not provided fair notice of this potential ground for liability. *See, e.g., Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 512 (2002) (stating that complaint must "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests"); *Cloaninger ex rel. Estate of Cloaninger v. McDevitt*, 555 F.3d 324, 336 (4th Cir. 2009) ("A plaintiff may not raise new claims after discovery has begun without amending his complaint."); *Barclay White Skanska, Inc. v. Battelle Mem'l Inst.*, 262 F. App'x 556, 563–64 (4th Cir. 2008) (finding that the plaintiffs' claim was not within the scope of the complaint because the complaint did not give fair notice of it to the defendants).

Summary judgment in favor of the defendants will be granted as to Count IV.

**5. Count V**

The defendants' summary judgment briefing does not address this claim except to assert their statute of limitation defenses. This claim will proceed to the extent it is based on acts or omission that occurred after September 4, 2009. *See supra* Analysis, Section I.

**B. Prohibited transaction claims: counts VI and VII**

Subject to several exemptions, ERISA prohibits certain transactions between fiduciaries and other entities that give rise to an inherent concern of self-dealing and conflicts of interest. There are two forms of prohibited transactions at issue here.

ERISA section 406(a) prohibits transactions between a plan and "parties in interest." 29 U.S.C. § 1106(a) (West, Westlaw through P.L. 115-185). "Parties in

interest" include plan fiduciaries, persons or entities that provide services to the plan, and subsidiaries of the foregoing. *Id.* § 1002(14) (West, Westlaw through P.L. 115-185). Section 406(b) prohibits a plan fiduciary from dealing with plan assets in his own interest, engaging in a transaction with the plan on behalf of parties whose interests are adverse to the plan, and receiving consideration from a party in connection with a transaction involving plan assets. *Id.* § 1106(b).

Such transactions are exempt from the definition of a prohibited transaction, however, if they are: (1) a "reasonable arrangement[] with a party in interest for . . . services necessary for the establishment or operation of the plan" when "no more than reasonable compensation is paid," *id.* § 1108(b)(2) (West, Westlaw through P.L. 115-185); or (2) if the transaction meets the requirements of Department of Labor Prohibited Transaction Exemption 77-3, which requires among other things that "all other dealings between the plan and the investment company, the investment adviser or principal underwriter for the investment company, or any affiliated person of such investment adviser or principal underwriter, are on a basis no less favorable to the plan than such dealings are with other shareholders of the investment company." *See* 42 Fed. Reg. 18734-18735 (Apr. 8, 1977) (PTE 77-3(d)).

The plaintiffs contend that the defendants committed prohibited transactions in violation of both § 406(a) (Count VI) and § 406(b) (Count VII) when they (1) caused the plan to use RIS as a recordkeeper, and (2) included Sterling mutual funds as investment options in the Plan. Doc. 88 at ¶¶ 171, 173, 176; Doc. 327 at 33–34. The defendants

assert that they have offered undisputed facts in support of the application of the § 408(b)(2) and the PTE 77-3 exemptions.

The defendants bear the burden of establishing an exemption to a prohibited transaction. *See Elmore v. Cone Mills Corp.*, 23 F.3d 855, 864 (4th Cir. 1994) ("[The defendant] bears the burden of proving the transaction was . . . in compliance with § 408(e)."); *see also Braden v. Wal–Mart Stores, Inc.*, 588 F.3d 585, 600–02 (8th Cir. 2009) (finding burden on defendants to establish exemption for prohibited transaction); *Howard v. Shay*, 100 F.3d 1484, 1488 (9th Cir. 1996), *cert. denied*, 520 U.S. 1237 (1997) (same); *In re Unisys Sav. Plan Litig.*, 74 F.3d 420, 446 (3d Cir. 1996) (applying affirmative defense argument to another ERISA exemption); *Lowen v. Tower Asset Mgmt., Inc.*, 829 F.2d 1209, 1215 (2d Cir. 1987) (placing burden on defendants to prove prohibited transaction exemptions).

### 1. Fees related to the use of RIS

The defendants maintain that using RIS for recordkeeping services is not a prohibited transaction because it is a reasonable arrangement under § 408(b)(2). Doc. 322 at 27–28. The plaintiffs agree that recordkeeping is a necessary service for the Plan, Doc. 88 at ¶ 45, and it is undisputed that BB&T, not the Plan, absorbs the full cost of the recordkeeping.

To the extent that these claims are based on recordkeeping fees that BB&T paid to RIS on behalf of the Plan, the motion will be granted. The arrangement was reasonable as a matter of law because RIS was providing a necessary service to the Plan at no cost to

the Plan. *See supra* Analysis, Section II.A.1 (Count I discussion). A fee for necessary services that is zero cannot be unreasonable.

To the extent that these claims are based on RIS's failure to rebate to the Plan some or all of the fees that Sterling paid to RIS, the motion will be denied for the same reason that the Court is denying summary judgment on Count I.

### 2. Inclusion of proprietary funds

The defendants maintain that including proprietary funds in the Plan is not a prohibited transaction because the manner in which these funds were included meets the requirements of PTE 77-3.

To the extent these claims are based on the failure to investigate and obtain rebates from RIS, the motion will be denied for the same reasons stated as to Count I.

To the extent the plaintiffs are asserting that the PTE 77-3 exemption is not applicable based on the defendants' failure to offer to the Plan the separate accounts offered to the Defined Benefit Plan, the motion will be granted. The evidence is undisputed that separate accounts are not the same thing as mutual funds, *see* Doc. 328-35 at 19 (providing some evidence that the proprietary mutual funds had different administrative transparency and reporting as compared to separate accounts); *see also* n.17. While the plaintiffs have offered evidence that the separate accounts had the same investment manager as the proprietary funds in the Plan and that the separate accounts were designed to mimic the proprietary fund investments, Doc. 328-39 at 3, 20–21, 49, there is no evidence that the separate accounts offered to the Defined Benefit Plan were identical to the mutual funds offered to the Plan.

Because the evidence establishes that the separate accounts and the proprietary funds are not the same investment, there is no evidence that the same investment option was offered on different, less favorable terms to the Plan than to other investors. *See Moreno v. Deutsche Bank Americas Holding Corp.*, No. 15 Civ. 9936, 2018 WL 2727880, *6 (S.D.N.Y June 6, 2018) ("[T]he explicit language of PTE 77-3, [] requires at least equally favorable terms only with other shareholders in the [investment company, i.e.] mutual fund, but not investors in similar but distinct investments."). The defendants have presented undisputed evidence that the PTE 77-3 exemption applies to this aspect of plaintiffs' prohibited transaction claim, and summary judgment will be granted.

## C. Count VIII

The defendants' summary judgment briefing does not address this claim except to assert their statute of limitation defenses. This claim will proceed to the extent it is based on acts or omission that occurred after September 4, 2009. *See supra* Analysis, Section I.

## OTHER MATTERS

The Court will strike paragraphs 79 to 105 of the Declaration of Troy A. Doles proffered by the plaintiffs. Doc. 328. These paragraphs are not factual or evidentiary in nature, but provide argument responding to the defendants' supporting factual affidavits. If it was important, such argument should have been included in the plaintiffs' responsive brief and had it been so included the brief would have exceeded the Local Rule's 6,250 word limit. L.R.7.3(d). Future attempts to circumvent the Local Rules will likewise be stricken. *See* Doc. 6 at ¶ 1.

The Court has dealt with the arguments the defendants have made and has not gone beyond them. Specifically, if the defendants did not challenge a particular aspect of a claim, the Court has not evaluated that aspect of the claim, much less attempted to test the evidence or legal theory supporting it. By denying summary judgment as to some claims, the Court expresses no opinion as to whether the plaintiffs will prevail at trial.

It is **ORDERED** that:

1. The BB&T defendants' motion for summary judgment, Doc, 277, is

   **GRANTED in part and DENIED in part** as stated herein; and

2. Paragraphs 79 to 105 of Document 328 are **STRICKEN**.

This the 26th day of June, 2018.

_____
UNITED STATES DISTRICT JUDGE